UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CITIGROUP INC.,

                    Plaintiff,

          -against-

ABU DHABI INVESTMENT
AUTHORITY,

                    Defendant.

Case No. _____

**FILED UNDER SEAL**

**MEMORANDUM OF LAW IN SUPPORT OF THE
MOTION OF CITIGROUP INC. FOR A PRELIMINARY INJUNCTION**

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000

*Attorneys for Plaintiff Citigroup Inc.*

**TABLE OF CONTENTS**

**Pages**

TABLE OF AUTHORITIES ........................................................................................... iii

PRELIMINARY STATEMENT ..................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ...................................................... 4

    A.    This Court Has Entered a Final Judgment in This Matter. ......................... 4

    B.    This Court's Final Judgment Confirmed an Award Based on a Full and Fair Arbitration Concerning ADIA's November 2007 Investment in Citigroup. ................................................................................ 4

    C.    The Judgment, and the Award It Confirmed, Arose from ADIA's November 2007 Investment in Citigroup. .................................................. 5

    D.    ADIA Initiated the Arbitration Underlying the Award and Final Judgment in December 2009, Asserting Causes of Action Against Citigroup That Related to Events Both Before and After the Parties' November 2007 Investment Agreement Was Signed. ................. 6

    E.    During the Arbitration, ADIA Was Focused on Events After the Investment Agreement Was Signed and Even After the Arbitration Was Filed. ................................................................................................. 7

    F.    In the Arbitration, ADIA Sought Damages Relating to the Decline in Value of Its Citigroup Investment Through At Least the End of 2010. .......................................................................................................... 8

    G.    The Tribunal Rejected Each of ADIA's Claims, Including Its Claims as to Events Following ADIA's November 2007 Investment in Citigroup and Citigroup's Supposed Obligation To Safeguard ADIA's Investment Returns. ................................................. 9

    H.    ADIA Now Purports To Bring a Second Arbitration Concerning the Same Matter, Its 2007 Investment in Citigroup, Asserting Claims It Could Have Brought or Did Bring in the First Arbitration and Seeking the Same Remedies As Before. ........................................... 10

ARGUMENT ............................................................................................................... 12

I.    THIS COURT'S FINAL JUDGMENT BARS ADIA'S ATTEMPT TO LITIGATE CLAIMS IT COULD HAVE OR DID BRING IN THE FIRST ARBITRATION. ................................................................................................ 12

    A.    ADIA's "New" Claims Are Barred Because ADIA Could Have Brought Them in the First Arbitration. ................................................... 13

          1.    ADIA's "New" Claims Arise out of the Same Transaction As Did the First Arbitration. ....................................................... 13

**Page**

        2.    ADIA's "New" Claims Are Based upon Facts ADIA Knew During the First Arbitration. .......................................................... 14

   B.    ADIA's "New" Claims Are Barred Because Those Claims Were in Fact Actually Brought in Significant Part in the First Arbitration. ........... 18

   C.    ADIA's "New" Claims Are Barred Because ADIA Seeks the Same Remedies and Damages in the New Arbitration That It Sought in the First Arbitration. ................................................................................. 19

II.   A PRELIMINARY INJUNCTION IS WARRANTED. ...................................... 21

   A.    Citigroup Is Likely To Succeed on the Merits of Its Claim. .................... 21

   B.    Citigroup Will Face Irreparable Harm If a New Arbitration Proceeds. ................................................................................................ 23

   C.    The Balance of Hardships Weighs in Citigroup's Favor. ......................... 24

CONCLUSION .......................................................................................................................... 24

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*In re Am. Exp. Fin. Advisors Sec. Litig.*,
    672 F.3d 113 (2d Cir. 2011) ...................................................................22

*Burmah Oil Tankers, Ltd.* v. *Trisun Tankers, Ltd.*,
    687 F. Supp. 897 (S.D.N.Y. 1988) ..........................................................22

*Citigroup Global Mkts., Inc.* v. *VCG Special Opportunities Master Fund Ltd.*,
    598 F.3d 30 (2d Cir. 2010) .....................................................................21

*Evangelical Alliance Mission/Nihon Domei Kirisuto Kyodan* v. *Lockman
    Found.*,
    No. 95 Civ. 7214 (SHS), 1995 WL 688958 (S.D.N.Y. Nov. 21, 1995).....................22

*Federated Dep't Stores, Inc.* v. *Moitie*,
    452 U.S. 394 (1981)................................................................................12

*Frost* v. *Bankers Commercial Corp.*,
    11 F.R.D. 195 (S.D.N.Y. 1951) ...............................................................18

*Fulani* v. *MacKay*,
    No. 06 Civ. 3747 (GBD), 2007 WL 959308 (S.D.N.Y. Mar. 29, 2007) ....................13

*Jock* v. *Sterling Jewelers, Inc.*,
    No. 08 Civ. 2875(JSR), 2010 WL 5158617 (S.D.N.Y. Dec. 10, 2010) .....................21

*John Hancock Mut. Life Ins. Co.* v. *Olick*,
    151 F.3d 132 (3d Cir. 1999) ...................................................................22

*John St. Leasehold, LLC* v. *Capital Mgmt. Res., L.P.*,
    154 F. Supp. 2d 527 (S.D.N.Y. 2001) .......................................................18

*Karaha Bodas Co., L.L.C.* v. *Perusahaan Pertambangan Minyak Dan Gas
    Bumi Negara*,
    500 F.3d 111 (2d Cir. 2007) ...................................................................21

*Md. Cas. Co.* v. *Realty Advisory Bd. on Labor Relations*,
    107 F.3d 979 (2d Cir. 1997) ...................................................................23

*Merrill Lynch Inv. Managers* v. *Optibase, Ltd.*,
    337 F.3d 125 (2d Cir. 2003) ...................................................................23

**Page(s)**

*Norris* v. *Grosvenor Mktg. Ltd.*,
    803 F.2d 1281 (2d Cir. 1986) ................................................................22

*In re Painewebber Ltd. P'ships Litig.*,
    No. 94 CIV. 8547SHS, 1996 WL 374162 (S.D.N.Y. July 1, 1996)...........................22

*Pike* v. *Freeman*,
    266 F.3d 78 (2d Cir. 2001) ..........................................................12, 13

*Pricaspian Dev. Corp. (Tex.)* v. *Royal Dutch Shell, plc*,
    No. 08 Civ. 9726, 2009 WL 1564110 (S.D.N.Y. June 3, 2009)...............................17

*Rolex Watch U.S.A., Inc.* v. *City Styles 313, LLC*,
    No. 12 Civ. 4754(AJN), 2012 WL 5992102 (S.D.N.Y. Nov. 29, 2012) ....................23

