UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CITIGROUP INC.,

               Plaintiff,

against

ABU DHABI INVESTMENT AUTHORITY,

               Defendant.

No. 13-cv-6073 (PKC)

---

**OPPOSITION OF DEFENDANT ABU DHABI INVESTMENT AUTHORITY TO
PLAINTIFF CITIGROUP INC.'S MOTION FOR PRELIMINARY INJUNCTION AND
RESPONSE TO MEMORANDUM OF LAW IN SUPPORT THEREOF**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................1

FACTUAL STATEMENT AND ARGUMENT ............................................................2

I.     THE COURT UNQUESTIONABLY LACKS JURISDICTION TO DECIDE
CITI'S RES JUDICATA DEFENSE TO THE ADIA II ARBITRATION .....................2

II.    ADIA I DOES NOT HAVE RES JUDICATA EFFECT ON ADIA II .............................2

     A.    The Claims, Supporting Facts, and Remedies Sought  in ADIA I are
Totally Distinct from Those of ADIA II ...................................................3

          1.    Comparison of the ADIA I and ADIA II Pleadings ...................................3

               (a)    The ADIA I Claim ...................................................3

               (b)    The ADIA II Notice of Arbitration .................................6

          2.    The ADIA I Factual Record .....................................................9

               (a)    Substantive Briefs Filed by ADIA in ADIA I .................9

               (b)    The Tribunal's Limitations on Document Production in
ADIA I .......................................................13

               (c)    The ADIA I Award .................................................14

           3.    The Irrelevant Evidence Cited by Citi in Support of its Res
Judicata Defense .................................................16

          4.    Conclusion .........................................................19

     B.    Applicable Legal Authority Establishes that ADIA I Does Not and Cannot
have a Res Judicata Impact on ADIA II ...............................................20

          1.    The Res Judicata Standard under Federal and New York Law ................20

          2.    Citi Has Not Come Close to Establishing a Res Judicata Defense
on the Merits .......................................................24

          3.    ADIA Could Not Have Brought  Its ADIA II Claims in ADIA I .............30

     C.    The Cases Cited by Citi in Support of its Motion on the Merits are All Off
Point .................................................................33

CONCLUSION..................................................................................................................34

**Cases**

*Alali v. DeBara,*
   07-CV-2916(CS), 2008 WL 4700431 (S.D.N.Y. Oct. 24, 2008) ..........................................24

*Bey v. City of New York,*
   99 CIV. 3873 LMM RLE, 2010 WL 3910231 (S.D.N.Y. Sept. 21, 2010).............................23

*BNP Paribas Mortgage Corp. v. Bank of Am., N.A.,*
   10 CIV. 8630 RWS, 2011 WL 3847376 (S.D.N.Y. Aug. 30, 2011) ....................................22

*Curtis v. Citibank, N.A.,*
   226 F.3d 133 (2d Cir. 2000)..............................................................................22, 24, 31

*Fulani v. Mackay,*
   No. 06 Civ. 3747 (GBD), 2007 WL 959308 (S.D.N.Y. Mar. 29, 2007) ...............................33

*Greenwich Life Settlements, Inc. v. ViaSource Funding Grp., LLC,*
   742 F. Supp. 2d 446 (S.D.N.Y. 2010)....................................................................21

*John Street Leasehold, LLC v. Capital Mgmt. Res. L.P.,*
   154 F. Supp. 2d 527 (S.D.N.Y. 2001)....................................................................33

*Jordan v. Verizon Corp.,*
   08 CIV. 6414, 2008 WL 5209989 (S.D.N.Y. Dec. 10, 2008) ...............................................22

*Legnani v. Alitalia Linee Aeree Italiane, S.p.A.,*
   400 F.3d 139 (2d Cir. 2005)................................................................................23

*Maharaj v. Bankamerica Corp.,*
   128 F.3d 94 (2d Cir. 1997).............................................................................22, 31

*Mahmood v. Research in Motion Ltd.,*
   905 F. Supp. 2d 498 (S.D.N.Y. 2012)....................................................................20

*Male v. Tops Markets, LLC,*
   354 F. App'x 514 (2d Cir. 2009) ......................................................................23, 30

*Merry Realty Co. v. Shamokin & Hollis Real Estate Co.,*
   230 N.Y. 316 (N.Y. App. 1921) ...........................................................................27

*Monahan v. New York City Dep't of Corr.,*
   214 F.3d 275 (2d Cir. 2000)................................................................................20

*PI, Inc. v. Quality Products, Inc.,*
   907 F. Supp. 752 (S.D.N.Y. 1995) .......................................................................26

*Pike v. Freeman,*
   266 F.3d 78 (2d Cir. 2001)...........................................................20, 21, 26, 30

*Pricaspian Dev. Co. v. Royal Dutch Shell, plc*,
    No. 08 Civ. 9726, 2009 WL 1564110 (S.D.N.Y., June 3, 2009)............................................33

*S.E.C. v. First Jersey Sec., Inc.*,
    101 F.3d 1450 (2d Cir. 1996)..................................................................21, 23, 24

*Storey v. Cello Holdings, L.L.C.*,
    347 F.3d 370 (2d Cir. 2003)........................................................................22, 30

*Sure-Snap Corp. v. State St. Bank & Trust Co.*,
    948 F.2d 869 (2d. Cir. 1991)................................................................................33

*Theatre Row Phase II Assocs. v. H & I Inc.*,
    443 B.R. 592 (S.D.N.Y. 2011)..............................................................................33

*Waldman v. Vill. of Kiryas Joel*,
    207 F.3d 105 (2d Cir. 2000).................................................................................33

## **Other Authorities**

Restatement (Third) of the U.S. Law of International Commercial Arbitration
    § 4.9, cmt. g (Tentative Draft No. 2, April 16, 2012).............................................30

## PRELIMINARY STATEMENT

The most surprising aspect of Citigroup's ("Citi" or "Citigroup") motion for a preliminary injunction is its utter disregard of a fatal jurisdictional flaw that renders the motion and Citi's complaint entirely moot. As shown herein and in ADIA's recently-filed motions to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), and to compel arbitration of Citi's res judicata defense, the Federal Arbitration Act ("FAA") requires, and Second Circuit authority *directly on point* along with a line of supporting case law emphatically confirm, that the power to decide a res judicata defense to an arbitration claim that falls within the parties' arbitration agreement—as ADIA's current arbitration claim ("ADIA II") concededly does—is vested *exclusively* with the arbitrators, not the court.

Even if the Court disregards controlling authority and improperly examines Citi's defense on the merits, it fails. At least three principles of res judicata law established by Second Circuit and New York case law compel this result. *First*, case law recognizes that, virtually by definition, breach of contract claims (as set forth in ADIA II)—which can only be based on facts arising during the life of the contract—are separate and distinct from fraud in the inducement claims (as set forth in ADIA's first arbitration against Citi ("ADIA I"))—which must be based on facts arising *before* the contract is signed and takes effect. *Second*, where, as here, breach of contract claims are based on facts that arose after a prior arbitration was filed, there can be no res judicata impact from the prior arbitration; moreover, a party has no legal obligation to amend its earlier claims by adding new claims based on later-arising facts. *Third*, a res judicata defense requires Citi to prove that the claims, supporting facts, and remedies in the two arbitrations are part of the "same factual grouping" and form a "convenient trial unit." Citi has not and cannot come close to meeting this standard. As shown below, the claims, supporting facts, and remedies in ADIA I and ADIA II are materially different in every respect.

For these same reasons, Citi's preliminary injunction motion also does not satisfy the required elements of a reasonable probability of success on the merits and irreparable harm. Moreover, the motion's fatal jurisdiction flaw prevents it from even leaving the starting blocks. The motion should be denied, and Citi's entire action dismissed with prejudice, pursuant to ADIA's recently-filed motions to dismiss and compel arbitration.

## FACTUAL STATEMENT AND ARGUMENT

### I. THE COURT UNQUESTIONABLY LACKS JURISDICTION TO DECIDE CITI'S RES JUDICATA DEFENSE TO THE ADIA II ARBITRATION

ADIA's jurisdictional argument is fully set forth in its joint Memorandum of Law filed in support of both motions, which ADIA incorporates in full by reference and will only summarize here. (*See* Declaration of Peter Calamari ("Calamari Decl."), Ex. 1.) As the Memorandum shows, because res judicata is defined by the courts as a *legal defense* to an arbitration, the tribunal, not the court, has exclusive jurisdiction to decide it, unless the parties' arbitration clause states otherwise "with positive assurance"—concededly not the case here. Since this fundamental jurisdictional issue impacts Citi's entire action, including its preliminary injunction motion, the Court should decide the jurisdictional issue before reaching the merits of Citi's res judicata argument. A ruling by the Court that it is not empowered to decide Citi's res judicata defense—under the controlling authority cited by ADIA in its previously-filed Memorandum— renders Citi's argument on the merits moot.