*Santana Prods., Inc.* v. *Sylvester & Assocs., Ltd.*,
    279 F. App'x 42 (2d Cir. 2008) .......................................................13

*Sure-Snap Corp.* v. *State St. Bank & Trust Co.*,
    948 F.2d 869 (2d Cir. 1991) .........................................................19

*Tellium, Inc.* v. *Corning Inc.*,
    No. 03 Civ. 8487(NRB), 2004 WL 307238 (S.D.N.Y. Feb. 13, 2004) ....................23

*Theatre Row Phase II Assocs.* v. *H & I Inc.*,
    443 B.R. 592 (S.D.N.Y. 2011) .......................................................12

*U.S. Fire Ins. Co.* v. *Nat'l Gypsum Co.*,
    101 F.3d 813 (2d Cir. 1996) .........................................................22

*UBS Secs., LLC* v. *Voegeli*,
    405 F. App'x 550 (2d Cir. 2011) .....................................................23

*Waldman* v. *Vill. of Kiryas Joel*,
    207 F.3d 105 (2d Cir. 2000) ......................................................13, 17

*In re Y & A Grp. Sec. Litig.*,
    38 F.3d 380 (8th Cir. 1994) .........................................................22

**Page(s)**

## STATUTES

9 U.S.C. § 13................................................................................................................4, 21

9 U.S.C. § 207.................................................................................................................21

9 U.S.C. § 208...................................................................................................................4

9 U.S.C. § 213.................................................................................................................21

28 U.S.C. § 1651...............................................................................................................1

## OTHER AUTHORITIES

Fed. R. Civ. P. 65..............................................................................................................1

ICDR Rules Art. IV.....................................................................................................7, 17

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, the All Writs Act (28 U.S.C. § 1651), the Federal Arbitration Act, and Section 5.6(a) of the Investment Agreement between Plaintiff Citigroup Inc. ("Citigroup") and Defendant Abu Dhabi Investment Authority ("ADIA"), Citigroup submits this memorandum of law in support of its Motion for a Preliminary Injunction to enjoin ADIA from relitigating an arbitration it has already lost, in defiance of this Court's final judgment.

## PRELIMINARY STATEMENT

A party, once it has litigated a matter and lost in a fair hearing, is not entitled to a "do-over."   In the face of a final judgment, losing parties may not level against their former adversaries new theories that could have been asserted previously but, for whatever reasons, were not.   And they may certainly not file their defeated claims yet again, no matter how those claims may be repackaged.

But this is precisely what ADIA attempts here in defiance of a final judgment of this Court.

In December 2009, ADIA filed an arbitration (the "First Arbitration") asserting claims arising out of a November 2007 transaction in which ADIA invested $7.5 billion in Citigroup. The gravamen of ADIA's case was the meritless contention that Citigroup had duped ADIA into investing and that, *inter alia*, when the value of Citigroup stock fell, violated purportedly implicit contractual protections by giving preferential treatment to other investors.

Frustrated that it had made a bad bet at the beginning of a financial crisis, ADIA asked a distinguished panel of arbitrators to rescind the investment contract between the parties or award more than $4 billion in damages based upon the fall in the value of its investment.   During the massive arbitration that followed, ADIA had a full opportunity to address every grievance it had

with Citigroup arising out of that transaction.  After a year of discovery and a four-week hearing, the Tribunal issued a unanimous, 84-page opinion that flatly rejected all of ADIA's claims.

ADIA then asked this Court to vacate the award.  But after full briefing and extensive oral argument, this Court denied ADIA's petition and entered a final judgment confirming the award.  Under federal law, that judgment has the same force and effect as any other judgment of this Court.

Yet ADIA, unwilling to abide by this Court's final judgment, is not done making arbitration claims.  Even as it presses an appeal of this Court's judgment, ADIA purports suddenly to realize, years after the events in question, that it has still more claims to arbitrate arising out of its November 2007 contract with Citigroup.  That realization appears to have occurred only after this Court rejected ADIA's efforts to prevent entry of final judgment in this matter.

This time, ADIA alleges that Citigroup somehow breached obligations during the life of the contract by failing to take all reasonable actions to maintain Citigroup's stock price in the financial crisis.  ADIA demands damages for the decline in the value of its investment.

But under basic principles of *res judicata*, this Court's judgment confirming the award in the First Arbitration precludes ADIA from bringing claims that it could have litigated, and in fact did litigate, in that arbitration.  The reasons are as follows:

- ADIA's claims in the new arbitration could have been raised in the First Arbitration because the "new" claims arise out of the same transaction as did the old claims, and the underlying facts of its "new" claims were well-known to ADIA so it could easily have asserted them in the First Arbitration.  Indeed, ADIA advanced many of the

facts underlying its "new" claims during that arbitration as core to its theory of the case.

- ADIA in fact asserted its "new" claims, in large measure, in the First Arbitration in connection with its ill-fated claim for breach of the implied covenant of good faith and fair dealing. In that claim, ADIA contended that, by its post-investment misconduct, Citigroup damaged the value of ADIA's investment. That claim is in no way materially different from claims that ADIA now purports to bring, again asserting breaches of supposed obligations that purportedly damaged the value of ADIA's investment.

- ADIA is seeking the same remedies and damages today that it sought in the First Arbitration. In both cases, ADIA has asked for rescission of the investment contract or damages for losses arising from the drop in the value of ADIA's investment.

Against the doctrine of *res judicata*, and this Court's final judgment, assertion of ADIA's "new" claims is indefensible.

This Court should issue a preliminary injunction to stay ADIA's pursuit of the new arbitration while this Court resolves Citigroup's claim for a permanent injunction. Citigroup has met all of the requirements for such interim relief. It is likely to succeed on the merits here because ADIA's "new" claims are plainly foreclosed by this Court's judgment. And Citigroup will face irreparable harm if the arbitration is allowed to proceed, including being forced to arbitrate claims that are barred and to pay the likely non-recoverable costs associated with the new arbitration. In contrast, ADIA, which waited as long as four years after filing the First Arbitration to assert its "new" claims, will suffer no prejudice from a short delay.

ADIA's new arbitration was conceived in defiance of this Court's final judgment. It should be enjoined.

## FACTUAL AND PROCEDURAL BACKGROUND

**A.      This Court Has Entered a Final Judgment in This Matter.**

There is a final judgment in this matter.

On January 11, 2012, ADIA filed a petition to vacate the award from the First Arbitration in New York State court. Citigroup removed the matter to this Court and cross-moved for confirmation of the award. On November 8, 2012, this Court heard nearly a full day of oral argument on those petitions. The record before the Court of more than a thousand pages included the critical documents in the case, including the 84-page decision written by the Tribunal. (Ex. A.)[1] On March 4, 2013, this Court confirmed the award. (Ex. C.)