### II. ADIA I DOES NOT HAVE RES JUDICATA EFFECT ON ADIA II

Under the applicable res judicata standard (discussed in Section II.B., *infra*), ADIA I has no preclusive effect on ADIA II. ADIA I was a fraud claim, based on allegations of misrepresentations made by Citi during pre-contract negotiations that induced ADIA to enter into an investment agreement. (October 11, 2013 Letter from Peter Calamari to Hon. P. Kevin Castel

("Calamari Letter"), Ex. A (the "Investment Agreement").) ADIA II is a breach of contract claim, supported by allegations of Citi's nonperformance of the agreement after it took effect. Many of the facts essential to proving the ADIA II claims did not arise until after the ADIA I claim was filed in December 2009. Moreover, an analysis of the claims, the facts supporting the claims, and the remedies requested in ADIA I shows that they are entirely separate and distinct from those in ADIA II. In these circumstances, case law and international arbitration principles are clear that res judicata cannot be invoked to bar the ADIA II arbitration.

### A. The Claims, Supporting Facts, and Remedies Sought in ADIA I are Totally Distinct from Those of ADIA II

#### 1. Comparison of the ADIA I and ADIA II Pleadings

The material differences, for res judicata purposes, between ADIA I and ADIA II first become clear from a comparison of claims alleged in the respective arbitration pleadings.

##### (a) The ADIA I Claim

*Basis of claim.* By its express terms, the ADIA I arbitration claim ("ADIA I Claim") was based on three material misrepresentations allegedly made by Citi during the negotiation of the Investment Agreement, which induced ADIA to make the deal. (*See* Calamari Decl., Ex. 2.)

*First*, Citi represented that it would not consolidate substantial losses incurred from its Structured Investment Deals ("SIVs") onto its balance sheet. (Calamari Decl., Ex. 2 at ¶¶ 4, 22–32.)

*Second*, Citi represented that its expected 2007 losses from the deterioration of it sub-prime, asset-backed securities and CDOs would not exceed $9 billion. (Calamari Decl., Ex. 2 at ¶¶ 4, 33–38.)

*Third*, Citi represented that it would need to raise only a specified amount ($5 billion) of "near term future capital" to shore up its troubled financial condition. (Calamari Decl., Ex. 2 at ¶¶ 4, 39–42.)

The ADIA I Claim alleged that ADIA focused its due diligence on these three important issues (Calamari Decl., Ex. 2 at ¶¶ 14–21) and justifiably relied on Citi's representations concerning them as an inducement for entering into the deal (*id.* at ¶¶ 43–49). The ADIA I Claim also asserted that ADIA had relied on Citi's assurances during the negotiation process that the Investment Agreement would create a "partnership" between the parties, thereby creating a special relationship that would allow ADIA to trust Citi to disclose its superior knowledge of its true financial condition in negotiating the deal. (*Id.* at ¶¶ 14, 46.)

The ADIA I Claim further alleged that the falsity of Citi's representations came to light within only weeks of the closing. Within a matter of days after the closing, Citi consolidated its SIV losses onto its balance sheet. (Calamari Decl., Ex 2 at ¶ 5.) Within a month and a half after the closing, Citi announced $18 billion in losses on subprime and CDO assets, at least twice as much as had been represented to ADIA during negotiations. (*Id.*) Finally, within two months of the closing, Citi raised over $25 billion in capital, over five times the amount it said it would need in the short term. (*Id.*)[1] ADIA alleged that had it been aware of these facts during negotiations, it would not have entered into the Investment Agreement. (*Id.* at ¶¶ 37–38, 40, 42.) Thus, ADIA's misrepresentation claim was ripe by the very beginning of the performance period under the Investment Agreement.

---

[1] This was followed by Citi raising even more capital through deals with other shareholders that offered much more favorable conversion rates than those offered to ADIA, which ADIA alleged further established the falsity of Citi's representations concerning its capital needs. (Calamari Decl., Ex. 2 at ¶ 6.)

*Legal claims alleged*.  The ADIA I Statement of Claim raised four discrete claims against Citi based on the above misrepresentations: (1) intentional fraud; (2) negligent misrepresentation; (3) breach of fiduciary duty; and (4) breach of certain representations and warranties in the Investment Agreement.  (Calamari Decl., Ex. 2 at pp. 15–16.)  The breach of fiduciary duty claim was based on allegations of  Citi's acknowledgement during negotiations of a "partnership" relationship with ADIA with regard to the investment, and ADIA claimed this duty was breached by Citi's misrepresentations.  (*Id.* at ¶¶ 14, 46 and p. 15.)  The breach of contract claim was based entirely on specific representations and warranties in the Investment Agreement, which allegedly encompassed Citi's misrepresentation concerning SIV consolidation.  (*Id.* at p. 16.)

The ADIA I Statement of Claim also included a fifth claim for breach of the implied covenant of good faith and fair dealing under the Investment Agreement.  (Calamari Decl., Ex. 2 at p. 16.)  This claim was based solely on Citi's misrepresentations that it would not consolidate its SIV losses onto its balance sheet, and that its capital needs did not exceed $5 billion. (Calamari Decl., Ex. 2 at ¶¶ 51–52 and p. 16.)  The claim alleged that Citi breached the implied covenant under the Investment Agreement by: (a) consolidating the SIV losses onto its balance sheet, which itself increased Citi's needs to obtain capital; and (b) by raising over $60 billion in additional capital  by negotiating deals with other investors that offered more favorable conversion rates than those given to ADIA under the Investment Agreement.  (*Id.* at ¶¶ 39, 51–52.)

*Relief sought*.  The ADIA I Claim alleged that ADIA had suffered injury as a direct result of Citi's misrepresentations, both in terms of a reduction in the value of ADIA's equity interest and Citi's stock price.  (Calamari Decl., Ex. 2 at ¶¶ 53–54.)  Significantly, such damages were

limited to damages incurred *solely* as a result of Citi's misrepresentations. (*Id.*) Accordingly, ADIA sought rescission of the Investment Agreement based on Citi's misrepresentations, or, in the alternative, damages incurred only as a result of Citi's misrepresentations. (*Id.* at ¶ 54 and p. 17.)

### (b)    The ADIA II Notice of Arbitration

The ADIA II Notice of Arbitration ("ADIA II Notice") (Calamari Decl., Ex. 3) differs from the ADIA I Claim in every material respect.

*Basis of claims*. In sharp contrast to the ADIA I Claim, the ADIA II Notice is based on Citi's breaches of the Investment Agreement *after* the close of the deal up to and through the period in which ADIA was mandated to convert its "Equity Units" (issued at the closing date), into Citi common stock—*i.e.*, March 2010 to September 2011. (Calamari Decl., Ex. 3 at ¶¶ 16–18, 22.) Specifically, the ADIA II Notice is based entirely on breaches by Citi of an express covenant of the Investment Agreement, the "Commercially Reasonable Efforts" covenant (Article 3.1), which, by definition, applies only to the performance period of the contract. (*Id.* at ¶ 19; *see also* Calamari Letter, Ex. A at p. 14.) Accordingly, the facts required to prove such breaches relate to an entirely different time period and have an origin completely distinct from Citi's misrepresentations during contract negotiations, which were the sole basis of the ADIA I Claim.

*Legal claims alleged*. The ADIA II Notice contains two specific claims, both sounding in breach of contract.

*First*, the ADIA II Notice alleges a claim for breach of an express covenant of the Investment Agreement related to contract performance by Citi. That covenant, the "Commercially Reasonable Efforts" covenant, required that Citi "use its commercially reasonable efforts in good faith" to enable consummation of the transactions (*i.e.*, the mandatory

6

stock conversions) as contemplated by the parties. (Calamari Decl., Ex. 3 at ¶¶ 19–21.) ADIA claims that Citi breached this covenant by acts and omissions during the contract performance period that were commercially unreasonable and/or in bad faith, adversely impacting Citi's stock price on the mandatory conversion dates. (*Id.* at ¶ 21.) These acts include acts or omissions after 2008 that were the basis of other legal actions filed by third parties against Citi that damaged its stock price, and other actions and business decisions after 2008 to promote other objectives which disregarded and adversely impacted ADIA's reasonably anticipated returns from its investment in Citi. (*Id.* at ¶ 21.)