On March 5, 2013, the Clerk of this Court entered final judgment on the award in favor of Citigroup. (Ex. B.)

Under the Federal Arbitration Act ("FAA"), that judgment has "the same force and effect, in all respects" as "a judgment in an action" and "may be enforced as if it had been rendered in an action in the court in which it is entered." 9 U.S.C. § 13; *see id.* § 208 (Section 13 applies to international arbitrations).

ADIA filed a notice of appeal, and its appeal is pending before the Second Circuit.

**B.      This Court's Final Judgment Confirmed an Award Based on a Full and Fair Arbitration Concerning ADIA's November 2007 Investment in Citigroup.**

This Court's judgment confirmed an arbitral award rendered after an exhaustive 18-month arbitral proceeding overseen by three prominent arbitrators. This First Arbitration, which

---

[1]      All references to "Ex. __" refer to exhibits to the Declaration of Leslie Gordon Fagen, dated August 27, 2013 and filed in support of this motion.

has now withstood "careful review" by this Court, was a model of fairness and due process in which ADIA had every opportunity to develop and prove its case.  (*See* Ex. C at 10.)

During the arbitration, the parties engaged in wide-ranging discovery.  Citigroup produced more than 550,000 pages of documents from files of 32 custodians, in response to 56 different document requests.  The Tribunal itself noted that the scope of discovery went "beyond what [it understood] generally to be the international norm."  (Ex. B at 5.)

The Tribunal also entertained significant briefing and motion practice, including motions to compel discovery, a motion for summary judgment, a motion to apply the law of the United Arab Emirates, motions to preclude expert testimony, motions *in limine*, and pre-hearing briefs.

And then, in May 2011, the parties conducted a 16-day hearing, which included testimony from 24 witnesses—many of whom were Citigroup's most senior executives—as well as almost 6,000 exhibits.

### C.     The Judgment, and the Award It Confirmed, Arose from ADIA's November 2007 Investment in Citigroup.

The arbitration record, upon which the award and this Court's final judgment are based, arose from ADIA's November 2007 investment in Citigroup.  On November 26, 2007, ADIA and Citigroup executed a contract pursuant to which ADIA invested $7.5 billion in Citigroup (the "Investment Agreement").  (Ex. D.)  The Investment Agreement, and certain other ancillary agreements, provided that ADIA would pay Citigroup $7.5 billion in exchange for securities that were to be converted into Citigroup common stock on four dates between March 2010 and September 2011.  (*Id.*)  The contract also established that ADIA's securities would be converted into Citigroup stock at a price between $31.83 and $37.24 per share, depending on the prevailing market price at the time of conversion.  (*Id.* § 4.3)

The Investment Agreement, intensely negotiated at arm's-length over the course of several days by the parties and their attorneys, includes more than ten pages of representations, warranties, and covenants.  It also includes an "Adjustment" provision that had the effect of lowering the price at which ADIA would convert its securities into common stock—thereby increasing the number of shares ADIA would receive—if, as ultimately happened here, Citigroup issued more than a specified amount of stock in the first year after the Agreement was signed. (*Id.*)

> **D.    ADIA Initiated the Arbitration Underlying the Award and Final Judgment in December 2009, Asserting Causes of Action Against Citigroup That Related to Events Both Before and After the Parties' November 2007 Investment Agreement Was Signed.**

On December 15, 2009, two years after it had signed the Investment Agreement, ADIA filed a Statement of Claim with the International Centre for Dispute Resolution (the "ICDR"). ADIA asserted five causes of action arising out of its November 2007 investment:  common law and securities fraud, negligent misrepresentation, breach of fiduciary duty, breach of contract, and breach of the implied covenant of good faith and fair dealing.

Essentially, ADIA complained that Citigroup had misrepresented facts during the negotiations that led to the investment and then failed to treat ADIA in good faith thereafter.  As ADIA later characterized its basic theory to this Court in contesting the arbitrator's final award, Citigroup's conduct "diluted ADIA's investment in Citigroup, drove down Citigroup's stock price, and harmed ADIA."  (Ex. E at 2 (reply).)

In particular, in its claim for breach of the implied covenant of good faith and fair dealing, ADIA complained of Citigroup's "issuance of tens of billions of dollars in preferred shares [to other investors] and the conversion of those shares to common stock at a conversion rate that is far preferable to, and dilutive of, ADIA's conversion rate, depriving ADIA of the

central purpose of its investment." (*Id.* at p. 16; *see id.* ¶ 52 (Citi "further diluted and devalued ADIA's investment [in 2009] by converting other investors who invested both before and after ADIA at a substantial premium while refusing to do the same for ADIA.").)  In other words, ADIA complained that Citigroup had allowed other investors to convert their securities into Citigroup common stock at a per-share price that was lower than the price ADIA had to pay under the Investment Agreement, thereby diluting the value of ADIA's investment.

ADIA sought rescission of the Investment Agreement or, in the alternative, more than $4 billion in damages.[2]

### E.   During the Arbitration, ADIA Was Focused on Events After the Investment Agreement Was Signed and Even After the Arbitration Was Filed.

During the arbitration, the Tribunal and the parties spent enormous time and energy in litigating events relating to Citigroup that occurred *after* the Investment Agreement was signed and, indeed, even *after* the arbitration was initiated.  Such events were key to ADIA's theory of the case and damages claims.  And those events, part and parcel of the financial crisis that began in late 2007, were of course well-publicized and fully known to ADIA as it monitored its multi-billion dollar Citigroup investment.

During discovery in the First Arbitration, ADIA sought extensive evidence concerning post-investment events.  For example, ADIA's request for the production of documents, filed in July 2010, sought numerous categories of documents that show ADIA's comprehensive

---

[2]   The ICDR Rules permitted ADIA to "amend or supplement its claim" at any point "[d]uring the arbitration" unless "the tribunal consider[ed] it inappropriate" to do so.  ICDR Rules Art. IV.  ADIA had ample opportunity to amend its claims.  Discovery did not close until late 2010.  And, ADIA did effectively amend its breach-of-contract claim in *January 2011*—after discovery had closed—when it announced that it would seek damages for the February 25, 2008 disclosure that Citigroup would consolidate certain hedge funds, an action that is not addressed in ADIA's Statement of Claim.  (*See* Ex. G ¶¶ 134-141 (Unni report).)  At no point during the arbitration did ADIA complain that it had been denied the opportunity to amend its claims.

understanding of Citigroup's challenges during the financial crisis and actions taken to address those challenges, including documents concerning several specific instances in which Citigroup raised capital in 2008 (Ex. F at 12), and documents about "Citi's conversion of securities in 2009" (*id.* at 27-28).