*Second*, the ADIA II Notice alleges a claim for breach of the implied covenant of good faith and fair dealing, arising out of and consistent with the "Commercially Reasonable Efforts" covenant. In this regard, ADIA alleges that Citi's acts and omissions that breached the covenant also failed to meet the standard of "good faith and fair dealing" of the implied covenant. (*Id.* at ¶¶ 27–30.) This claim is completely different from the breach of implied covenant claim in ADIA I. As explained above, ADIA I's implied covenant claim was based on and described as a further manifestation of Citi's misrepresentations concerning consolidation of the SIVs on its balance sheet and its supposed lack of need to obtain new capital in excess of $5 billion. (Calamari Decl., Ex. 2 at ¶¶ 39, 51–52 and p. 16.) None of these facts are alleged by ADIA as support for the claim for breach of the implied covenant in ADIA II. (*See* Calamari Decl., Ex. 3 at ¶¶ 27–30.) Further, whereas the ADIA II implied covenant claim is tied to an express provision of the Investment Agreement ("Commercially Reasonable Efforts"), the ADIA I claim was not linked to any contract provision. (*See* Calamari Decl., Ex. 2 at p. 16.)

*Relief sought.* The relief sought in ADIA II is also separate and distinct from the relief sought in ADIA I. The damages sought in ADIA I were alleged to have been incurred as a *sole*

*and direct* result of the misrepresentations. (*See* Calamari Decl., Ex. 2 at ¶ 54 and p. 17.)

Further, and as explained below, the dates on which ADIA's primary damages—in the form of

declines in Citi's stock price—were alleged to have occurred from the misrepresentations were

the exact dates on which the facts proving Citi's representations to be false were made public,

within weeks of the closing of the deal. Additional damages relating to the alleged

representations were calculated only up to the end of the second quarter of 2008. In contrast, the

damages pleaded in ADIA II are not based in any way on Citi's misrepresentations during

negotiations and do not encompass the damages incurred in 2008 as a result of such

misrepresentations. Rather, ADIA II seeks contract damages for the diminished value of Citi's

stock price as of the mandatory conversion dates two to three years later—*i.e*, March 15, 2010,

September 15, 2010, March 15, 2011, and September 15, 2011—based on the extent to which

Citi's breaches prevented its stock from recovering to the level of its peers on those dates.

(Calamari Decl., Ex. 3 at ¶¶ 22–23, 28–29.)

The rescission requests in ADIA I and ADIA II are also distinct. The ADIA I Notice

requests rescission of the entire Investment Agreement, based on the traditional fraud-in the-

inducement premise that ADIA would not have entered into the deal had it known Citi's three

critical representations made during negotiations were false. (Calamari Decl., Ex. 2 at ¶¶ 28–30,

38, 42, 46.) In contrast, the ADIA II Notice does not request rescission of the entire deal based

on misrepresentations made during negotiations. Rather, it requests only rescission of the stock

purchase obligation set forth in the Stock Purchase Agreement (an ancillary agreement to the

Investment Agreement (*see* Calamari Decl., Ex. 3 at ¶ 6)) to effectuate a return of ADIA's

"Equity Units," combined with an order setting new conversion dates for the "Equity Units" that

will mitigate ADIA's damages caused by Citi's breaches of contract. (Calamari Decl., Ex. 3 at

pp. 13–14.)  Further, ADIA's limited rescission request is not based on fraud, but on Citi's

breaches of contract, which the ADIA II Notice alleges "caused the purpose of the stock

purchase transactions (*i.e*, the conversions) contemplated by the parties to be substantially

defeated."  (*Id.* at ¶¶ 23, 28.)

## 2. <u>The ADIA I Factual Record</u>

The ADIA I evidentiary record is consistent with its Statement of Claim in every respect

and is different from the ADIA II claims in every way.  The evidence presented by ADIA in

support of its claims in ADIA I is reflected in: (i) ADIA's  pre-hearing and post-hearing briefs;

(ii) discovery orders issued by the tribunal that limited the scope of documents that Citi was

obligated to produce in response to ADIA's document requests; and, most importantly, (iii) the

tribunal's Final Award, which discussed detailed evidence presented in support of each claim.

### (a) <u>Substantive Briefs Filed by ADIA in ADIA I</u>

ADIA submitted briefs that were consistent with, and entirely within the parameters of,

its Statement of Claim.

*ADIA's pre-hearing brief.*  ADIA's pre-hearing brief laid out a summary of the evidence

to be presented at the hearing that focused exclusively on Citi's misrepresentations.  (*See*

Calamari Decl., Ex. 4.)  Evidence pertaining to Citi's representations and related actions during

negotiations of the Investment Agreement was explained under the following topics: (i) Citi's

solicitation of ADIA's investment (*id.* at pp. 3–4); (ii) Citi's pre-contract representation that Q4

2007 subprime losses would be in the range of $9 billion (*id.* at pp. 5–7); (iii) Citi's pre-contract

representation that it would not consolidate SIV losses onto its books (*id.* at pp. 7–9); and (iv)

Citi's pre-contract representation that it did not need to raise more than $12 billion in capital, which included ADIA's $7.5 billion investment (*id.* at pp. 9–11).[2]

The *only* post-closing evidence presented by ADIA in the pre-hearing brief consisted of: (i) facts occurring within weeks of the closing that revealed Citi's pre-closing representations to be false, and ADIA's internal attempts to put these revelation in a positive light (Calamari Decl., Ex. 4 at pp. 16–17); and (ii) post-closing settlement negotiations between the parties (*id.* at pp. 17–19). The only purposes of the settlement negotiation evidence was to underscore ADIA's belief that its "partner" Citi would "make the situation right" regarding its misrepresentations, and to show that these discussions, which continued to October 2009, excused ADIA from strict compliance with the notice provision of the Investment Agreement—*i.e.*, Article 5.1(a), which required ADIA to give notice of its breach of contract claim within nine months of the closing date. (*Id.* at p. 18 and p. 18 fn. 6.)

*ADIA's brief in response to Citi's motion for summary judgment*. On February 11, 2011, Citi brought a summary judgment motion against ADIA in ADIA I, which alleged (among other arguments) that ADIA's claim for breach of the implied covenant of good faith and fair dealing was time-barred and legally deficient. (*See* Calamari Decl., Ex. 5 at p. 26–27.) ADIA's response reaffirmed that its implied covenant claim was purely an outgrowth of its claim that Citi had misrepresented its capital needs during contract negotiations. (*See* Calamari Decl., Ex. 6 at p. 45.) In particular, ADIA argued that both the $20 billion in capital that Citi raised in January 2008 through sales of securities to new investors, and Citi's later decision in February 2009 to

---

[2] ADIA also referenced enforcement actions that the SEC had brought against Citi that were based on the falsity of Citi's public representations concerning its subprime loss exposure during 2007. (Calamari Decl., Ex. 4 at p. 6.) However, although these actions were initiated after 2007, none raised or were related to Citi's conduct post-closing that forms the basis of ADIA II's breach of contract claims, and ADIA does not intend to use these SEC actions to support its ADIA II claims.

allow those investors to convert their securities into stock at rates lower than those which had

been agreed with ADIA was additional  proof of the falsity of Citi's representation that its capital

needs did not exceed $12 billion.  (Calamari Decl., Ex. 6 at pp. 45–49.)  ADIA's argument thus

made clear that the implied covenant claim in ADIA I had nothing to do with Citi's contractual

performance obligation under the "Commercially Reasonable Efforts" covenant (Article 3.l),

which is the basis of the implied covenant claim in ADIA II.  (*See* Calamari Decl., Ex. 3 at ¶¶

27–30.)  On March 31, 2011, the tribunal issued a partial award granting summary judgment on

the implied covenant claim on the grounds that it was legally deficient.  (Calamari Decl., Ex. 7 at

pp. 3–4.)

*ADIA's post-hearing brief.*  Consistent with its pre-hearing brief, ADIA's post-hearing

brief focused exclusively on Citi's pre-contract misrepresentations and the injury ADIA had

incurred as a direct result thereof.  (*See* Calamari Decl., Ex. 8.)  ADIA's lengthy 31-page

Statement of Facts in its post-hearing brief contained a detailed discussion on evidence

introduced at the hearing on the following topics:

(i)     Citi's need to raise capital in 2007 (Calamari Decl., Ex. 8 at pp. 2–4);

(ii)    Citi's solicitations of the Singaporean sovereign wealth fund and of ADIA to make an "anchor" investment regarding Citi's capital raising strategy (*id.* at pp. 4–9);

(iii)   Citi's knowing or reckless misrepresentations of its Q4 2007 subprime losses during contract negotiations (*id.* at pp. 9–21);

(iv)    Citi's knowing or reckless misrepresentation that it would not consolidate the SIVs onto its balance sheet (*id.* at pp. 21–27); and

(v)     Citi's knowing or reckless misrepresentation of its capital needs (*id.* at pp. 27–32).