At the hearing, ADIA elicited a substantial amount of testimony from its witnesses about Citigroup's conversion of securities held by other investors into common stock.  In fact, one of its principal witnesses and senior executives, Khalil Foulathi, submitted a witness statement in advance of the hearing, in which he testified almost exclusively about that issue, discussing events from 2008 and 2009 in detail.  (Ex. H at 5-10.)  ADIA also cross-examined Citigroup's Chief Executive Officer about the decision to convert the securities of other investors into Citigroup common stock in February 2009 and the effect that conversion had on ADIA.  (Ex. I Tr. 5224:22-5226:13.)   ADIA addressed other post-2007 events as well, for example cross-examining Citigroup's former Chief Financial Officer about securities fraud lawsuits "that involve Citi's disclosures with respect to its subprime loss exposure," including lawsuits filed after ADIA signed the investment agreement.  (*Id.* Tr. 2395:4-2396:13.)

### F.    In the Arbitration, ADIA Sought Damages Relating to the Decline in Value of Its Citigroup Investment Through At Least the End of 2010.

ADIA sought damages in the First Arbitration through at least December 31, 2010.  (*E.g.*, Ex. G at ¶¶ 52-62 (Unni report).)  ADIA's damages claim rested, in significant part, on the decline in the value of ADIA's investment in Citigroup.

In its Statement of Claim, ADIA contended that "the considerable losses . . . that Citi had represented it would not be exposed to have eroded Citi's value causing its stock price to plummet," thereby "forc[ing]" ADIA to "pay $31.83 for Citi shares that are now trading for less than $4 per share."  (Ex. J ¶¶ 53-54.)  And, during the arbitration, ADIA estimated its damages

by comparing its actual rate of return to the return it supposedly would have gotten through at least December 2010 had it decided to invest on the same terms as did the other investors, whose securities were later converted to Citigroup common stock at lower prices than were available to ADIA under the terms of its contract.  (*Id.*; Ex. G ¶ 42.)

### G.  The Tribunal Rejected Each of ADIA's Claims, Including Its Claims as to Events Following ADIA's November 2007 Investment in Citigroup and Citigroup's Supposed Obligation To Safeguard ADIA's Investment Returns.

In October 2011, the Tribunal issued a detailed, 84-page award that rejected each of ADIA's claims and alternative requests for relief, ultimately finding that each claim and requested remedy was either flawed as a matter of law, unsupported by the evidence, or both.[3]

As to ADIA's claim for breach of the implied covenant of good faith and fair dealing, the Tribunal rejected ADIA's position that Citigroup was somehow obligated to safeguard the "central purpose" of ADIA's investment.  (*See* Ex. A at 2.)  ADIA had alleged that Citigroup had violated such an obligation by issuing billions of dollars in securities to other investors and then allowing those other investors to convert their securities to Citigroup common stock "at a conversion rate that is far preferable to, and dilutive of, ADIA's conversion rate."  (*Id.*)  But the Tribunal held that the Investment Agreement "contains no Citigroup obligation to offer to ADIA terms identical or even similar to those that it might offer to later investors."  (Ex. K at 4.)  Instead, the Agreement "explicitly deals with ADIA's rights and Citigroup's obligations with regard to future investments" in a single clause that "sets out detailed anti-dilution protection to which ADIA would be entitled if Citigroup were to issue certain other securities."  (*Id.*)

---

[3]   The Tribunal granted Citigroup's motion for summary judgment on ADIA's claim for breach of the implied covenant of good faith and fair dealing in February 2011.  (Ex. K.)  The Tribunal's written ruling on that claim was incorporated into its October 2011 Award.  (Ex. A at 2 (Award).)

The Tribunal rejected ADIA's claim for breach of fiduciary duty on similar grounds. ADIA had argued that "Citigroup breached its fiduciary duty by refusing to convert ADIA's securities on terms similar to those voluntarily extended to preferred shareholders in January 2009." (Ex. A at 47.)  ADIA's claim essentially rested on an assertion that Citigroup should have given ADIA "terms identical or even similar to those that [Citigroup] might offer to later investors" (*id.* at 47-48), but the Tribunal held that ADIA could not reasonably have expected such terms because they "were inconsistent with the Agreement."

After determining that Citigroup was not liable to ADIA on any of its causes of action, the Tribunal also rejected ADIA's claim for rescission because "ADIA could not – two years after learning the facts relevant to its Claims and after the receipt of billions of dollars in dividends – obtain rescission" of the Investment Agreement.  (Ex. A at 53.)

**H.     ADIA Now Purports To Bring a Second Arbitration Concerning the Same Matter, Its 2007 Investment in Citigroup, Asserting Claims It Could Have Brought or Did Bring in the First Arbitration and Seeking the Same Remedies As Before.**

On August 20, 2013, ADIA purported to commence a new arbitration related to its November 2007 investment in Citigroup.  The Notice of Arbitration (the "Notice") asserts claims for breach of contract and breach of the implied covenant of good faith and fair dealing.  (Ex. L.) As to the former, ADIA alleges that, between November 2007 and the last conversion of ADIA's securities in September 2011, Citigroup breached Section 3.1 of the Investment Agreement, which provides:

> Commercially Reasonable Efforts. (a) Subject to the terms and conditions of this Agreement, each of the parties hereto agrees to use its commercially reasonable efforts in good faith to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or desirable, or advisable under applicable laws, so as to permit consummation of the transactions contemplated hereby as promptly as practicable and otherwise to enable consummation of the transactions contemplated hereby and shall cooperate fully with the other parties hereto to that end . . .

ADIA contends that Citigroup undertook certain unidentified actions that allegedly "caused Citi's stock price ultimately to sink to a level much lower than that of its peers . . . and then languish at a low level during the entire stock purchase transactions period," thereby "prevent[ing]" ADIA "from obtaining the mutually contemplated benefits of its bargain" and "substantially defeat[ing]" the "purpose of the stock purchase transactions."[4]  Put simply, ADIA appears to fault Citigroup for failing to preserve the value of its stock price and therefore the rate of return to which ADIA considered itself entitled on its investment.