The bulk of ADIA's post hearing brief was devoted to a discussion of the law and evidence supporting a finding of liability on its misrepresentation claims.[3]

With respect to liability issues, ADIA addressed each claim in detail, as follows:

(i)      Citi's fraudulent inducement of ADIA to enter into the Investment Agreement (Calamari Decl., Ex. 8 at pp. 32–49);

(ii)     Citi's misrepresentations being, at the very least, negligent (*id.* at pp. 50–53);

(iii)    Citi's breach of its fiduciary duty to ADIA, including evidence of a "special relationship" between the parties that gave rise to a fiduciary duty (*id.* at pp. 50–55); and

(iv)    Citi's breach of Section 2.2 (d) (3) of the Investment Agreement, *i.e.*, that Citi's failure to disclose to ADIA that Citi had not performed an analysis required under the FINRA Rules (46R) in November 2007, and that Citi had committed to purchase $10 billion of SIV commercial paper (either of which would have obligated Citi to consolidate the SIVs onto its books), were breaches of Section 2.2(d)(3), which required Citi to disclose any "obligations" to consolidate its SIV liabilities onto its balance sheet. (*Id.* at pp. 55–56) ADIA also argued that its breach of contract claim was timely, since ongoing settlement discussions between the parties had excused ADIA from strict compliance with the notice provision of the Investment Agreement. (*Id.* at 57–58.)

Finally, the post-hearing brief discussed appropriate remedies arising from Citi's misrepresentations to ADIA. With respect to ADIA's claim of rescission (based on the allegation that ADIA never would have entered into the deal had it know Citi's representations were false), the brief cited authorities and evidence to refute Citi's defenses that rescission is improper because of ADIA's unexcused delay in seeking it and ADIA's acceptance of benefits under the Investment Agreement. (Calamari Decl., Ex. 8 at pp. 59–61.) With respect to ADIA's damages claim, the brief cited the expert report and testimony of Sanjay Unni, the only expert who calculated "the actual loss suffered as a result of Citi's misrepresentations." (*Id.* at p. 61.) It explained the two analyses performed by Dr. Unni: (i) a "but for" loss calculation, based on a

---

[3]  Given the tribunal's award of summary judgment on ADIA's claim for breach of the implied covenant of good faith and fair dealing, ADIA did not address that claim in its post-hearing brief.

rate of return that ADIA would have earned by refusing to make the deal with Citi and instead investing $7.5 billion elsewhere; and (ii) an "event study" calculation, in which Dr. Unni calculated loss based on the impact of public revelations establishing the falsity of Citi's representations on Citi's stock price on the specific dates they were made—November 27, 2007, December 12, 2007, and January 15 and 16, 2008. (*Id.* at pp. 61–63.) Dr. Unni also calculated additional losses through Q2 2008 based on "continuing disclosures" to the market of Citi's subprime exposure. (*Id.* at 62.) The only other damages-related subject addressed in the post-closing brief was ADIA's criticism of Citi's expert's views of Dr. Unni's analysis. (*Id.* at 63–65.)

The post-hearing brief makes no mention of evidence concerning Citi's nonperformance of its obligations under the Investment Agreement, or of damages arising therefrom.

### (b)    The Tribunal's Limitations on Document Production in ADIA I

Citi argues that ADIA sought and obtained, through discovery in ADIA I, all the evidence it needed to support the ADIA II contract claims, and so could easily have included such claims in ADIA I. (Pl.'s Mem. at pp. 7–8.) Not so. This assertion is disproven by the ADIA I tribunal's discovery order of August 12, 2010, which was the result of vigorous efforts by Citi to *limit* the scope of document production in ADIA I. (*See* Calamari Decl., Ex. 9.) The August 12 order deals with issues concerning 64 document production requests from ADIA to Citi. (*Id.*, App. A at pp. 1 –15.) Fifty-seven (57) of those requests either asked for documents generated prior to January 31, 2008, or, if they did not, were limited to that date by the tribunal's order. (*See id.*) The obvious basis for this was the tribunal's recognition that, with very few exceptions, all documents relevant to proving ADIA's misrepresentation claims in ADIA I would have been generated by this date. The only exceptions granted by the tribunal to the

January 31, 2008 cut-off date were as to evidence of obvious relevance to Citi's pre-contract representations, including: (i) documents describing any amendment to the Investment Agreement, as to which the tribunal set a cut off date of December 14, 2009 (*id.*, App. at p. 1); (ii) documents on which Citi relied in representing that it had $9 billion in subprime losses for 2007, as to which the tribunal set a cut-off date of November 24, 2008 (*id.*, App. at p. 4); (iii) minutes of meetings of Citi's Board of Directors and Audit and Risk Management Committee discussing the subject matter of Citi's representations, as to which the tribunal set a cut-off date of July 18, 2008 (*id.*, App. at p. 12); (iv) reports provided by Citi to governmental agencies concerning ADIA or the subject matter of Citi's representations, as to which the tribunal set a cut-off date of March 1, 2009 (*id.*, App. at p. 13); and (v) curriculum vitae of potential witnesses in the case, as to which the tribunal set a cut-off date of July 9, 2010 (*id.*, App. at p. 15).

Thus, the August 12 order makes clear that ADIA neither had access to nor obtained through discovery any documents relating to Citi's contract performance of its "Commercially Reasonable Efforts" covenant (Article 3.1). The ADIA I tribunal made it impossible for ADIA to obtain evidence of post-investment breaches of the "Commercially Reasonable Efforts" covenant. Citi cannot now argue that ADIA is thereby precluded from bringing ADIA II because ADIA purportedly had such evidence available to it in ADIA I.

### (c)     The ADIA I Award

The ADIA I tribunal issued its "Award and Statement of Reasons" ("Award") on October 14, 2011, finding in favor of Citi on ADIA's claims. (Calamari Letter, Ex. C.) The Award was wholly consistent with and stayed strictly within the parameters of the evidence and arguments raised by the pleadings and briefings, and introduced at the hearing itself—all of which, as shown above, focused on Citi's pre-contract misrepresentations, and none of which addressed Citi's contract performance.

From a liability perspective, the Award focused exclusively on a detailed analysis of law and evidence pertaining to each of ADIA's misrepresentation claims, as follows:

*Fraud claim.* The Award laid out in detail the legal elements of fraud, along with what the tribunal considered to be key evidence regarding the claim—a non-disclosure agreement, a November 2007 letter from Citi concerning its transparency in its discussions with AIDA, and the Investment Agreement itself. (Calamari Letter, Ex. C at pp. 10–27.) The tribunal analyzed, in great detail, the evidence pertaining to each of Citi's representations, ultimately concluding that ADIA had failed to prove, by "clear and convincing evidence," that such representations were knowingly or recklessly false. (*Id.*) "For the sake of completeness", the tribunal then engaged in an analysis of whether ADIA "actually" or "reasonably" relied on the representations in making the deal, and concluded on both counts that ADIA did not do so. (*Id.* at pp. 27–41.)

*Negligent misrepresentation and negligence claims.* The Award analyzed the negligent misrepresentation claim in the context of the Non-disclosure agreement, holding that it did not fall under the disclaimer for "fraud" and therefore could not be maintained by ADIA. The tribunal also performed an in-depth analysis of the "special relationship" test for a party to maintain a negligent misrepresentation claim, holding that a special relationship between the parties did not exist. (Calamari Letter, Ex. C at 42–47.) For this reason, the tribunal rejected ADIA's negligence claim. (*Id.* at 47.)

*Breach of fiduciary duty claim.* The Award contained a brief analysis of ADIA's breach of fiduciary duty claim, holding that the claim was defeated by the absence of any "special relationship" between the parties. (Calamari Letter, Ex. C at pp. 47–48.)

*Breach of contract claim.* The Award analyzed ADIA's breach of contract claim from two perspectives. *First*, the tribunal addressed the notice requirement for breach of contract

actions under Section 5.1(a) of the Investment Agreement, holding that ADIA failed to give notice within the required nine month period after closing and that ongoing settlement discussions between the parties up to October 2009 did not excuse ADIA from doing so. (Calamari Letter, Ex. C at pp. 48–50.)  The tribunal also analyzed  the claim on its merits, holding that the evidence was insufficient to show that Citi had an obligation under Section 2.2(d)(3) of the Investment Agreement  to consolidate its SIVs on its books that it had failed to reveal to ADIA.  (*Id.* at 51–52.)