ADIA's "new" claims for breach of the implied covenant advance exactly the same argument that ADIA advanced unsuccessfully in the First Arbitration.  Namely, ADIA contends that "the implied covenant required that Citi not perform any act or omission that was not in good faith and/or failed to meet the standard of 'fair dealing' to an extent that would negatively impact the investment returns to ADIA contemplated by the parties through the consummation of the stock purchase transactions."  Citigroup allegedly broke that covenant by "acts and/or omissions that were not in good faith and/or did not meet the industry standard of 'fair dealing,'" causing "the purpose of the stock purchase transactions contemplated by the parties to be substantially defeated."  (Ex. L ¶¶ 27-28.)

This time, ADIA seeks $2 billion in damages for each of its claims or, alternatively, rescission of the stock purchase agreements "by ordering Citi to return or reissue the [convertible securities] to ADIA, and the issuance of an order setting a new conversion period/procedure that would eliminate or minimize the adverse impact of Citigroup's breaches on ADIA's investment

---

[4]   The Notice does not identify a single, specific improper action on the part of Citigroup.  Instead, ADIA refers cryptically to "acts and omissions that ultimately became the basis of legal actions filed against Citi, as well as other actions and business decisions to promote other objectives which disregarded and adversely impacted ADIA's anticipated investment returns from the stock purchase transactions."  (Ex. L ¶ 21.)

returns from the stock purchase transactions." (*Id.* at p. 15.)   Once again, ADIA repeats contentions made in the First Arbitration.

It cannot be disputed that the facts supporting ADIA's "new" claim arise from the same transaction as the one at issue in the First Arbitration.  It cannot be disputed that ADIA's "new" claim seeks essentially the same relief that ADIA sought in the First Arbitration.  Yet the Notice falsely asserts that "ADIA's claims in this arbitration and the facts on which they are based are separate from, independent of, and materially different from, the claims made by ADIA in the first arbitration."   It cannot be disputed that that the First Arbitration focused on conduct and events that occurred well after November 2007.  Yet the Notice falsely asserts that "the first arbitration was based on Citi's misrepresentation during negotiations which induced ADIA to enter into agreements," but "this arbitration is based on Citi's breaches and conduct during the period from when the agreements were signed up to the final, mandated stock purchase transaction." (*Id.* ¶ 15.)   Finally, the Notice nowhere suggests that the facts underlying the "new" claims were unknown to ADIA in December 2009, when it brought the First Arbitration.

## ARGUMENT

## I.   THIS COURT'S FINAL JUDGMENT BARS ADIA'S ATTEMPT TO LITIGATE CLAIMS IT COULD HAVE OR DID BRING IN THE FIRST ARBITRATION.

A final judgment, such as the judgment this Court entered in March, bars relitigation of claims that could have been asserted, as well as claims that actually were asserted in the previous action.  *Theatre Row Phase II Assocs.* v. *H & I Inc.*, 443 B.R. 592, 598 (S.D.N.Y. 2011) (Daniels, J.); *accord, e.g.*, *Federated Dep't Stores, Inc.* v. *Moitie*, 452 U.S. 394, 398 (1981) ("A final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action."); *Pike* v. *Freeman*, 266 F.3d 78, 90-91

& n.14 (2d Cir. 2001) ("were, or could have been, raised"); *Waldman* v. *Vill. of Kiryas Joel*, 207 F.3d 105, 108 (2d Cir. 2000) ("were or should have been adjudicated").

ADIA now asserts claims that could have been, and in significant measure were, brought in the First Arbitration. Those claims are therefore barred by this Court's final judgment.[5]

### A.   ADIA's "New" Claims Are Barred Because ADIA Could Have Brought Them in the First Arbitration.

#### 1.   *ADIA's "New" Claims Arise out of the Same Transaction As Did the First Arbitration.*

There is no question that ADIA's "new" claims arise from the same transaction as did its old claims. In considering whether a claim could have been raised in the first proceeding, courts analyze "whether the same transaction or connected series of transactions is at issue," including whether the underlying facts are related, the old and new claims "form a convenient trial unit," and the treatment of the claims as a single unit "conforms to the parties' expectations." *E.g.*, *Pike*, 266 F.3d at 91 (quoting Restatement (Second) of Judgments §24(b)); *accord Fulani* v. *MacKay*, No. 06 Civ. 3747 (GBD), 2007 WL 959308, at *5 (S.D.N.Y. Mar. 29, 2007) (Daniels, J.).

Here, both sets of claims indisputably concern the $7.5 billion investment in Citigroup in November 2007 that ADIA challenged in the First Arbitration. ADIA does not deny this— indeed, the Notice confirms that fact. (*See* Ex. L at p. 1 (ADIA "brings this arbitration . . . in connection with certain transactions between ADIA and Citi that were agreed to in November 2007").) ADIA's "new" claims also involve breaches of the same Investment Agreement and

---

[5]   In addition, to the extent that the Tribunal resolved certain issues during the arbitration—for example, as discussed below, the fact that ADIA was not entitled to seek rescission of the Investment Agreement, or that the Agreement did not impose on Citigroup a general obligation to safeguard or guarantee the rate of return for ADIA's investment—the doctrine of issue preclusion prevents ADIA from relitigating those issues here. *See, e.g.*, *Santana Prods., Inc.* v. *Sylvester & Assocs., Ltd.*, 279 F. App'x 42, 44 (2d Cir. 2008).

the purported implied covenant at issue in the First Arbitration, and by the same actors involved in the First Arbitration.

Nor is there any doubt that the old and "new" claims would have formed a "convenient trial unit" and should have been tried together during the massive, multi-year arbitration proceeding that ADIA initiated in late 2009 and that addressed the events underlying both sets of claims. Having scoured Citigroup's files and examined Citigroup's most senior executives at trial in 2011, ADIA was fully positioned to address all of its claims concerning Citigroup's alleged misconduct during the First Arbitration. Moreover, Citigroup "expected," as any reasonable litigant would have, that ADIA would raise all of its grievances arising out of its November 2007 investment during that arbitration. That expectation is especially reasonable given the broad sweep of the conduct addressed in, and the enormity of, that proceeding. It is also evident from the breadth of the First Arbitration—including the scope of ADIA's claims, the discovery it sought, the remedies it demanded, and the case it presented at the hearing—that ADIA intended to litigate all of its legitimate grievances during that proceeding.