Since the Award found no liability against Citi on ADIA's claims, its damages analysis was very brief.  In less than a page, the tribunal found that ADIA's two-year delay and acceptance of benefits under the Investment Agreement barred rescission on grounds of fraud, and that Dr. Unni's "event study"—based on the impact of the misrepresentations on Citi's stock price on discrete dates in early 2008—had produced losses that were overstated and failed to adequately account for other causative factors.  (Calamari Letter, Ex. C at 53.)

Most importantly for this motion, the Award contains *no* analysis of evidence or conclusions regarding Citi's performance of its ongoing obligations (*e.g.*, the "Commercially Reasonable Efforts" covenant in Article 3.1) under the Investment Agreement, or the impact thereof on ADIA.

### 3. The Irrelevant Evidence Cited by Citi in Support of its Res Judicata Defense

Citi's assertion that the evidence presented at the ADIA I arbitration "focused" on the sort of post-closing breaches at issue in the ADIA II arbitration (Pl.'s Mem. at pp. 7–8) crumbles under scrutiny.

Although Citi complains that ADIA elicited a "substantial" amount of testimony from its witnesses about Citigroup's conversion of securities held by other investors into common stock

in 2008 and 2009 (Pl.'s Mem. at p. 8), that entirely misses the point. ADIA's claim in ADIA I for breach of the implied covenant of good faith and fair dealing was based on Citi raising additional capital by unfairly selling convertible securities to other investors in early 2008, and then allowing those investors to convert those securities into Citi stock at prices much lower than those agreed with ADIA. (Calamari Decl., Ex. 2 at ¶¶ 39, 51–52 and p. 16.)

As such, that claim was simply an outgrowth and further manifestation of Citi's *pre-closing* misrepresentation that its capital needs did not exceed $12 billion. (Calamari Decl., Ex. 2 at ¶¶ 39–42.) Excerpts from the witness statement of an advisor to the Managing Director of ADIA were cited by Citi to support its claim that the ADIA I evidence was focused on post-closing breaches. (Pl.'s Mem. at p. 8.) However, proper examination of these excerpts in fact reveal that his statements about the conversion of other stockholders and other post-closing events in 2008 and 2009 were made solely in the context of describing ADIA's efforts to amicably resolve the dispute with Citi arising from Citi's pre-closing misrepresentations, including Citi's false representation about its capital needs. (Declaration of Leslie Gordon Fagen ("Fagen Decl."), Ex. H at ¶¶ 10–29.) That ADIA also cross-examined Citigroup's Chief Executive Officer about the decision *in 2009* to convert other institutional investors who had been allowed to invest in January 2008 on more favorable terms than those offered to ADIA (Fagen Decl., Ex. I at 5224:22–5226:13) is likewise consistent with ADIA's implied covenant claim in ADIA I and has no bearing on the sort of post-closing breaches that ADIA contends in ADIA II to have damaged ADIA in its mandatory conversion of the Upper DECS *in 2010 and beyond*.

The sole additional piece of evidence Citi cites from a 5,275 page hearing transcript to substantiate its claim that the parties spent "enormous time and energy" during the arbitration

litigating post-closing events (*see* Pl.'s Mem. at p. 7) is a one-page excerpt from ADIA's cross-examination of Citi's Chief Financial Officer, in which he was asked whether he was aware of securities fraud lawsuits "that involve Citi's disclosures with respect to its subprime loss exposure" (Fagen Decl., Ex. I at 2395:4–2396:13) and which Citi notes "include[s] lawsuits filed after ADIA signed the investment agreement." (*See* Pl.'s Mem. at p. 8.) This examination was clearly directed to establishing that Citi had misled ADIA into investing by misrepresenting the extent of its subprime exposure. (*See* Calamari Decl., Ex. 2 at ¶¶ 5, 16, 33–38.) Naturally, other investors who had been harmed by Citi's subprime misrepresentations brought lawsuits, and obviously those lawsuits could not have been filed until after revelations of the true extent of Citi's subprime exposures hit the market in the weeks and months after the Investment Agreement was signed.[4]

Citi does not point to a single piece of witness evidence or hearing testimony to suggest that ADIA elicited testimony relating to Citi's post-closing breaches of its obligations to act in good faith and with commercial reasonableness so as to enable the proper and economically feasible conversion of ADIA's Equity Units in 2010 and onwards because it cannot—these

---

[4]  Citi also makes passing reference to the witness statement of ADIA's damages expert, Dr. Sanjay Unni (Pl.'s Mem. at p. 8 (citing Fagen Decl., Ex. G)), but is mistaken in its attempt to argue that Dr. Unni's report suggested that ADIA was seeking damages in *ADIA I* for post-closing breaches. Rather, Dr. Unni's witness statement attempted to asses ADIA's losses from Citi's alleged pre-closing misrepresentations and did not address, much less attempt to quantify, ADIA's losses arising from Citi's post-closing breaches of contract. Specifically, Dr. Unni's quantification of damages consisted primarily of a "but for" test, which calculated what ADIA would have made (and lost) by investing its $7.5 billion elsewhere had it known the truth about Citi's pre-contract misrepresentations. (Fagen Decl., Ex. G ("Expert Report of Sanjay Unni") at ¶¶ 6, 43–47.) To perform that analysis, Dr. Unni simply carried ADIA's 2007 $7.5 billion investment forward to December 2010 at a risk free rate of interest as well as under ADIA's "overall investment approach." (*Id.* at ¶¶ 43–47.) This calculation did not include,  and could not logically have included, any losses result from Citi's post-closing contract breaches. Alternatively, Dr. Unni quantified damages under an event study analysis that attributed declines in Citi's stock price post-closing to revelations of its pre-closing misrepresentations, which by definition excluded loses arising from Citi's post-closing breaches of contract. (*Id.* at ¶ 8.)

claims were nowhere present in ADIA I.  Indeed, had Citi attempted to accurately portray the hearing evidence in ADIA I, it would have been forced to admit that to the extent ADIA's witnesses were examined about post-closing events, that testimony in fact "focused" on how those witnesses discovered Citi's pre-closing misrepresentations only after the agreement was signed; their reaction to learning they had been misled; their efforts to find a business solution with Citigroup that would mitigate ADIA's losses as a result of Citigroup's misrepresentations; and the injury suffered as a consequence of Citi's pre-closing misrepresentations.  This in no way precludes ADIA's assertion of its independent claims of post-closing contract breaches at issue in ADIA II.

## 4.    Conclusion

The above summary proves definitively that ADIA I does not have a res judicata effect on ADIA II under the applicable legal standard, discussed in Section II.B., *infra*.  Every aspect of ADIA I was directed solely to the issues of whether Citi had made misrepresentations that ADIA relied on in agreeing to the deal, and, if so, what ADIA's proper remedy would be.  ADIA I  in no way addressed any facts, legal authority, or analysis—or included any claims—that raised or related to Citi's contractual performance and breaches under the "Commercially Reasonable Efforts" covenant (Article 3.1) of the Investment Agreement, or the impact of such breaches on Citi's stock price at the time ADIA's mandatory conversions took place, *over 2 years* after the closing.  As the legal authorities discussed below show, there can be no preclusive effect of ADIA I on ADIA II in these circumstances.

**B.** **Applicable Legal Authority Establishes that ADIA I Does Not and Cannot have a Res Judicata Impact on ADIA II**

**1.** **The Res Judicata Standard under Federal and New York Law**

In *Pike v. Freeman*, 266 F.3d 78 (2d Cir. 2001), the Second Circuit articulated the general standard for evaluating a res judicata defense:

> To prove that a claim is precluded under this doctrine, a party must show that (1) the previous action involved an adjudication on the merits; (2) the previous action involved the [parties] or those in privity with them; [and] (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action. Whether a claim that was not raised in the previous action could have been raised therein depends in part on whether the same transaction or connected series of transactions is at issue, and whether the same evidence is needed to support both claims. <u>To ascertain whether two actions spring from the same transaction or claim, we look to whether the underlying facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.</u>

*Pike*, 266 F.3d at 91 (emphasis added) (internal quotations and citations omitted).