2. *ADIA's "New" Claims Are Based upon Facts ADIA Knew During the First Arbitration.*

The events upon which ADIA bases its "new" claims were well known by December 2009, when ADIA commenced the First Arbitration, as well as during the pre-hearing stages of the arbitration. *First*, ADIA alleges that Citigroup's misconduct "caused Citi's stock price ultimately to sink to a level much lower than that of its peers in the financial industry during the financial crisis, and then languish at a low level during the entire stock purchase transaction period." (*Id.* ¶ 21.) But there is no doubt that, as of December 2009, when ADIA initiated the First Arbitration, Citigroup's stock price was barely ten percent of what it had been in November 2007 and that ADIA was fully focused on that fact. For example, the Statement of Claim in the

First Arbitration alleges that "ADIA is now forced to pay $31.83 for Citi shares that are now trading for less than $4 per share." (Ex. J ¶ 54.) Nor is ADIA pointing to some other drop in the price of Citigroup stock. As the Notice itself points out, Citigroup's stock fell and then "languish[ed]" at a low level through September 2011.[6] (Ex. L ¶ 21.) Thus the 2007−2009 drop is clearly the drop addressed in the Notice.

*Second*, all of Citigroup's allegedly improper actions upon which ADIA bases the second arbitration were known to ADIA when it filed the First Arbitration. ADIA points to two categories of conduct: "acts and omissions that ultimately became the basis of legal actions filed against Citi" and "other actions and business decisions to promote other objectives which disregarded and adversely impacted ADIA's anticipated investment returns." (*Id.*) The first category plainly refers to the litigations filed against Citigroup starting in late 2007 based upon what ADIA itself describes as the "financial crisis." (*Id.*) But those litigations were disclosed to investors, including ADIA, beginning in the third quarter of 2007, and the significant suits against Citigroup concerning the financial crisis had been filed by December 2009, the date ADIA started the First Arbitration. In fact, during the hearing, ADIA even cross-examined Citigroup's former Chief Financial Officer about securities fraud lawsuits "that involve Citi's disclosures with respect to its subprime loss exposure." (Ex. I Tr. 2395:4-2396:13.)[7]

The second category—disregard of ADIA's investment returns in order to promote other business objectives—refers to Citigroup's efforts to raise capital from post-November 2007 investors and Citigroup's allegedly more favorable treatment of those subsequent investors. But

---

[6]   Although Citigroup's stock price fell from $30.70 in November 2007 to $3.70 in December 2009, the price did not decline significantly after that, trading between approximately $2 and $4 through September 2011.

[7]   Not surprisingly, ADIA has not bothered to identify a single relevant litigation against Citigroup that began after December 2009. If ADIA had any in mind, it doubtless would have identified them.

those actions were also well known to ADIA by December 2009.  Indeed, Citigroup's treatment of other investors relative to ADIA was a fixation of ADIA's even *before* the First Arbitration. ADIA employees communicated frequently with Citigroup management in 2008 and 2009, particularly about this issue of conversions.  (*See* Ex. A at 50-51 (Award).)  Moreover, ADIA's old claim for breach of the implied covenant is premised upon Citigroup's "conversion of [shares issued to other investors] to common stock at a conversion rate that is far preferable to, and dilutive of, ADIA's conversion rate."  (Ex. J at p. 16.)  ADIA was so focused on this post-investment conduct that it even devoted a discovery request solely to documents concerning what ADIA characterized as Citigroup's "decision to exclude ADIA from the conversion of its investment in Citi at the $3.25 conversion rate" given other investors.  (Ex. F at 28.)  ADIA has pointed to no post-December 2009 actions or omissions that purportedly "promoted" other business objectives at the expense of ADIA's investment.

ADIA has feebly attempted to distinguish the supposed focus of the First Arbitration ("misrepresentations during negotiations") and the supposed focus of the second arbitration ("breaches and conduct during the period from when the agreements were signed" through September 2011).  (Ex. L ¶ 15.)  In reality, and as the record before the arbitrators and this Court showed, every stage of the First Arbitration involved events that occurred well after November 2007, the date the parties entered into the Investment Agreement.  For example, ADIA's Statement of Claim invoked post-2007 events, including Citigroup's efforts to raise capital and its conversion of securities held by other investors into common stock in 2009.  And, during discovery, ADIA sought documents concerning post-investment events, including events in 2009.  During the hearing, ADIA continued to focus on post-investment events, presenting

testimony from multiple witnesses about Citigroup's conduct in 2008 and 2009, and seeking damages through 2010. *See supra* page 7.

And even if, contrary to fact, some evidence upon which ADIA now relies had been unavailable in December 2009, that would still not entitle ADIA to relitigate its claims because such evidence would constitute "nothing more than additional instances of what was previously asserted." *Pricaspian Dev. Corp. (Tex.)* v. *Royal Dutch Shell, plc*, No. 08 Civ. 9726, 2009 WL 1564110, at *12 (S.D.N.Y. June 3, 2009) (Cote, J.); *see Waldman* v. *Vill. of Kiryas Joel*, 207 F.3d 105, 113 (2d Cir. 2000) (*res judicata* barred claim where "it is simply not plausible to characterize [plaintiff's new] claim as one based in any significant way upon the post-[filing] facts"). Here, the very breadth of ADIA's "new" claims indicates that the conduct at issue in the new arbitration is bound up with, and flows from, the conduct at issue in the First Arbitration.

Nor has ADIA explained why it did not amend its claims once the arbitration had begun in order to address conduct after December 2009. ADIA could have done so under the generous rules governing amendments during the First Arbitration. *See* ICDR Rules Art. IV (permitting amendments). Indeed, ADIA *did* effectively amend its breach-of-contract claim in the First Arbitration by seeking damages for the February 25, 2008 disclosure that Citigroup would consolidate certain hedge funds, an action that is not addressed at all in ADIA's Statement of Claim. (Ex. G ¶¶ 132-134.)

That ADIA never asserted its "new" claims in the First Arbitration, although it knew the underlying facts and had every opportunity to allege these causes of action, demonstrates that its efforts to initiate a new arbitration, after final judgment was entered in March 2013, are purely tactical and designed to evade this Court's final adjudication.

**B.     ADIA's "New" Claims Are Barred Because Those Claims Were in Fact Actually Brought in Significant Part in the First Arbitration.**

Not only could ADIA have brought its "new" claims in the First Arbitration, it did.  A significant part of ADIA's "new" claims was asserted and litigated in that proceeding.

In particular, ADIA's old and "new" claims for breach of the implied covenant of good faith and fair dealing are identical in all material respects.  The "new" claim alleges that Citigroup took certain improper actions after signing the Investment Agreement, including actions that "disregarded" ADIA's investment and "negatively impact[ed] the investment returns to ADIA contemplated by the parties" for the transaction.  (Ex. L ¶¶ 21, 27.)  Likewise, the old claim alleged that Citigroup raised more capital and treated later investors more favorably than it treated ADIA, "depriving ADIA of the central purpose of its investment."  (Ex. J at p. 16.)