Whether claims were raised or could have been raised in a prior proceeding "depends in part on [1] whether the same transaction of series of transactions is at issue, [2] whether the same evidence is needed to support both claims, and [3] whether the facts essential to the second were present in the first." *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 285 (2d Cir. 2000) (internal quotations omitted) (numbering added). "[C]ourts must make a pragmatic distinction between, on the one hand, parties who bring multiple suits because <u>different circumstances have caused different legal injuries</u> than those previously litigated, and, on the other hand, parties who seek multiple bites at the apple by splitting claims[.]" *Mahmood v. Research in Motion Ltd.*, 905 F. Supp. 2d 498, 502 (S.D.N.Y. 2012) (emphasis added) (patent suit barred identical claims directed to both the patent and its family). Accordingly, "the fact that both suits involved essentially the same course of wrongful conduct is not decisive; nor is it

dispositive that the two proceedings involved the same parties, similar or overlapping facts, and similar legal issues." *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1463 (2d Cir. 1996) (citations omitted). "The question is not whether the applicable procedural rules permitted assertion of the claim in the first proceeding; rather, the question is whether the claim was sufficiently related to the claims that were asserted in the first proceeding that it should have been asserted in that proceeding." *Pike*, 266 F.3d at 91.[5]

Courts in the Second Circuit have refused to apply res judicata when the factual predicates between two sets of claims differed significantly. In *Pike*, the claimant prevailed in an arbitration on breach-of-contract claims and petitioned for confirmation of the award in New York state court. 266 F.3d at 80–81, 82. The petition was removed to federal court under the FAA. *Id.* at 85. One of the respondents filed a motion to vacate as well as counterclaims for indemnification of the award under an ancillary contract (which did not have an arbitration clause) that it had executed with the claimant. *Id.* at 89–90. The *Pike* Court held that the respondent's indemnification counterclaims were "related in neither time nor origin" to the petitioner's breach-of-contract claims because the contract claims were based on "conduct prior to institution of the arbitration" while the indemnification counterclaims "did not arise until the [arbitral award] was granted." *Id.* at 91–92. Thus, the counterclaims were not barred by res judicata. *Id.* at 92.

In a case particularly similar to this one, the Southern District of New York held that a claim for fraudulent inducement into a contract cannot have res judicata effect on a subsequent

---

[5]   Federal courts have concluded that New York's rules on res judicata are "virtually identical" to the federal rules. *See, e.g.*, *Pike*, 266 F.3d at 91 fn. 14 ("[T]here appears to be no significant difference between New York preclusion law and federal preclusion law."); *Greenwich Life Settlements, Inc. v. ViaSource Funding Grp.*, LLC, 742 F. Supp. 2d 446, 452 (S.D.N.Y. 2010) ("The federal, New York, and New Jersey doctrines of res judicata are virtually identical.").

claim for breach of that contract.  In *Jordan v. Verizon Corp.*, 08 CIV. 6414 (GEL), 2008 WL

5209989 (S.D.N.Y. Dec. 10, 2008), Judge Lynch explained that the plaintiff's prior suit for

fraudulent inducement of a settlement agreement did not bar a subsequent suit for breach of that

agreement because the breach-of-contract claim "state[d] a new claim for relief by alleging that

the settlement agreement is a valid contract."  2008 WL 5209989, at *6–*7 (breach-of-contract

claim had "not yet been litigated and thus [had] not been extinguished").  Other Southern District

opinions have likewise refused to bar claims based on different factual predicates.  *See, e.g.*, *BNP

Paribas Mortgage Corp. v. Bank of Am., N.A.*, 10 CIV. 8630 RWS, 2011 WL 3847376, at *5–*6

(S.D.N.Y. Aug. 30, 2011) (although conversion claim would be dismissed because it was

inadequately pleaded, res judicata did not apply because "the conversion and contract actions

arise from sets of facts that are not co-extensive with each other and which would require

different discovery").

Further, the Second Circuit has held that res judicata cannot apply to bar claims that did

not yet arise at the time the purportedly preclusive suit was filed, "regardless of whether they are

premised on facts representing a continuance of the same 'course of conduct.'"  *Storey v. Cello

Holdings, L.L.C.*, 347 F.3d 370, 383 (2d Cir. 2003).  "Where the facts that have accumulated

after the first action are enough on their own to sustain the second action, the new facts clearly

constitute a new 'claim,' and the second action is not barred by *res judicata.*"  *Id.* at 385; *see also

Maharaj v. Bankamerica Corp.*, 128 F.3d 94, 97 (2d Cir. 1997) ("[A]s a matter of logic, when

the second action concerns a transaction occurring after the commencement of the prior

litigation, claim preclusion generally does not come into play.").  Whether the prior suit could

have been amended to include the after-arising claims is irrelevant.  *Curtis*, 226 F.3d at 139

("The plaintiff has no continuing obligation to file amendments to the complaint to stay abreast

of subsequent events; plaintiff may simply bring a later suit on those later-arising claims."); *see also First Jersey*, 101 F.3d at 1464 ("If a defendant engages in actionable conduct after a lawsuit is commenced, the plaintiff may seek leave to file a supplemental pleading to assert a claim based on the subsequent conduct. But he is not required to do so, and his election not to do so is not penalized by application of res judicata to bar a later suit on that subsequent conduct.") (internal citations omitted).

Accordingly, the Second Circuit and New York district courts have repeatedly refused to apply res judicata to bar a subsequent action where that claim could not have been raised in the previous action because it was predicated on events that occurred after the filing of that action. *See, e.g.*, *Male v. Tops Markets, LLC*, 354 F. App'x 514, 515 (2d Cir. 2009) ("The district court in the instant case erred, however, in determining that Male's Title VII claim was barred . . . Male's complaint indicates that her claim against her former employer for post-termination retaliation sounds in events that transpired after the filing of the complaint in her first action . . . Accordingly, res judicata does not apply to the Title VII claim."); *Legnani v. Alitalia Linee Aeree Italiane, S.p.A.*, 400 F.3d 139, 141 (2d Cir. 2005) ("Here, *res judicata* does not bar Legnani's retaliatory discharge action . . . When Legnani filed her 1995 action, she had not yet been discharged from Alitalia. She could not have brought the retaliatory discharge action at that time and, accordingly, she was free to bring her retaliatory discharge claim in this subsequent action.").

Moreover, the Southern District of New York has held that even where res judicata may operate to bar some claims based on conduct occurring prior to the filing of the previous suit, it may not reach claims predicated on after-arising facts. *See Bey v. City of New York*, 99 CIV. 3873 LMM RLE, 2010 WL 3910231, at *13 (S.D.N.Y. Sept. 21, 2010) (although prior litigation

involved "essentially the same course of allegedly wrongful conduct, the same parties, overlapping facts and similar legal issues," res judicata did not bar some of plaintiffs' claims because "some of the events which form the basis of the Remaining Plaintiffs' current suit occurred subsequent to the date the complaints were filed"); *Alali v. DeBara*, 07-CV-2916(CS), 2008 WL 4700431, at *4 (S.D.N.Y. Oct. 24, 2008) ("Therefore, the Alali I summary judgment order [dismissing retaliation claims] has no res judicata effect on Plaintiff's allegations of retaliatory conduct occurring after the date the Alali I complaint was filed.").

### 2. Citi Has Not Come Close to Establishing a Res Judicata Defense on the Merits

Under the standard established by the above cases, Citi has not come close to proving its res judicata defense. ADIA I is based entirely on pre-contract misrepresentations by Citi that induced ADIA to enter into the Investment Agreement. ADIA II, by contrast, is based on Citi's non-performance of its contractual obligations under that Agreement after it took effect. Material events supporting the ADIA II claims—including, notably, injury to ADIA from the mandatory conversions beginning in March 2010—did not occur until after ADIA I was filed in December 2009. Further, as shown above, the ADIA I record demonstrates that the claims, facts supporting the claims, and remedies sought in ADIA II are completely separate and distinct from the claims, facts, and remedies in ADIA I, and in no way form a "convenient trial unit" with or fall within the "same factual grouping" as ADIA I. The Second Circuit has cautioned that a "court must be careful, when dismissing a second suit between the same parties as duplicative, not to be swayed by a rough resemblance between the two suits without assuring itself that beyond the resemblance already noted, the claims asserted in both suits are also the same." *Curtis v. Citibank, N.A.*, 226 F.3d 133, 136 (2d Cir. 2000); *see also First Jersey*, 101 F.3d at 1463 ("[T]he fact that both suits involved essentially the same course of wrongful conduct is not

decisive; nor is it dispositive that the two proceedings involved the same parties, similar or overlapping facts, and similar legal issues.") (citations omitted).  That warning is particularly apt here.