And the relief sought in the "new" claim—an order for a "new conversion period/procedure"—plainly refers to the same actions that Citigroup took concerning other investors that were at issue in ADIA's old claim, further confirming that the claims in both cases are the same.  (Ex. L ¶ 30.)  ADIA may now describe its "new" claim using slightly different words than it used previously.  But a party may not "avoid the effects of res judicata by repackaging an adjudicated claim in new legal theories to bring a second claim when the facts essential to the second claim were present at the time of the adjudicated claim."  *E.g.*, *John St. Leasehold, LLC* v. *Capital Mgmt. Res., L.P.*, 154 F. Supp. 2d 527, 538 (S.D.N.Y. 2001) (Koeltl, J.); *see Frost* v. *Bankers Commercial Corp.*, 11 F.R.D. 195, 195-96 (S.D.N.Y. 1951) (plaintiff cannot "escape the effect of" *res judicata* "by clothing the claim in different garb").

The Tribunal squarely rejected ADIA's implied covenant claim.  It held that Citigroup's obligations concerning ADIA's expected return on its investment were addressed solely by a provision in the contract that effectively increased ADIA's rate of return if Citigroup took certain

actions that tended to dilute the value of the investment, and not elsewhere in the Investment Agreement or in any implied obligation.  (Ex. K; *see id.* at 4 ("[T]he implied covenant cannot be used to create independent obligations beyond the contract.").)  Thus the Tribunal has already effectively rejected ADIA's "new" claim that an implied covenant obligates Citigroup generally to protect the "central purpose" of ADIA's investment.

Further, ADIA's "new" claim for breach of the implied covenant is materially the same as its "new" claim for breach of contract.  Both allege a violation of a supposed duty to protect the return on ADIA's investment.  The breach of contract claim is therefore also foreclosed by this Court's final judgment confirming the award in the First Arbitration.  ADIA's attempt to dress up the same, tired claim with different names does not change the fact that it has already and unsuccessfully litigated the claim.  *Cf., e.g.*, *Sure-Snap Corp.* v. *State St. Bank & Trust Co.*, 948 F.2d 869, 875 (2d Cir. 1991) ("[a] party may not avoid the preclusive [e]ffect of res judicata by asserting a new theory or a different remedy").

### C.   ADIA's "New" Claims Are Barred Because ADIA Seeks the Same Remedies and Damages in the New Arbitration That It Sought in the First Arbitration.

The remedies and damages sought by ADIA have not changed.  Indeed, it seeks the same relief in its new arbitration as it pursued unsuccessfully in the First Arbitration.  There, ADIA sought rescission of the Investment Agreement and damages equal to the diminution in the value of its investment in Citigroup caused by the drop in Citigroup's stock price.  Now, it repeats its demand.

In the First Arbitration, ADIA claimed $4 billion in damages through at least December 2010.  (Ex. J at p. 17; Ex. G ¶¶ 52-62.)  ADIA now seeks at least $2 billion in damages over a similar time period.  Both the old and new allegations focus on decreases in the value of ADIA's investment caused by changes in Citigroup's stock price.  In the First Arbitration, ADIA alleged

19

that Citigroup's actions made ADIA's investment "worth far less than it had bargained for" and that ADIA was "forced to pay $31.83 for Citi shares that are now trading for less than $4 per share." (Ex. J ¶¶ 50, 54.)  Indeed, ADIA told this Court in its effort to prevent the entry of final judgment that the thrust of the First Arbitration was the claim that Citigroup's actions "diluted ADIA's investment in Citigroup, drove down Citigroup's stock price, and harmed ADIA." (Ex. E at 2 (reply).)  Similarly, ADIA now alleges that Citigroup prevented it from "obtaining the mutually contemplated benefits of its bargain" and that it was harmed by "having to make its stock purchases at a preset price and time when the market value of Citi's stock had been significantly and uniquely depressed by Citi's acts and omissions . . . ." (Ex. L ¶ 23.)  There is simply no material difference between the injuries that ADIA seeks to remedy in the two proceedings.

Also, in each proceeding, ADIA has asked for rescission of the Investment Agreement. (Ex. J at p. 17; Ex. L at p. 14.)  Although ADIA has tried to disguise that similarity by claiming now to seek rescission of the "Stock Purchase Agreement and Stock Purchase Contract" (Ex. L at p. 14), rather than rescission of the entire Investment Agreement, the relief is the same:  ADIA wants to trade the deal it did make for a deal that, with the benefit of hindsight, it wishes it had made instead.  This is just another example of how ADIA is trying now to secure exactly what it sought—and was denied—during the First Arbitration.

The Tribunal, in its award confirmed by this Court's final judgment, categorically rejected ADIA's contention that it was entitled to rescission.  The Tribunal explained that "ADIA could not – two years after learning the facts relevant to its Claims and after the receipt of billions of dollars in dividends – obtain rescission" of that agreement.  (Ex. A at 53.).  Those arbitral and judicial determinations indisputably foreclose ADIA's new litigation efforts.

## II.     A PRELIMINARY INJUNCTION IS WARRANTED.

Citigroup is entitled to an order preliminarily enjoining ADIA's efforts to circumvent this Court's judgment.  A party seeking a preliminary injunction must show "either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief," as well as "irreparable harm."  *Citigroup Global Mkts., Inc.* v. *VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).  The standard is fully met here.

### A.     Citigroup Is Likely To Succeed on the Merits of Its Claim.

Citigroup is likely to succeed on the merits of its claim because this Court's final judgment forecloses ADIA's "new" claims, and ADIA's efforts therefore infringe upon that judgment.  Alternatively, Citigroup has at the very least raised sufficiently serious questions going to the merits to make them a fair ground for litigation.

ADIA's efforts under the case law must clearly be enjoined:  This Court's judgment has the "same force and effect, in all respects" as a "judgment in an action" and "may be enforced as if it had been rendered in an action."  9 U.S.C. § 13; *see id.* §§ 207, 213.  Enforcement of a judgment necessarily includes the power to prevent relitigation of matters resolved by the judgment. *See, e.g.*, *Karaha Bodas Co., L.L.C.* v. *Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 500 F.3d 111, 129 (2d Cir. 2007) ("[F]ederal courts have continuing jurisdiction, grounded in the concepts of *res judicata* and collateral estoppel, to enjoin a party properly before them from relitigating issues in a non-federal forum that were already decided in federal court."); *Jock* v. *Sterling Jewelers, Inc.*, No. 08 Civ. 2875(JSR), 2010 WL 5158617, at *3 (S.D.N.Y. Dec. 10, 2010) ("[A]s a necessary incident to its power to compel arbitration proceedings under § 4 of the FAA, [a court] may preserve the integrity of those proceedings by enjoining later-filed arbitrations that arise out of the same controversy.").