*Differences between ADIA I and ADIA II claims.*  As shown above, each claim made by ADIA in ADIA I was based on three key misrepresentations that Citi made in pre-contract negotiations, obviously before the Investment Agreement (and ancillary contracts, such as the Stock Purchase Agreement) were signed.  The misrepresentations were expressly set forth and formed the basis of ADIA's fraud, negligent misrepresentation and negligence claims.  (*See* Calamari Decl., Ex. 2 at ¶¶ 4, 22–42 and pp. 15–16.)  In like manner, ADIA's breach of contract action was based on Citi's misrepresentation that it was not going to consolidate the SIVs onto its balance sheet, which ADIA contended violated an express representation and warranty in the Investment Agreement.  (*Id.* at p. 16.)  ADIA's breach of fiduciary duty claim asserted that the special relationship created between ADIA and Citi in connection with the deal had been breached by Citi's  misrepresentations.  (*Id.* at p. 15.)  And ADIA's claim for breach of the implied covenant of good faith and fair dealing on grounds that Citi had raised additional capital by unfairly selling convertible securities to other investors, and then allowed those investors to convert the securities into Citi stock at prices much lower than those agreed with ADIA, was simply an outgrowth and further manifestation of Citi's misrepresentation that its capital needs did not exceed $12 billion.  (*Id.* at p. 16.)

By contrast, ADIA II's breach of contract claims have nothing to do with Citi's pre-contract negotiations or their impact—nor could they.  Rather, the ADIA II claims focus exclusively on Citi's performance of its contract obligations under the "Commercially Reasonable Efforts" covenant (Article 3.1) after the contract was signed, and the impact of those

breaches two to three years down the line, when ADIA exercised its mandatory stock conversions. (Calamari Decl., Ex. 3 at ¶¶ 16–18, 22.) It is black-letter law that breach of contract actions cannot be based on conduct by any party that takes place before the contract is signed and takes effect. *See, e.g.*, *PI, Inc. v. Quality Products, Inc.*, 907 F. Supp. 752, 758 (S.D.N.Y. 1995) ("[A] contract cannot be breached until it exists."). Thus, as *Pike*, 255 F.3d 78, and *Jordan*, 2008 WL 5209989, affirm, there is no way that such claims can rationally be grouped into a "convenient trial unit."

*Differences between ADIA I and ADIA II facts supporting liability.* The facts supporting liability in the ADIA I and ADIA II arbitration do not meet a single one of the elements required by *Pike* and other courts to establish the "same factual grouping" or link the two actions into a single "convenient trial unit."

The <u>time period</u> associated with each set of facts is completely different. ADIA I was based on pre-contract representations by Citi, whereas ADIA II is based on Citi's nonperformance of a covenant (Article 3.1) that obviously did not and could not occur until the Investment Agreement was signed and took effect. The only ADIA I liability facts that overlapped into the contract performance period were: (i) revelations within weeks of the signing of the agreements that proved the falsity of Citi's pre-contract representations; (ii) later manifestations of Citi's misrepresentation concerning its capital needs through conversion deals (in February 2009) made with other investors; and (iii) settlement discussions between the parties that continued to October 2009, which ADIA used solely as grounds for excusing it from strict compliance with the notice requirement of the Investment Agreement pertaining to the ADIA I breach of contract action. (Calamari Decl., Ex. 4 at pp. 16–19 and p. 18 fn. 6.)

Just as obvious, the liability facts in ADIA I and ADIA II have completely distinct origins.  The ADIA I facts originate from Citi's actions before the contract was signed whereas the ADIA II facts derive from Citi's non-performance of a contractual covenant that did not take effect until after signing and continued through the conversion period.

Finally, the motivations related to ADIA I are not the same as the motivations regarding ADIA II.  In ADIA I, Citi's alleged motivation was purely and simply to induce ADIA to make its $7.5 billion investment; ADIA's motivation in bringing ADIA I was to cancel the deal based on the misrepresentations, or, alternatively, obtain compensation for damages flowing directly from such representations.  In ADIA II, Citi's alleged motivation was—after ADIA's investment had been made—to disregard its obligation to behave in a commercially reasonable manner and in good faith to help ensure a reasonable return on that investment as required by the "Commercially Reasonable Efforts" covenant (Article 3.1) in favor of other objectives; ADIA's motivation for bringing ADIA II is to obtain a fair return on its investment from the mandatory conversions.  In sum, there is no rational way that the liability facts of ADIA I and ADIA II form the "same factual grouping" or a "convenient trial unit."

*Differences between ADIA I and ADIA II remedies.*  The relief sought in ADIA I was a direct result of Citi's misrepresentations.  ADIA requested, as primary relief, that the entire deal be rescinded (*see* Calamari Decl., Ex. 2 at p. 17), an accepted  remedy for a fraudulent inducement claim.  *See, e.g., Merry Realty Co. v. Shamokin & Hollis Real Estate Co.*, 230 N.Y. 316, 323 (N.Y. App. 1921) (remedies for fraud include rescission).  ADIA requested damages in the alternative (*see* Calamari Decl., Ex. 2 at p. 17), but based only on: (i) what ADIA could have made if it had not been fraudulently lured into the deal by Citi and invested its $7.5 billion elsewhere; or, in the alternative (ii) the direct impact that Citi's misrepresentations had on Citi's

stock price on the dates the misrepresentations came to light in the financial markets. (Fagen Decl. Ex. G at ¶¶ 6, 8, 43–47.) Accordingly, the damages analysis performed by ADIA's expert (Sanjay Unni) did not extend beyond the second quarter of 2008. By contrast, in ADIA II, ADIA seeks damages based on the failure of Citi's stock to rebound from the financial crisis by the time of ADIA's mandatory conversions in March 2010 to September 2011, due to a pattern of commercially unreasonable conduct that continued up to and during the conversion period. (Calamari Decl., Ex. 3 at ¶¶ 22–23, 28–29.) ADIA also seeks, in the alternative, a distinct rescission-type remedy—not of the entire deal, but only of the Stock Purchase Agreement, which sets the conversion dates and prices, coupled with an order setting new conversion dates under the same conversion formula—to help ADIA mitigate the impact of Citi's contract nonperformance on the stock price at the original conversion dates. (Calamari Decl., Ex. 3 at pp. 13–14.) Further, the full extent of the ADIA II damages could not even have been calculated in the ADIA I arbitration, since, at the very least, the third mandatory conversion date (March 2011) (Calamari Decl., Ex. 3 at ¶ 22) occurred during final hearing preparations—long after expert damages statement had been submitted (*see* Calamari Letter, Ex. C at p. 3)—and the final conversion date (September 2011) (Calamari Decl., Ex. 3 at ¶ 22) did not occur until long after the ADIA I hearing had ended on May 25, 2011 (*see* Calamari Letter, Ex. C at p. 5). There is, in sum, no rational way that the relief requested in ADIA I and ADIA II is identical or even sufficiently related to be part of the "same factual grouping".

*The parties' expectations and business understanding regarding arbitration claims.* Citi appears to argue that the parties' mutual expectations in connection with their deal was that only *one* arbitration dispute under the Investment Agreement—encompassing all possible claims, present and future, of any kind—could be brought against it by ADIA. The stark contrasts

between ADIA I and ADIA II in every respect, as discussed above, themselves prove the irrationality of this bizarre notion.   In addition, the arbitration clause, as well as the basic structure of the deal, clearly belie it.  By its terms, the arbitration clause of the Investment Agreement applies to "any" dispute arising out of or related to the Investment Agreement, clearly reflecting the parties' mutual expectation that there could be multiple arbitrations under the clause.  (*See* Fagen Decl., Ex. D at p. 27.)  Nowhere does the clause, or any other provision of the Investment Agreement, suggest that each party has a "quota" of one arbitration.

The basic structure of the investment is also entirely consistent with this interpretation. The deal between ADIA and Citi is clearly divided into at least two separate parts: (i) the terms of the closing, and obligations of the parties—including express representations and warranties in connection therewith (Fagen Decl., Ex. D at pp. 1–14); and (ii) contract performance obligations (*id.* at pp. 15–24), which include the mandatory stock conversion process under the Stock Purchase Agreement and other ancillary agreements.   Nowhere does the Investment Agreement suggest that disputes arising out of these fundamentally distinct areas must be combined in a single arbitration proceeding.

*Essential facts in ADIA II did not exist when ADIA I was filed*.   The essential facts supporting  the ADIA II contract claims demonstrably did not exist when ADIA I was filed in December 2009.  December 2009 was over three months before the start of the one and a half year mandatory conversion period, from March 2010 to September 2011, on which the ADIA II damages claims are based.   Citi's contractual obligations under the "Commercially Reasonable Efforts" clause (Article 3.1) were ongoing, and continued through the last conversion date. Further, ADIA obviously had focused up to that time on establishing its misrepresentations claims in ADIA I, which as shown above were based on facts related to pre-contractual actions

of Citi completely independent from contract performance issues. Thus, the essential facts supporting the ADIA II claims were not even close to fruition—let alone known—when ADIA I was filed. This alone is sufficient to defeat Citi's res judicata defense.[6] *See, e.g.*, *Storey*, 347 F.3d 370; *Male*, 354 F. App'x 514.