There is good reason for this:  Once a party has been "given [its] opportunity to argue [its] case to the arbitrator," it should not "be given another bite of the cherry."  *Norris* v. *Grosvenor Mktg. Ltd.*, 803 F.2d 1281, 1286 (2d Cir. 1986).  Thus courts have enjoined arbitrations precisely because the proceeding would "relitigate claims that have already been decided."  *In re Painewebber Ltd. P'ships Litig.*, No. 94 CIV. 8547SHS, 1996 WL 374162, at *4 (S.D.N.Y. July 1, 1996); *accord In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 141 n.20 (2d Cir. 2011), *quoting In re Y & A Grp. Sec. Litig.*, 38 F.3d 380, 382 (8th Cir. 1994) ("No matter what, courts have the power to defend their judgments as *res judicata*, including the power to enjoin or stay subsequent arbitrations."); *Evangelical Alliance Mission/Nihon Domei Kirisuto Kyodan* v. *Lockman Found.*, No. 95 Civ. 7214 (SHS), 1995 WL 688958, at *2 (S.D.N.Y. Nov. 21, 1995) ("[T]his Court has the power [to] enjoin arbitration when necessary to avoid relitigation of claims."); *Burmah Oil Tankers, Ltd.* v. *Trisun Tankers, Ltd.*, 687 F. Supp. 897, 901 (S.D.N.Y. 1988) (enjoining arbitral claim that "should have been raised in the original arbitration proceeding"); *see also John Hancock Mut. Life Ins. Co.* v. *Olick*, 151 F.3d 132, 139 (3d Cir. 1999) ("[F]ederal courts must intervene in the arbitration process when faced with res judicata objections stemming from a prior federal judgment.").[8]

---

[8]   Although the Second Circuit has held that the question of whether *res judicata* bars an arbitration must first be decided by the arbitrators, *see U.S. Fire Ins. Co.* v. *Nat'l Gypsum Co.*, 101 F.3d 813 (2d Cir. 1996), that holding does not apply here.  In *U.S. Fire*, the Second Circuit reversed an injunction against a domestic arbitration, which injunction the district court had issued on the ground that a prior declaratory judgment about the contract in dispute had issue-preclusive effect on the new arbitration.  The Second Circuit reasoned that issue preclusion was a merits question that, under the arbitration agreement, had to be resolved by the arbitrators.  *U.S. Fire* thus did not address the question here, whether a second arbitration, arising out of the same transaction and raising claims that were or should have been raised in the first, may proceed in the face of a final federal judgment confirming the award from the first arbitration.

**B.      Citigroup Will Face Irreparable Harm If a New Arbitration Proceeds.**

Citigroup will face significant, irreparable injury if the new arbitration is allowed to proceed.  *First*, it is clear that a party suffers irreparable harm if it is compelled to arbitrate a matter "not properly subject to arbitration."  *Tellium, Inc.* v. *Corning Inc.*, No. 03 Civ. 8487(NRB), 2004 WL 307238, at *3 (S.D.N.Y. Feb. 13, 2004) (Buchwald, J.); *see, e.g.*, *UBS Secs., LLC* v. *Voegeli*, 405 F. App'x 550, 552 (2d Cir. 2011) ("Being forced to arbitrate a claim one did not agree to arbitrate constitutes an irreparable harm for which there is no adequate remedy at law."); *Merrill Lynch Inv. Managers* v. *Optibase, Ltd.*, 337 F.3d 125, 129 (2d Cir. 2003) (irreparable harm where issue was "not arbitrable" and resulting award "would not be enforceable").  Here, ADIA is trying to force Citigroup to arbitrate claims that are foreclosed as a matter of law by this Court's judgment and are therefore not properly the subject of further litigation.

*Second*, if the new arbitration proceeds, Citigroup will incur costs that are likely not recoverable in court.  *Cf. Md. Cas. Co.* v. *Realty Advisory Bd. on Labor Relations*, 107 F.3d 979, 985 (2d Cir. 1997) (irreparable harm arises where "the time and resources [petitioner] would expend in arbitration is not compensable by any monetary award of attorneys' fees or damages pursuant to the provisions of the [parties'] Agreement or the [FAA]").

*Third*, Citigroup will be required to disclose the new multibillion-dollar arbitration and to continue to provide disclosures to investors about material developments relating to it.  It is impossible to predict precisely what effect such public scrutiny will have, but it assuredly will be prejudicial to Citigroup.  *See Rolex Watch U.S.A., Inc.* v. *City Styles 313, LLC*, No. 12 Civ. 4754(AJN), 2012 WL 5992102, at *5 (S.D.N.Y. Nov. 29, 2012) (Nathan, J.) (holding "permanent harm to Plaintiff's reputation cannot be adequately monetized" and issuing injunction).

Thus, this is not a case where the availability of monetary damages precludes a finding of irreparable harm.  Such cases typically involve a breach of a contract or similar claim in which a court waits until the suit is resolved to award monetary damages rather than enjoining the breach at the outset.  Citigroup's injury, by contrast, cannot be remedied if this court waits until the end of this proceeding to resolve the harm because Citigroup is not seeking monetary damages at all.

**C.      The Balance of Hardships Weighs in Citigroup's Favor.**

The balance of hardships tips decidedly in Citigroup's favor on this application.  As we have shown, Citigroup will face significant, irreparable injury here in the absence of an injunction.  In contrast, ADIA will not be prejudiced by any delay arising from this Court's consideration of the issues raised in this motion.  Despite full awareness of the facts, and every opportunity to assert its "new" claims in the First Arbitration, ADIA has waited almost four years since it commenced that arbitration to bring this new proceeding.[9]

## CONCLUSION

For the foregoing reasons, Citigroup respectfully requests that this Court issue an order preliminarily enjoining ADIA from bringing the arbitration described in the Notice and schedule a hearing to address whether ADIA should be permanently enjoined from bringing that arbitration.

---

[9]     To the extent the public interest is implicated in this matter, a preliminary injunction is in the public interest, among other reasons, because it would further public policy concerning the proper arbitration of claims and would impose no burden on the public.

Dated: August 27, 2013
New York, New York

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By:
    Brad S. Karp
    Leslie Gordon Fagen
    Jay Cohen
    Bruce Birenboim
    Daniel J. Toal

1285 Avenue of the Americas
New York, New York 10019-6064
Tel. (212) 373-3000
Fax (212) 757-3980
bkarp@paulweiss.com
lfagen@paulweiss.com
jaycohen@paulweiss.com
bbirenboim@paulweiss.com
dtoal@paulweiss.com

*Attorneys for Plaintiff Citigroup Inc.*

25