### 3.    ADIA Could Not Have Brought  Its ADIA II Claims in ADIA I

The above-cited case authority requires Citi to show that ADIA "could"  have raised its ADIA II claims in ADIA I in order to sustain a res judicata defense. *See, e.g.*, *Pike*, 266 F.3d at 91. However, the Second Circuit has been careful to  point out that whether such  claims "could" have been raised does not depend simply on whether they would have been  allowed as  an amendment to the pleadings in the earlier action:

> As this "same transaction" test indicates, the "could have been" language of the third requirement is something of a misnomer. The question is not whether the applicable procedural rules *permitted* assertion of the claim in the first proceeding; rather, the question is whether the claim was sufficiently related to the claims that were asserted in the first proceeding that it *should have been* asserted in that proceeding. This said, showing that the applicable procedural rules did not permit assertion of the claim in question in the first action of course also suffices to show that the claim is not barred in the second action.

*Pike*, 266 F.3d at 91 (citations omitted).

Thus, the question of whether ADIA could have added its breach of contract claims to ADIA  I must be determined, in the first instance, by the relationship of the ADIA II claims to

---

[6]  This factor, in particular, is in line with the elements relevant to deciding a res judicata defense in international arbitration proceedings such as ADIA II,  which places great emphasis on the parties' intentions and expectations as reflected in the arbitration clause and the contract. *See* Restatement (Third) of the U.S. Law of International Commercial Arbitration § 4.9, cmt. g (Tentative Draft No. 2, April 16, 2012) (Calamari Decl., Ex. 10) ("International awards, however, often include parties from foreign systems . . . For these reasons, the Restatement requires for claim preclusion not only satisfaction of the criteria for recognition under the Conventions or FAA and an identity of parties and claims, but also a finding that claim preclusion would be consistent with the parties' agreement and expectations."). ADIA does not discuss such authority here, but reserves its right to do so before the arbitration tribunal.

the ADIA I claims.  As the above analysis demonstrates, there is none.  The fundamental nature

of the claims, the facts supporting them, and the remedies requested are materially distinct from

each other.

Second Circuit authority also holds that Citi cannot satisfy this res judicata element by

arguing that ADIA could have amended its ADIA I Statement of Claim to include the breach of

contract claims raised in ADIA II:

> [I]f, after the first suit is underway, a defendant engages in
> actionable conduct, plaintiff may but is not required to file a
> supplemental pleading setting forth defendant's subsequent
> conduct. Plaintiff's failure to supplement the pleadings of his
> already commenced lawsuit will not result in a *res judicata* bar
> when he alleges defendant's later conduct as a cause of action in a
> second suit. New York law is the same.

*Maharaj*, 128 F.3d at 97–98 (claims arising from dissolution of corporation could not have been

brought prior to dissolution, and thus could not have been brought in earlier action for breach of

contract that was pending at the time of dissolution); *see also Curtis*, 226 F.3d at 139–40.

The evidence is also clear that, as a practical matter,  ADIA could not possibly have

succeeded in amending  its ADIA I pleading to add the ADIA II breach of contract claims even if

it had tried to do so.  On June 28, 2010, the tribunal issued Scheduling Order No. 1,  which

contained a detailed listing of all prehearing and hearing dates.  (*See* Calamari Decl., Ex. 11.)

The key dates included:

(i)      June 23, 2010 to July 9, 2010—Parties to complete document production, Stage 1;

(ii)     July 9, 2010—Parties to exchange preliminary witness lists;

(iii)    July 23, 2010 to October 29, 2010—Parties to complete Stage 2 document
production, on a rolling basis;

(iii)    August 2, 2010—Parties to file motions to compel in connection with document
production;

(iv)     October 29, 2010—Parties to complete document production;

(v)      November 5, 2010—Parties to identify experts;

(vi)     November 12, 2010—Parties to exchange exhibit lists;

(vii)    December 17, 2010—Parties to exchange fact witness statements;

(viii)   February 1, 2011—Parties to submit summary judgment motions;

(ix)     March 25, 2011—Parties to exchange final witness and exhibit lists;

(x)      April 15, 2011—Parties to submit pre-hearing briefs, fact stipulations, final
         exhibit and witness lists, and exhibit and case law binders; and

(xi)     May 2, 2011—Arbitration hearing to commence.

The tribunal made two points of particular importance in  Scheduling Order No. 1: (i) that

the parties would not be allowed to alter any dates "for a scheduled submission to the Tribunal or

scheduled conference, oral argument, or hearing dates" (Calamari Decl., Ex. 11 at p. 2); and (ii)

that the May 2, 2011 hearing date was "locked in stone" (*id.* at p. 9).

At the time of June 23, 2010, the first key date in the Scheduling Order, ADIA had

executed only one of its four mandatory conversions (March 15, 2010).  (*See* Calamari Decl., Ex.

3 at ¶ 22.)  It had not investigated the impact of Citi's contract performance on the stock price as

of that date—not informally and certainly not through discovery in ADIA I—and so did not

know the impact of Citi's contract performance on the first conversion date.  Nor could ADIA

have known the impact of the three remaining conversions that loomed on the horizon.  (*See id.*)

Further, the tribunal's stridently-expressed view on the finality of  Scheduling Order No. 1 made

clear that it  would never have allowed ADIA to amend its ADIA I claims at that time to bring

what fundamentally would have been a new arbitration proceeding, with new claims, facts and

remedies, that had not even fully matured.  Further, there is not the slightest question that Citi

would have objected mightily (and properly) to any such attempt as highly prejudicial, since

such an amendment would have triggered a complete reopening of ADIA I discovery covering a theretofore unexplored time period and subject matter, new witness statements on new subjects, and completely new expert damages reports, thereby necessitating an entirely new pre-hearing and hearing schedule.

C.    The Cases Cited by Citi in Support of its Motion on the Merits are All Off Point

The authorities cited by Citigroup involve plaintiffs asserting different *legal theories* to seek relief based on *identical facts* raised in a previous suit or additional instances of *identical conduct. See, e.g.*, *Theatre Row Phase II Assocs. v. H & I Inc.,* 443 B.R. 592, 599 (S.D.N.Y. 2011) (no "different or additional factual allegations" or "newly discovered facts or evidence"); *Waldman v. Vill. of Kiryas Joel,* 207 F.3d 105, 111 (2d Cir. 2000) (facts "essential" to second suit were present in first and "were not included in that case only as background information"); *Fulani v. Mackay,* No. 06 Civ. 3747 (GBD), 2007 WL 959308, at *6 (S.D.N.Y. Mar. 29, 2007) (There was "no dispute that the two lawsuits . . . both arise from the disbanding of the ICOs[.]"); *John Street Leasehold, LLC v. Capital Mgmt. Res. L.P.*, 154 F. Supp. 2d 527, 540 (S.D.N.Y. 2001) ("[T]he essential distinction between this action and *John Street I* is that the respective complaints allege somewhat different theories to explain the cause of the FDIC's decision to institute foreclosure proceedings."); *Sure-Snap Corp. v. State St. Bank & Trust Co.*, 948 F.2d 869, 675 (2d. Cir. 1991) ("Sure-Snap's very allegation that the banks' tortious conduct negatively influenced their business's health, makes it hard-pressed to explain how the two causes of action- the plan of reorganization and the lender liability claims-did not comprise the same essential matter."); *Pricaspian Dev. Co. v. Royal Dutch Shell, plc*, No. 08 Civ. 9726, 2009 WL 1564110, at *12 (S.D.N.Y., June 3, 2009) (subsequent claims were based on "nothing more than additional instances of what was previously asserted"). None of these cases involved the preclusive effect

of a prior arbitration proceeding on a subsequent arbitration. More importantly, none of these cases involved subsequent claims that were based on facts distinct in both time and relevance from the facts underlying the previous claims.

## CONCLUSION

For the above reasons, ADIA respectfully requests that Citi's motion be denied, in combination with the dismissal with prejudice of its complaint and an order compelling Citi to arbitrate the ADIA II dispute and its res judicata defense thereto, as requested in ADIA's recently filed motions to dismiss and to compel arbitration.

DATED: October 14, 2013

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By: /s/ Peter E. Calamari
   Peter E. Calamari
   Fred G. Bennett
   Tai-Heng Cheng

   Attorneys for Abu Dhabi Investment Authority