# Exhibit B

FINAL

INVESTMENT AGREEMENT

dated November 26, 2007

between

CITIGROUP INC.

and

ABU DHABI INVESTMENT AUTHORITY

NY12532:411584.9

# TABLE OF CONTENTS

Page

Recitals: ..................................................................................................................I

## Article I

### Purchase; Closing

1.1    Purchase ..........................................................................................1
1.2    Closing .............................................................................................2
1.3    Interpretation ...................................................................................4

## Article II

### Representations and Warranties

2.1    Disclosure .........................................................................................5
2.2    Representations and Warranties of the Company ............................6
2.3    Representations and Warranties of the Investor .............................12

## Article III

### Covenants

3.1    Commercially Reasonable Efforts ..................................................14
3.2    Expenses .........................................................................................15
3.3    Publicity ..........................................................................................15
3.4    Listing .............................................................................................15
3.5    Sufficiency of Outstanding Common Stock ...................................15
3.6    Payments Free of Tax .....................................................................15

## Article IV

### Additional Agreements

4.1    Standstill Agreement .......................................................................16
4.2    Lock-up Agreement .........................................................................17
4.3    Adjustment Provisions ....................................................................17
4.4    Preemptive Rights ...........................................................................20
4.5    Transfer Restrictions .......................................................................23
4.6    Legend .............................................................................................23

NYI2532:411584.9

Article V

Miscellaneous

| | | |
|---|---|---|
| 5.1 | Survival; Indemnification. | 24 |
| 5.2 | Termination | 26 |
| 5.3 | Amendment | 26 |
| 5.4 | Waiver of Conditions | 26 |
| 5.5 | Counterparts and Facsimile | 27 |
| 5.6 | Dispute Resolution | 27 |
| 5.7 | Governing Law; Submission to Jurisdiction, Etc | 28 |
| 5.8 | Sovereign Waiver | 28 |
| 5.9 | Remedies | 28 |
| 5.10 | Notices | 28 |
| 5.11 | Entire Agreement, Etc | 30 |
| 5.12 | Definitions of "subsidiary" and "Affiliate" | 30 |
| 5.13 | Captions | 30 |
| 5.14 | Severability | 30 |
| 5.15 | No Third Party Beneficiaries | 30 |

LIST OF ANNEXES AND EXHIBITS

Annex A      Description of the Capital Securities, Common Stock and Equity Contracts

Annex B      Registration Rights Agreement

NYI2532:411584.9

## INDEX OF DEFINED TERMS

| Term | Location of Definition |
|---|---|
| Affiliate | 5.12(b) |
| Agreement | Preamble |
| Bankruptcy Exceptions | 2.2(c) |
| BHC Act | 2.2(g)(1) |
| Capital Securities | Recitals |
| Closing | 1.2(a) |
| Closing Date | 1.2(a) |
| Commission | 2.1(b) |
| Common Stock | Recitals |
| Company | Preamble |
| Company Indemnified Party | 5.1(c) |
| Confidentiality Agreement | 4.2(b) |
| Covered Securities | 4.3(a) |
| Designated Securities | 4.4(b)(1) |
| Disposition | 4.2(a) |
| Disputing Party | 5.6(a) |
| Dollars | 1.3 |
| Equity Contracts | Recitals |
| Equity Units | Recitals |
| Exchange Act | 2.1(b) |
| Excluded Securities | 4.3(f)(2) |
| FDIC | 2.2(a) |
| Federal Reserve | 2.2(n)(3) |
| GAAP | 2.1(a) |
| Governmental Entities | 1.2(c) |
| Hedging Transaction | 4.2(a) |
| Indemnified Party | 5.1(d)(2) |
| Interim Measures | 5.6(a) |
| Investor | Preamble |
| Investor Indemnified Party | 5.1(b) |
| Investor Material Adverse Effect | 2.3(a) |
| Investor Percentage Interest | 4.4(a)(2) |
| Issuing Parties | Recitals |
| Lock-up Period | 4.2(a) |
| Lock-up Securities | 4.2(a) |
| Loss | 5.1(b) |
| Mandatorily Convertible Securities | 4.3(f)(2) |
| Material Adverse Effect | 2.1(a) |
| OCC | 2.2(n)(3) |
| Optionally Convertible Securities | 4.3(f)(3) |

NY12532:411584.9

| | |
|---|---|
| Previously Disclosed | 2.1(b) |
| Private Placement | 4.4(b)(2) |
| Purchase | 1.1 |
| Purchased Securities | Recitals |
| Qualified Equity Offering | 4.4(a)(z) |
| Reference Price | 4.3(f)(4) |
| Reset Causing Covered Securities | 4.3(f)(5) |
| Reset Conversion Premium | 4.3(f)(6) |
| Reset Event | 4.3(a) |
| Reset Reference Price | 4.3(f)(8) |
| Rights Agreement | 1.2(e)(ii) |
| SEC Reports | 2.1(b) |
| Securities Act | 2.2(d) |
| Securities Issuance Agreements | Recitals |
| Significant Subsidiary | 2.2(a) |
| Subsidiary | 5.12(a) |
| Third Party Claim | 5.1(d)(2) |
| Threshold Appreciation Price | 4.3(f)(8) |
| Transaction Documents | Recitals |
| Transfer | 4.5(a) |
| Trusts | Recitals |

NY12532:411584.9

INVESTMENT AGREEMENT, dated November 26, 2007 (this *"Agreement"*), between Citigroup Inc., a Delaware corporation (the *"Company"*), and Abu Dhabi Investment Authority, a public institution established under the laws of Abu Dhabi (the *"Investor"*).

RECITALS:

A.    The Trusts. Each of the trusts identified in Annex A hereto (each a *"Trust"*, and together, the *"Trusts"*, and together with the Company, the *"Issuing Parties"*) will be organized as a direct subsidiary of the Company.

B.    The Investment. The Company intends to (i) cause the Trusts to sell to the Investor, and the Investor intends to purchase from the Trusts, the number and type of capital securities of the Trusts (including the related guarantee agreements) described in Annex A hereto (the *"Capital Securities"*) and (ii) sell to the Investor, and the Investor intends to purchase from the Company, the number and type of the irrevocable equity contracts to purchase shares of common stock of the Company, par value $0.01 per share (the *"Common Stock"*), described in Annex A hereto (the *"Equity Contracts"*, together with the Capital Securities, the *"Equity Units"* and each of the components thereto described in Annex A hereto, the *"Purchased Securities"*).

C.    Securities Issuance Agreements and Transaction Documents. The term *"Securities Issuance Agreements"* refers collectively to (i) the trust agreements that will govern the Trusts, (ii) the indentures, and supplements thereto, that will govern each series of the Company's junior subordinated debt securities held by the Trusts, (iii) the notes that will evidence interests in the junior subordinated debt security, (iv) the stock purchase agreement, pursuant to which the Company will sell the Common Stock to the Investor and (v) the pledge agreements, pursuant to which the Capital Securities will be held as collateral in favor of the Company. The term *"Transaction Documents"* refers collectively to this Agreement and the Rights Agreement (as defined below).

NOW, THEREFORE, in consideration of the premises, and of the representations, warranties, covenants and agreements set forth herein, the parties agree as follows:

## ARTICLE I

### PURCHASE; CLOSING

1.1    Purchase. On the terms and subject to the conditions set forth herein, the Company will (i) cause the Trusts to sell to the Investor the Capital Securities and (ii) enter into the Equity Contracts with the Investor, at an aggregate price of $7,500,000,000 and a price per Equity Unit of $100, and the Investor will purchase such Capital Securities from the Trusts and enter into the Equity Contracts with the Company, respectively (the *"Purchase"*).

1.2    Closing.

(a)      Upon the terms and subject to the conditions contained in this Agreement, the closing of the Purchase (the "*Closing*") will take place at the offices of Sullivan & Cromwell LLP located at 125 Broad Street, New York, New York 10004 at 10:00 a.m., New York time, on the fifth New York Stock Exchange trading day after the date hereof or as soon as practicable thereafter, or at such other place, time and date as shall be agreed between the Company and the Investor. The time and date on which the Closing occurs is referred to in this Agreement as the closing date (the "*Closing Date*").

(b)      Subject to the satisfaction or waiver of the conditions to the Closing in Sections 1.2(c) and (d), at the Closing, the Company will deliver to the Investor the Equity Units in exchange for payment therefor by wire transfer of immediately available United States funds to a bank account designated by the Company no later than two business days prior to the Closing Date.

(c)      The respective obligation of each of the Investor and the Company to consummate the Closing is subject to the fulfillment or written waiver by the Investor and the Company prior to the Closing of the following conditions: (i) any approvals or authorizations of, filings and registrations with, and notifications to, all governmental or regulatory authorities (collectively, "*Governmental Entities*") required for the Purchase shall have been obtained or made and shall be in full force and effect and all waiting periods required by law shall have expired; and (ii) no provision of any applicable law or regulation and no judgment, injunction, order or decree shall prohibit the Purchase, and no Governmental Entity shall have instituted an investigation or proceeding that could result in such a judgment, injunction order or decree.

(d)      The obligation of the Company to consummate the Closing is also subject to the fulfillment or waiver prior to the Closing of each of the following conditions:

(i)      (A) the representations and warranties of the Investor set forth in this Agreement shall be true and correct in all material respects as though made on and as of the Closing Date (except that representations and warranties that by their terms speak as of an earlier date shall be true and correct as of such date) and the Investor shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing; *provided* that such representations and warranties shall be deemed to be true and correct in all material respects if any fact, circumstance, event, change, effect, occurrence or state of facts that gives rise to the failure or failures of such representations and warranties to be so true and correct (without giving effect to any qualifiers or exceptions relating to materiality or Investor Material Adverse Effect) does not have and is not reasonably likely to have, individually or in the aggregate, an Investor Material Adverse Effect;

NY12532:411584.9

(ii)    the Company shall have received from Shearman & Sterling LLP, special counsel for the Investor, a legal opinion addressed to the Company, dated as of the Closing Date, covering, assuming the Investor's due authorization, execution and delivery of, and the Investor's power to perform its obligations under this Agreement and the Transaction Agreement under the laws of the United Arab Emirates, (A) the enforceability of the Transaction Documents under the laws of the State of New York and (B) the execution, delivery and performance by the Investor of the Transaction Documents will not violate any laws of the State of New York covered by the opinion, in form and substance reasonably acceptable to the Company; and

(iii)    the Company shall have received a certificate dated as of the Closing Date signed on behalf of the Investor by a senior officer certifying compliance with Section 1.2(d)(i) and that the income received by Investor under the terms of the Equity Units, the Equity Contracts, the trust preferred securities and Treasuries is, and will be, exempt from taxation under Section 892 of the Internal Revenue Code of 1986, as amended, and the regulations thereunder and that the Investor is an integral part of a foreign government (as defined in Treasury Regulations Section 1.892-2T(a)(2)) or a controlled entity (as defined in Treasury Regulations Section 1.892-2T(a)(3)); and

(iv)    the Company shall have received an IRS Form W-8 duly executed by an officer of the Investor.

(e)    The obligation of the Investor to consummate the Closing is also subject to the fulfillment or waiver prior to the Closing of each of the following conditions:

(i)    (A) the representations and warranties of the Company set forth in this Agreement shall be true and correct in all material respects as though made on and as of the Closing Date (except that representations and warranties that by their terms speak as of an earlier date shall be true and correct as of such date) and the Company shall have performed in all material respects all obligations required to be performed by it under this Agreement at or prior to the Closing; *provided* that such representations and warranties shall be deemed to be true and correct in all material respects if any fact, circumstance, event, change, effect, occurrence or state of facts that gives rise to the failure or failures of such representations and warranties to be so true and correct (without giving effect to any qualifiers or exceptions relating to materiality or Material Adverse Effect) does not have and is not reasonably likely to have, individually or in the aggregate, a Material Adverse Effect;

(ii)    the Company shall have duly executed and delivered to the

NY12532:411584.9

Investor a Registration Rights Agreement (the *"Rights Agreement"*) in substantially the form of Annex B;

(iii)   the Investor shall have received from the general counsel or an assistant general counsel of the Company, Sullivan & Cromwell LLP, special counsel to the Company, and Richards Layton & Finger LLP, Delaware counsel to the Company, legal opinions addressed to the Investor, dated as of the Closing Date, covering, among other customary matters, (A) the Company's due authorization, execution and delivery of the Transaction Documents, (B) the Company's and the Trust's power to perform its obligations under the Transaction Documents, (C) the enforceability of the Transaction Documents, (D) the due and valid issuance of the Purchased Securities and the Common Stock and (E) the execution, delivery and performance by the Company and the Trusts of the Transaction Documents will not violate any laws covered by the opinion, in form and substance reasonably acceptable to the Investor;

(iv)   the Investor shall have received a certificate dated as of the Closing Date signed on behalf of the Company by a senior officer certifying compliance with Section 1.2(e)(i); and

(v)   with respect to each series of junior subordinated debt security held by a Trust, the Investor shall have received an indenture supplement dated as of the Closing Date executed by the trustee of such Trust and a duly authorized officer of the Company.

1.3   Interpretation.   When a reference is made in this Agreement to "Recitals," "Articles," "Sections," "Annexes," "Exhibits" or "Schedules," such reference shall be to a Recital, Article or Section of, or Annex, Exhibit or Schedule to, this Agreement unless otherwise indicated.   The terms defined in the singular have a comparable meaning when used in the plural, and vice versa.   The table of contents and headings contained in this Agreement are for reference purposes only and are not part of this Agreement.   Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed followed by the words "without limitation."   No rule of construction against the draftsperson shall be applied in connection with the interpretation or enforcement of this Agreement, as this Agreement is the product of negotiation between sophisticated parties advised by counsel.   All references to "$" or "dollars" mean the lawful currency of the United States of America.   Except as expressly stated in this Agreement, all references to any statute, rule or regulation are to the statute, rule or regulation as amended, modified, supplemented or replaced from time to time (and, in the case of statutes, include any rules and regulations promulgated under the statute) and to any section of any statute, rule or regulation include any successor to the section.   For the avoidance of doubt, at any time when this Agreement requires a calculation of the number or percentage of shares of Common Stock "beneficially owned" by the Investor or another person, the number of shares of Common Stock underlying any Equity Units, and other convertible securities, beneficially owned by such

-4-

person are to be included as if such Equity Units were being fully converted as of that time.

## ARTICLE II

### REPRESENTATIONS AND WARRANTIES

2.1   Disclosure.

(a)   *"Material Adverse Effect"* means any fact, circumstance, event, change, effect or occurrence that, individually or in the aggregate with all other facts, circumstances, events, changes, effects or occurrences, has a material adverse effect on (i) the business, assets, liabilities, results of operation or financial condition of the Company and its subsidiaries taken as a whole; *provided, however,* that Material Adverse Effect shall not be deemed to include facts, circumstances, events, changes, effects or occurrences (1) generally affecting businesses and industries in which the Company operates, or companies engaged in such businesses or industries or the economy or the financial or securities markets and credit markets in the United States or elsewhere in the world, including effects on such businesses, industries or economy or markets resulting from any regulatory or political conditions or developments, or any outbreak or escalation of hostilities, declared or undeclared acts of war or terrorism, or work stoppages or slowdowns, boycotts or labor strikes, or weather or climatic conditions, in each case, other than facts, circumstances, events, changes, effects or occurrences that arise after the date of this Agreement but before the Closing to the extent that such facts, circumstances, events, changes, effects or occurrences have a disproportionately adverse affect on the Company and its subsidiaries taken as a whole, as compared to similar participants in the businesses and industries in which the Company operates, or (2) reflecting or resulting from (A) any changes in generally accepted accounting principles in the United States (*"GAAP"*) or regulatory accounting requirements applicable to depository institutions and their holding companies generally (or authoritative interpretations thereof) or (B) changes in banking and other laws of general applicability or related policies or interpretations of Governmental Entities; or (ii) the ability of the Company to consummate the transactions contemplated by this Agreement.

(b)   *"Previously Disclosed"* means information set forth or incorporated in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2005 or its other reports and forms filed with the Securities and Exchange Commission (the *"Commission"*) under Sections 12, 13, 14 or 15(d) of the Securities Exchange Act of 1934 (the *"Exchange Act"*), after January 1, 2006 (except, in each case, for information set forth or incorporated in the Section "Risk Factors" in the Form 10-K) (the *"SEC Reports"*) and before the date of this Agreement or that was contained in the package of disclosure materials delivered to the Investor on November 24, 2007.

(c)   Each party acknowledges that it is not relying upon any representation or warranty not set forth in this Agreement. Investor acknowledges that it

has conducted its own independent review and analysis of the business, assets, condition, operation and prospects of the Company and the subsidiaries.

        2.2    <u>Representations and Warranties of the Company</u>.   Except as Previously Disclosed, the Company represents and warrants to the Investor that as of the date hereof (or such other date specified herein):

        (a)    <u>Organization, Authority and Significant Subsidiaries</u>.   The Company has been duly incorporated and is validly existing as a corporation in good standing under the laws of the State of Delaware, with corporate power and authority to own its properties and conduct its business as currently conducted, and, except as would not be reasonably likely to have a Material Adverse Effect, has been duly qualified as a foreign corporation for the transaction of business and is in good standing under the laws of each other jurisdiction in which it owns or leases properties, or conducts any business so as to require such qualification; each subsidiary of the Company that is a "significant subsidiary" within the meaning of Rule 1-01(w) of Regulation S-X under the Securities Act (individually a "*Significant Subsidiary*" and collectively the "*Significant Subsidiaries*") has been duly organized and is validly existing in good standing under the laws of its jurisdiction of organization.  Citibank N.A. is duly organized and validly existing as a national banking association and its deposit accounts are insured up to applicable limits by the Federal Deposit Insurance Corporation ("*FDIC*").

        (b)    <u>Capitalization</u>.  As of September 30, 2007: (1) the Company has 15,000,000,000 authorized shares of Common Stock; (2) the Company has 4,981,134,274 issued and outstanding shares of Common Stock; (3) all of the issued shares of capital stock of the Company have been duly and validly authorized and issued and are fully paid and non-assessable; and (4) all of the issued shares of capital stock of each Significant Subsidiary have been duly and validly authorized and issued, are fully paid and non-assessable, and are owned directly or indirectly by the Company, free and clear of all liens, encumbrances, equities or claims.

        (c)    <u>Authorization, Enforceability of Securities Issuance Agreements and Transaction Documents</u>.  The Company has the power and authority to enter into the Securities Issuance Agreements and Transaction Documents and to carry out its obligations hereunder and thereunder.  The execution, delivery and performance of the Securities Issuance Agreements and Transaction Documents by the Company and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate action on the part of the Company.  The Securities Issuance Agreements and Transaction Documents will be valid and binding obligations of the Company enforceable against the Company in accordance with their respective terms, except as the same may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights

generally and general equitable principles, regardless of whether such enforceability is considered in a proceeding at law or in equity (*"Bankruptcy Exceptions"*).

As of the date of execution of the Securities Issuance Agreements and the Transaction Documents, as the case may be, neither the execution, delivery and performance by the Company hereof and thereof, nor the consummation of the transactions contemplated hereby and thereby, nor compliance by the Company with any of the provisions thereof, will (1) violate, conflict with, or result in a breach of any provision of, or constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under, or result in the termination of, or accelerate the performance required by, or result in a right of termination or acceleration of, or result in the creation of, any lien, security interest, charge or encumbrance upon any of the properties or assets of the Company or any Significant Subsidiary under any of the terms, conditions or provisions of (A) its certificate of incorporation or by-laws or (B) any note, bond, mortgage, indenture, deed of trust, license, lease, agreement or other instrument or obligation to which the Company or any Significant Subsidiary is a party or by which it may be bound, or to which the Company or any Significant Subsidiary or any of the properties or assets of the Company or any Significant Subsidiary may be subject, or (C) subject to compliance with the statutes and regulations referred to in the next paragraph, violate any statute, rule or regulation or any judgment, ruling, order, writ, injunction or decree applicable to the Company or any Significant Subsidiary or any of their respective properties or assets except, in the case of clauses (B) and (C) for those occurrences that would not be reasonably likely to result in a Material Adverse Effect.

Other than in connection or in compliance with the provisions of the Securities Act and the securities or blue sky laws of the various states, to the best knowledge of the Company, no notice to, filing with, exemption or review by, or authorization, consent or approval of, any Governmental Entity is necessary for the consummation of the transactions contemplated by the Transaction Documents.

(d)    Company Financial Statements.

(1)    The consolidated financial statements of the Company and its consolidated subsidiaries included or incorporated by reference in the SEC Reports, present fairly in all material respects the consolidated financial position of the Company and its consolidated subsidiaries as of the dates indicated therein and the consolidated results of their operations for the periods specified therein; and except as stated therein, such financial statements were prepared in conformity with GAAP applied on a consistent basis (except as may be noted therein).

(2)    KPMG LLP, who have certified certain financial statements of the

-7-

Company and its subsidiaries, are independent public accountants as required by the Act and the rules and regulations of the Commission.

(3)     The Company and its subsidiaries do not have any liabilities or obligations (accrued, absolute, contingent or otherwise) of a nature that would be required to be accrued or reflected in a consolidated balance sheet prepared in accordance with GAAP, whether accrued, absolute, contingent or otherwise other than liabilities or obligations (i) reflected on, reserved against, or disclosed in the notes to, the Company's consolidated balance sheet included in the Company's Quarterly Report on Form 10-Q for the fiscal quarter ended September 30, 2007, (ii) that have been discharged or paid in full prior to the date of this Agreement in the ordinary course of business, or (iii) that would not be reasonably likely to have a Material Adverse Effect.

(e)     No Material Adverse Effect.  Since September 30, 2007, no event or circumstance has occurred that, individually or in the aggregate, has had or is reasonably likely to have a Material Adverse Effect.

(f)     Proceedings.  There is no litigation or similar proceeding pending or, to the Company's knowledge, threatened to which the Company or any of its subsidiaries is a party or of which any property of the Company or any of its subsidiaries is the subject which, based on the information available to the Company as of the date hereof, the Company's management believes is reasonably likely to have a Material Adverse Effect.

(g)     Compliance with Laws; Permits.

(1)     The Company is a financial holding company and a bank holding company registered under the Bank Holding Company Act of 1956 (the "*BHC Act*"); the Company and each of its subsidiaries have conducted their businesses in compliance with all applicable federal, state and foreign laws, regulations and applicable stock exchange requirements, including all laws and regulations restricting activities of bank holding companies and banking organizations, except for any noncompliance which is not reasonably likely to have a Material Adverse Effect.

(2)     The Company and each subsidiary have all permits, licenses, authorizations, orders and approvals of, and have made all filings, applications and registrations with, any Governmental Entities that are required in order to carry on their business as presently conducted, except where the failure to have such permits, licenses, authorizations, orders and approvals or the failure to make such filings, applications and registrations is not reasonably likely to have a Material Adverse Effect; and all such permits, licenses, certificates of authority, orders and approvals are in full force and effect and, to the knowledge of the Company, no suspension or cancellation of any of them is threatened, and all such filings, applications and registrations are current, except where such absence,

-8-

suspension or cancellation is not reasonably likely to have a Material Adverse Effect.

(h)   Authorization of Equity Contracts and Common Stock.

(1)   As of the Closing Date, the Equity Contracts will be duly authorized by all necessary corporate action on the part of the Company and will be valid and binding obligations of the Company enforceable against the Company in accordance with their respective terms, except as the same may be limited by Bankruptcy Exceptions.

(2)   The issuance of the shares of the Common Stock underlying the Equity Contracts have been duly authorized by all necessary corporate action on the part of the Company and upon the issuance of the Common Stock underlying the Equity Contracts, such shares of Common Stock will (A) be duly authorized by all necessary corporate action on the part of the Company, (B) be validly issued, fully paid and nonassessable, (C) not have been issued in violation of any preemptive or other similar right, and (D) if such shares are treasury shares, be free of any adverse claim.

(3)   Authorization of the Equity Units. As of the Closing Date, the Equity Units will be duly authorized by all necessary corporate action on the part of the Issuing Parties; and when executed and delivered by the Issuing Parties, will constitute the valid and binding obligations of the Issuing Parties, enforceable against each of the Issuing Parties in accordance with their terms, except as the enforcement thereof may be limited by Bankruptcy Exceptions; and neither the issuance of the Purchased Securities nor the Purchased Securities will be subject to preemptive or other similar rights.

(i)   The Trusts. As of the Closing Date:

(1)   each of the Trusts will be duly created as a statutory trust and will be validly existing in good standing under the laws of the State of Delaware. Each Trust will be classified as a grantor trust and will not be classified as an association taxable as a corporation for United States federal income tax purposes; each Trust will have the power and authority necessary to own or hold its properties and to conduct the businesses in which such Trust is engaged;

(2)   The trust agreement for each Trust will have been duly authorized by the Company and, will have been duly executed and delivered by the Company, as sponsor and depositor, and, assuming due authorization, execution and delivery of each trust agreement by the applicable trustees, each trust agreement will be a valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except to the extent that enforcement thereof may be limited by Bankruptcy Exceptions;

(3)   the Capital Securities will have been duly authorized by each Trust

-9-

and, when issued and delivered against payment of the consideration described in this Agreement, will be validly issued and fully paid and non-assessable undivided beneficial interests in the assets of such Trust, will be entitled to the benefits of each applicable trust agreement and will conform in all material respects to the descriptions thereof contained in Annex A; the issuance of the Capital Securities will not be subject to preemptive or other similar rights; and Investor will be entitled to the same limitation of personal liability under Delaware law as extended to stockholders of private corporations for profit;

(4)    the common securities issuable by each Trust to the Company will have been duly authorized by the Trust and, when issued and delivered by each Trust to the Company will be validly issued and (subject to the terms of the relevant trust agreement) fully paid undivided beneficial interests in the assets of each Trust; the issuance by each Trust of common securities is not subject to preemptive or other similar rights; and upon consummation of the Closing all of the issued and outstanding common securities of each Trust will be directly owned by the Company free and clear of any security interest, mortgage, pledge, lien, encumbrance, claim or equity; and

(5)    Each of the Administrative Trustees of each Trust will be an employee or officer of, or affiliated with, the Company; each Trust Agreement will have been duly executed and delivered by the Administrative Trustees and will be a valid and binding obligation of each Administrative Trustee, enforceable against such Administrative Trustee in accordance with its terms, except to the extent that enforcement thereof may be limited by Bankruptcy Exceptions.

(j)    Authorization of the Junior Subordinated Indentures.  As of the Closing Date, each junior subordinated indenture of the Company, and each supplement thereto under which a junior subordinated debt security is delivered to a Trust, will have been duly authorized, executed and delivered by the Company and will constitute a valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms, except to the extent that enforcement thereof may be limited by the Bankruptcy Exceptions.

(k)    Authorization of Junior Subordinated Debt Securities.  As of the Closing Date, each junior subordinated debt security delivered to a Trust will have been duly authorized by the Company and, duly executed and delivered by the Company to a Trust, and when authenticated, issued and delivered in the manner provided for in each applicable indenture or supplement thereto, will constitute valid and legally binding obligations of the Company, enforceable against the Company in accordance with their terms, except to the extent that the enforcement thereof may be limited by the Bankruptcy Exceptions, and will be in the form contemplated by, and entitled to the benefits of, the applicable indenture or supplement thereto.

-10-

(l)  <u>Authorization of Guarantee Agreements</u>.  As of the Closing Date, each guarantee agreement of the Company with respect to Capital Securities of a Trust will have been duly authorized by the Company,  and will have been duly executed and delivered by the Company and, assuming due authorization, execution and delivery by the applicable guarantee trustee, will constitute a valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms, except to the extent that enforcement thereof may be limited by the Bankruptcy Exceptions.

(m)  <u>Authorization of the Pledge Agreement</u>.  As of the Closing Date, each pledge agreement entered into by the Company with respect to the Equity Contracts will have been duly authorized by the Company, and will be validly executed and delivered by the Company and assuming due authorization, execution and delivery of such pledge agreement by the other parties thereto, such pledge agreement will constitute a valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as to the extent that the enforcement thereof may be limited by the Bankruptcy Exceptions.

(n)  <u>Reports</u>.

(1)  Since December 31, 2005, the Company has timely filed all documents required to be filed with the Commission pursuant to Sections 13(a), 14(a) or 15(d) of the Exchange Act, except where the failure to so file is not reasonably likely to have a Material Adverse Effect.

(2)  The SEC Reports, when they became effective or were filed with the Commission, as the case may be, conformed in all material respects to the requirements of the Securities Act or the Exchange Act, as applicable, and the rules and regulations of the Commission thereunder, and none of such documents contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make such statements, in light of the circumstances in which they were made, not misleading.

(3)  Since December 31, 2005, the Company and each subsidiary have filed all material reports, registrations and statements, together with any required amendments thereto, that it was required to file with the Board of Governors of the Federal Reserve System (the "*Federal Reserve*"), the Office of the Comptroller of the Currency (the "*OCC*"), the FDIC and any other applicable federal or state securities or banking authorities, except where the failure to file any such report, registration or statement is not reasonably likely to have a Material Adverse Effect.  As of their respective dates, each of the foregoing reports complied with all applicable rules and regulations promulgated by the Federal Reserve, the OCC, the FDIC and any other applicable foreign, federal or state securities or banking authorities, as the case may be, except for any failure that is not reasonably likely to have a Material Adverse Effect.

-11-

(4)   The records, systems, controls, data and information of the Company and the subsidiaries are recorded, stored, maintained and operated under means (including any electronic, mechanical or photographic process, whether computerized or not) that are under the exclusive ownership and direct control of the Company or the subsidiaries or their accountants (including all means of access thereto and therefrom). The Company (i) has implemented and maintains disclosure controls and procedures (as defined in Rule 13a-15(e) under the Exchange Act) to ensure that material information relating to the Company, including the subsidiaries, is made known to the chief executive officer and the chief financial officer of the Company by others within those entities, and (ii) has disclosed, based on its most recent evaluation prior to the date hereof, to the Company's outside auditors and the audit committee of the Company's board of directors (A) any significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) that are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information and (B) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls over financial reporting. As of the date hereof, to the knowledge of the Company, there is no reason that its outside auditors and its chief executive officer and chief financial officer will not be able to give the certifications and attestations required pursuant to the rules and regulations adopted pursuant to Section 404 of the Sarbanes-Oxley Act of 2002, without qualification, when next due.

2.3   Representations and Warranties of the Investor.   The Investor hereby represents and warrants to the Company that as of the date hereof:

(a)   Organization and Authority.   The Investor has been duly organized and is validly existing in good standing under the laws of the jurisdiction of its organization, with the requisite power and authority to own its properties and conduct its business as currently conducted. *"Investor Material Adverse Effect"* means any fact, circumstance, event, change, effect or occurrence that, individually or in the aggregate with all other facts, circumstances, events, changes, effects, or occurrences, has or is reasonably likely to have a material adverse effect on the ability of the Investor to consummate the transactions contemplated by this Agreement.

(b)   Authorization, Enforceability.   The Investor has the requisite power and authority to enter into the Transaction Documents and to carry out its obligations hereunder and thereunder. The execution, delivery and performance of the Transaction Documents by the Investor and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary action on the part of the Investor and no further approval or authorization is required on the part of the Investor. The Transaction Documents will be valid and binding obligations of the Investor enforceable against the

-12-

Investor in accordance with their respective terms, except as the same may be limited by Bankruptcy Exceptions.

Neither the execution, delivery and performance by the Investor of the Transaction Documents, nor the consummation of the transactions contemplated hereby and thereby, nor compliance by the Investor with any of the provisions thereof, will (1) violate, conflict with, or result in a breach of any provision of, or constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under, or result in the termination of, or accelerate the performance required by, or result in a right of termination or acceleration of, or result in the creation of, any lien, security interest, charge or encumbrance upon any of the properties or assets of the Investor under any of the terms, conditions or provisions of (A) its organizational documents or (B) any note, bond, mortgage, indenture, deed of trust, license, lease, agreement or other instrument or obligation to which the Investor is a party or by which it may be bound, or to which the Investor or any of the properties or assets of the Investor may be subject, or (2) subject to compliance with the statutes and regulations referred to in the next paragraph, violate any statute, rule or regulation or any judgment, ruling, order, writ, injunction or decree applicable to the Investor or any of their respective properties or assets except, in the case of clauses (1)(B) and (2), for those occurrences that are not reasonably likely to result in an Investor Material Adverse Effect.

Other than in connection or in compliance with the provisions of the Securities Act and the securities or blue sky laws of the various states, to the Investor's best knowledge, no notice to, filing with, exemption or review by, or authorization, consent or approval of, any Governmental Entity is necessary for the consummation by the Investor of the transactions contemplated by the Transaction Documents. The Investor has the present intention to hold all Equity Units in a manner that is consistent with the investment exception to the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

(c)    Purchase for Investment.  The Investor acknowledges that the Equity Units have not been registered under the Securities Act or under any state securities laws.  The Investor (1) is a public institution, wholly owned by the Government of the Emirate of Abu Dhabi and is not making the investment in connection with any commercial activity, (2) is acquiring the Equity Units pursuant to an exemption from registration under the Securities Act solely for investment with no present intention to distribute any of the Purchased Securities to any person in violation of the Securities Act, (3) will not sell or otherwise dispose of any of the Purchased Securities, except in compliance with the registration requirements or exemption provisions of the Securities Act and any other applicable securities laws, (4) has such knowledge and experience in financial and business matters and in investments of this type that it is capable of evaluating the merits and risks of its investment in the Equity Units and of making an informed investment decision, and has conducted a review of the business and

affairs of the Company that it considers sufficient and reasonable for purposes of its making this Investment, and (5) is an Accredited Investor (as that term is defined by Rule 501 of the Securities Act).

(d)     Financial Capability.  The Investor has or will have available funds to make the Purchase on the terms and conditions contemplated by this Agreement.

(e)     Taxes.  The Investor is an "integral part" or a "controlled entity" of a foreign sovereign within the meaning of Treasury regulation section 1.892-2T(a)(1), and thus, (i) qualifies as a "foreign government" for purposes of Section 892 of the Code and (ii) is not subject to any U.S. federal income tax withholding on any payments made under the terms of the Purchased Securities.

## ARTICLE III

### COVENANTS

3.1     Commercially Reasonable Efforts.  (a) Subject to the terms and conditions of this Agreement, each of the parties hereto agrees to use its commercially reasonable efforts in good faith to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or desirable, or advisable under applicable laws, so as to permit consummation of the transactions contemplated hereby as promptly as practicable and otherwise to enable consummation of the transactions contemplated hereby and shall cooperate fully with the other parties hereto to that end, including in relation to the satisfaction of the conditions to Closing set forth in Sections 1.2(c), (d) and (e) and cooperating in seeking to obtain any consent required from Governmental Entities.

(b)     The Company shall form the Trusts, as promptly as reasonably practicable following the date hereof, and shall cause the Trusts to take all actions as may be reasonably necessary or advisable to carry out or to perform the provisions of this Agreement.

(c)     In furtherance and not limitation of the foregoing, the Company agrees, upon request, to furnish the Investor with all information concerning itself, its subsidiaries, directors, officers and stockholders and such other matters as may be reasonably necessary in connection with any statement, filing, notice or application made by or on behalf of the Investor or any of its subsidiaries to any Governmental Entity in connection with the Purchase.

(d)     In furtherance and not limitation of the foregoing, the Investor shall, upon request, furnish the Company with all information concerning itself and its subsidiaries and such other matters as may be required by law in connection with any statement, filing, notice or application made by or on behalf of the Company or any of its subsidiaries to any Governmental Entity in connection with the Purchase.

NY12532:411584.9

3.2   Expenses.   Unless otherwise provided in the Transaction Documents, each of the parties hereto will bear and pay all costs and expenses incurred by it or on its behalf in connection with the transactions contemplated under the Transaction Documents including fees and expenses of its own financial or other consultants, investment bankers, accountants and counsel.

3.3   Publicity.   No public release or announcement concerning the transactions contemplated hereby shall be issued by any party hereto without the prior consent of the other party (which consent shall not be unreasonably withheld), except as such release or announcement may be required by law or the rules or regulations of any United States or foreign securities exchange, in which case the party required to make the release or announcement shall, to the extent reasonably practicable, allow the other party reasonable time to comment on such release or announcement in advance of such issuance. The provisions of this Section 3.3 shall not restrict the ability of a party hereto to summarize or describe the transactions contemplated by this Agreement in any prospectus or similar offering document so long as the other party is provided a reasonable opportunity to review such disclosure in advance. Notwithstanding anything to the contrary, nothing in this Section 3.3 shall require the Investor to provide any financial information concerning itself, or any information regarding its directors, officers or stockholders.

3.4   Listing.   The Company shall use its commercially reasonable efforts to cause all Common Stock issued under the Equity Contracts to be listed on each securities exchange or quotation system on which the Common Stock is listed or traded, subject to notice of issuance.

3.5   Sufficiency of Outstanding Common Stock.   During the period from the date of this Agreement until the date of completion of all of the Common Stock issuances contemplated under the Equity Contracts, the Company shall at all times have reserved for issuance a sufficient number of shares of authorized and unissued Common Stock to complete the Common Stock issuances contemplated under the Equity Contracts.

3.6   Payments Free of Tax.   The Company shall, or shall cause its paying agent to, make any and all payments on the Purchased Securities free and clear of and without reduction or withholding for any taxes, provided that the Company or its Paying Agent has received a valid and properly completed IRS Form W-8EXP (or appropriate substitute form) from the Investor evidencing exemption from such reduction or withholding prior to making such a payment.

NY12532;411584.9

## ARTICLE IV

### ADDITIONAL AGREEMENTS

4.1    Standstill Agreement.  The Investor agrees that, without the prior approval of the Company, the Investor will not, directly or indirectly, through its subsidiaries or any other persons, or in concert with any person, or as a group (as defined in Section 13 of the Exchange Act) with any person:

(a)    purchase, offer to purchase, or agree to purchase or otherwise acquire beneficial ownership (as defined in Rule 13d-3 and Rule 13d-5 under the Exchange Act) of any Common Stock, or securities convertible into or exchangeable for Common Stock, that would result in the Investor or its subsidiaries having control of the Company within the meaning of the BHC Act or having beneficial ownership of more than 4.9% of the outstanding shares of voting stock or Common Stock of the Company (treating Equity Units and other convertible securities of the Company that are beneficially owned by a person or its Affiliates as fully converted into the underlying Common Stock);

(b)    make, or in any way participate in any solicitation of proxies to vote, or seek to advise or influence any person with respect to the voting of, any voting securities of the Company or any of its subsidiaries, or seek or propose to influence, advise, change or control the management, board of directors, policies, affairs or strategy of the Company by way of any public communication or other communications to securityholders intended for such purpose;

(c)    make a proposal for, or offer of (with or without conditions) any acquisition of, or extraordinary transaction involving, the Company or any of the Company's subsidiaries or any of their respective securities or assets; or

(d)    enter into any discussions, negotiations, arrangements, or understandings with or form a group with, any other person in such other person's taking, planning to take, or seeking to take any of the actions described in clauses (a) through (c) of this Section 4.1 or otherwise act, alone or in concert with others, to seek to control or influence the management or policies of the Company, board of directors of the Company or policies of the Company, including any of the Company's subsidiaries.

The Investor's obligations under this Section 4.1 shall terminate on the later of (1) the third anniversary of the Closing Date and (2) the date on which the Investor and its subsidiaries beneficially own less than 2% of the outstanding Common Stock (treating Equity Units and other convertible securities of the Company that are beneficially owned by the Investor or its subsidiaries as fully converted into the underlying Common Stock).

NY12532:411584.9

4.2     Lock-up Agreement.

(a)     Until the first anniversary of the Closing Date (the *"Lock-up Period"*), the Investor shall not, without the prior written consent of the Company, directly or indirectly (i) offer, transfer, sell, contract to sell (including any short sale), grant any option to purchase or otherwise dispose of any common equity or equity-related securities of the Company (*"Lock-up Securities"*) which may be deemed to be beneficially owned by it or its Affiliates in accordance with the rules and regulations of the Commission, including the Equity Units (but not the Capital Securities separate from Equity Units) purchased by the Investor pursuant to this Investment Agreement or the shares of Common Stock underlying such Equity Units, (ii) enter into any Hedging Transaction (as defined below) involving Lock-up Securities, or (iii) publicly announce any intention to do any of the foregoing (each of the foregoing referred to as a *"Disposition"*). The foregoing restrictions shall not apply to transfers by Investor of any or all of the Equity Units purchased by the Investor pursuant to this Agreement to any wholly-owned subsidiary in accordance with Section 4.5, *provided that* such transferee agrees in writing to the terms of this Section 4.2. The foregoing restriction is expressly intended to preclude the Investor from engaging in any Hedging Transaction or other transaction which is designed to or reasonably expected to lead to or result in a Disposition of Lock-up Securities during the Lock-Up Period even if the securities would be disposed of by someone other than the Investor. *"Hedging Transaction"*, with respect to a security means any short sale (whether or not against the box) or any purchase, sale or grant of any right (including any put or call option) with respect to any security (other than a broad-based market basket or index) that includes, relates to or derives any significant part of its value from such security or the Common Stock.

(b)     Investor represents and warrants to the Company that it has in place information barrier policies and procedures with respect to certain persons and Affiliates engaged in trading of securities that have been reasonably designed and implemented so as to effectively ensure against such persons or Affiliates trading on the basis of material non-public information. This Section 4.2 shall not apply to any such person or Affiliate that is on the other side of such information barrier from the Investor's Strategic Investment Team and complies with such policies and procedures and who is not aware of any Information (as such term is defined in the Confidentiality Agreement, dated November 24, 2007 (the *"Confidentiality Agreement"*), between the Company and Investor).

4.3     Adjustment Provisions.

(a)     If during the period commencing on the date of this Agreement and continuing to the first anniversary of the Closing Date the Company issues one or more of the following types of securities (collectively, *"Covered Securities"*):

(1)     shares of Common Stock (other than Excluded Securities (as defined below)) at a price per share less than the Reference Price (as defined below);

-17-

(2)     Optionally Convertible Securities (as defined below) (other than Excluded Securities) (x) as to which the price per share of Common Stock on the date of pricing of such Optionally Convertible Securities is less than the Reference Price and (y) having a conversion price that is less than the Threshold Appreciation Price; or

(3)     Mandatorily Convertible Securities (as defined below) (other than Excluded Securities) having an exercise price or reference price that is less than the Reference Price;

and if the gross proceeds raised by the Company from issuance of such Covered Securities during such period exceeds $5 billion (such occurrence a *"Reset Event"*), then the Company shall amend the Equity Contracts as provided in Sections 4.3(b), (c), (d) and (e). Such amendment shall be effected within 90 days after the first anniversary of the Closing Date.

(b)     If a Reset Event occurs and:

(1)     if all of the Reset Causing Covered Securities are shares of Common Stock, then the Company shall amend each Equity Contract so that the Threshold Appreciation Price (as defined below) as adjusted shall equal (x) the weighted average issuance price of such shares of Common Stock multiplied by (y) 1.17 (subject to Section 4.3(d));

(2)     if all of the Reset Causing Covered Securities are Mandatorily Convertible Securities, then the Company shall amend each Equity Contract so that the Threshold Appreciation Price as adjusted is the Reset Reference Price (as defined below) multiplied by the sum of (i) one plus (ii) the Reset Conversion Premium (as defined below) (subject to Section 4.3(d)); and

(3)     if all of the Reset Causing Covered Securities are Optionally Convertible Securities, then the Company shall amend each Equity Contract so that the Threshold Appreciation Price as adjusted equals the weighted average of the conversion prices of such Optionally Convertible Securities (subject to Section 4.3(d)).

(c)     If in connection with the occurrence of a Reset Event the Company has issued Reset Causing Covered Securities under two or more of sub-paragraphs (1), (2) or (3) of Section 4.3(a), then the adjusted Threshold Appreciation Price shall be calculated by (i) first calculating the adjusted Threshold Appreciation Price under each of sub-paragraphs (1), (2) and (3) of Section 4.3(b), applying such calculation only to the corresponding Reset Causing Covered Securities and (ii) then calculating the weighted average of such adjusted Threshold Appreciation Prices, which weighted average shall be the price to which the Threshold Appreciation Price shall be adjusted for the Equity Contracts held by the Investor (subject to Section 4.3(d)).

NY12532:411584.9

(d)    If the result of the calculation pursuant to Section 4.3(b) or 4.3(c) would result in an adjusted Threshold Appreciation Price that is less than $31.83, the adjusted Threshold Appreciation Price shall be $31.83; *provided* that in no event shall any adjustment made pursuant to this Section 4.3 result in the adjusted Threshold Appreciation Price being an amount in excess of $37.24.

(e)    It is understood and agreed that if any antidilution adjustments are made to the Equity Contracts pursuant to the terms thereof, appropriate changes will be made to the adjustments contemplated by paragraphs (b), (c) and (d) of this Section 4.3 and related definitions in Section 4.3(f).

(f)    For purposes of this Section 4.3:

(1)    *"Excluded Securities"* means (A) any Covered Securities issued by the Company pursuant to any employment contract, employee or benefit plan, stock purchase plan, stock ownership plan, stock option or equity compensation plan or other similar plan where stock is being issued or offered to a trust, other entity or otherwise, to or for the benefit of any employees, potential employees, officers or directors of the Company, (B) any Covered Securities issued by the Company in connection with a business combination or other merger, acquisition or disposition transaction, a partnership or joint venture or strategic alliance by the Company, (C) any Covered Securities issued with reference to the Common Stock of a subsidiary (*i.e.*, a carve-out transaction) and (D) Covered Securities issued in connection with a dividend investment or stockholder purchase plan;

(2)    *"Mandatorily Convertible Securities"* means additional Equity Units or mandatorily convertible securities convertible into common equity of the Company.

(3)    *"Optionally Convertible Securities"* means securities that are convertible into or exchangeable for shares of Common Stock at the option of the holder of such securities.

(4)    *"Reference Price"* means $31.83.

(5)    *"Reset Causing Covered Securities"* means all Covered Securities issued during the period provided for in Section 4.3(a).

(6)    *"Reset Conversion Premium"* means the lowest of (i) 0.17, (ii) the weighted average of the conversion premiums (expressed as a decimal) for the Reset Causing Covered Securities that are Mandatorily Convertible Securities, and (iii) in the event the weighted average of the coupons of such Reset Causing Covered Securities is greater than 11%, the difference between (I) the lower of the amount calculated under clause (i) and clause (ii) of this paragraph (6) and (II) 2.5 multiplied by the difference between (A) the weighted average of the coupons (expressed as a decimal) of such Reset Causing Covered Securities and (B) 0.11.

(7)   *"Reset Reference Price"* means the lesser of (i) $31.83 and (ii) the weighted average of the reference prices for such Reset Causing Covered Securities that are Mandatorily Convertible Securities.

(8)   *"Threshold Appreciation Price"* means $37.24, as adjusted pursuant to Section 4.3(a).

4.4   Preemptive Rights.

(a)   Company Sale of Covered Securities.

(1)   If the Company at any time after the first anniversary date of the Closing and before the 18-month anniversary of the Closing Date, offers to sell Covered Securities that are not Excluded Securities, the Investor shall be afforded the opportunity to acquire from the Company, for the same price and on the same terms as such securities are proposed to be offered to others, in the aggregate up to the amount of Covered Securities required to enable it to maintain its then-current Investor Percentage Interest (as defined below), *provided, however,* that the Investor's preemptive rights under this Section 4.4 shall terminate on the date that is eighteen (18) months after the Closing Date.

(2)   For purposes of this Section 4.4: *"Investor Percentage Interest"* means as of any date, the percentage equal to (a) the aggregate number of shares of Common Stock beneficially owned by the Investor (treating Equity Units and other convertible securities of the Company that are beneficially owned by the Investor or its Affiliates as fully converted into the underlying Common Stock) divided by (b) the total number of outstanding shares of Common Stock after giving effect to the issuance of all Shares described in clause (a); and *"Qualified Equity Offering"* means a public or nonpublic offering of Covered Securities solely for cash; *provided, however,* that none of the following offerings shall constitute a Qualified Equity Offering:  (a) any offering pursuant to any stock purchase plan, stock ownership plan, stock option or equity compensation plan or other similar plan where stock is being issued or offered to a trust, other entity or otherwise, to or for the benefit of any employees, potential employees, officers or directors of the Company, or (b) any offering made as part of or in connection with a business combination or other merger, acquisition or disposition transaction, a partnership or joint venture or strategic alliance by the Company or any similar transaction not primarily intended for the purpose of capital raising.

(b)   Notice.

(1)   In the event the Company intends to make a Qualified Equity Offering of Covered Securities that is an underwritten public offering or a private offering made to Qualified Institutional Buyers (as such term is defined in the Securities Act) for resale pursuant to Rule 144A under the Securities Act, no later than ten (10) business days after the initial filing of a registration statement with the Commission with respect to such underwritten public offering or the

-20-

commencement of marketing with respect to such Rule 144A offering, it shall give Investor written notice of its intention (including, in the case of a registered public offering and to the extent possible, a copy of the prospectus included in the registration statement filed in respect of such offering) describing, to the extent then known, the anticipated amount of securities, range of prices, timing and other material terms of such offering. Investor shall have ten (10) calendar days from the date of receipt of any such notice to notify the Company in writing that it intends to exercise such preemptive purchase rights and as to the amount of Covered Securities Investor desires to purchase, up to the maximum amount calculated pursuant to Section 4.4 (the *"Designated Securities"*). Such notice shall constitute a non-binding indication of interest of Investor to purchase the Designated Securities so specified at the range of prices and other terms set forth in the Company's notice to it. The failure to respond during such ten (10) calendar day period shall constitute a waiver of preemptive rights in respect of such offering.

   (2)   If the Company proposes to make a Qualified Equity Offering of Covered Securities that is not an underwritten public offering or Rule 144A offering (a *"Private Placement"*), the Company shall give Investor written notice of its intention, describing, to the extent then known, the anticipated amount of securities, price and other material terms upon which the Company proposes to offer the same. Investor shall have ten (10) calendar days from the date of receipt of the notice required by the immediately preceding sentence to notify the Company in writing that it intends to exercise such preemptive purchase rights and as to the amount of Designated Securities Investor desires to purchase, up to the maximum amount calculated pursuant to Section 4.4. Such notice shall constitute a non-binding indication of interest of Investor to purchase the amount of Designated Securities so specified (or a proportionately lesser amount if the amount of Covered Securities to be offered in such Private Placement is subsequently reduced) upon the price and other terms set forth in the Company's notice to it. The failure of Investor to respond during the ten (10) calendar day period referred to in the second preceding sentence shall constitute a waiver of the preemptive rights in respect of such offering.

   (c)   <u>Purchase Mechanism</u>.

   (1)   If Investor exercises its preemptive rights provided in Section 4.4(b)(2), the closing of the purchase of the Covered Securities with respect to which such right has been exercised shall be conditioned on the consummation of the Private Placement giving rise to such preemptive purchase rights and shall take place simultaneously with the closing of the Private Placement or on such other date as the Company and Investor shall agree in writing; provided, that the actual amount of Covered Securities to be sold to the Investor pursuant to its exercise of preemptive rights hereunder shall be reduced if the aggregate amount of Covered Securities sold in the Private Placement is reduced and, at the option of the Investor (to be exercised by delivery of written

NY12532:411584.9

notice to the Company within five (5) business days of receipt of notice of such increase), shall be increased if such aggregate amount of Covered Securities sold in the Private Placement is increased. In connection with its purchase of Designated Securities, Investor shall execute an agreement containing representations, warranties and agreements of Investor that are substantially similar in all material respects to the agreements executed by other purchasers in such Private Placement.

(2)     If the Investor exercises its preemptive purchase rights provided in Section 4.4(b)(1), the Company shall offer the Investor, if such underwritten public offering or Rule 144A offering is consummated, the Designated Securities (as adjusted to reflect the actual size of such offering when priced) at the same price as the Covered Securities are offered to the underwriters or initial purchasers and shall provide written notice of such price to Investor as soon as practicable prior to such consummation. Contemporaneously with the execution of any underwriting agreement or purchase agreement entered into between the Company and the underwriters or initial purchasers of such underwritten public offering or Rule 144A offering, Investor shall enter into an instrument in form and substance reasonably satisfactory to the Company acknowledging Investor's binding obligation to purchase the Designated Securities to be acquired by it and containing representations, warranties and agreements of Investor that are customary in private placement transactions and, in any event, no less favorable to Investor than any underwriting or purchase agreement entered into by the Company in connection with such offering, and the failure to enter into such an instrument at or prior to such time shall constitute a waiver of preemptive rights in respect of such offering. Any offers and sales pursuant to this Section 4.4 in the context of a registered public offering shall be also conditioned on reasonably acceptable representations and warranties of the Investor regarding its status as the type of offeree to whom a private sale can be made concurrently with a registered offering in compliance with applicable securities laws.

(d)     No Negotiation Right.  The Investor shall not have any rights to participate in the negotiation of the proposed terms of any Private Placement, underwritten public offering or Rule 144A offering.

(e)     Cooperation.  The Company and the Investor shall cooperate in good faith to facilitate the exercise of the Investor's preemptive rights hereunder, including securing any required approvals or consents, in a manner that does not jeopardize the timing, marketing, pricing or execution of any offering of the Company's securities.

(f)     Limitation of Rights.  Notwithstanding the above, nothing set forth in this Section 4.4 shall confer upon the Investor the right to purchase any securities of the Company other than Designated Securities, and, unless herein provided, in no event shall the issuance of securities by the Company pursuant to any merger, acquisition or asset purchase transaction or pursuant to the terms and provisions of any current or future

equity compensation or employee benefit plan of the Company or otherwise than through a Qualified Equity Offering be deemed included in any right granted to the Investor under this Section 4.4.

4.5    Transfer Restrictions.

(a)    Restrictions on Transfer.  Except as otherwise expressly permitted in this Agreement, until the second anniversary of the Closing Date, the Investor will not, directly or indirectly, transfer, sell, assign, pledge, convey, hypothecate or otherwise encumber or dispose of, or engage in a Hedging Transaction with respect to, (collectively, "*Transfer*") any Equity Contracts or Common Stock or permit its subsidiaries to do so.

(b)    Permitted Transfers.  (1) Notwithstanding Section 4.2(a), the Investor shall be permitted to Transfer any portion or all of the Purchased Securities at any time to any wholly-owned subsidiary of the Investor, but only if the transferee agrees in writing for the benefit of the Company and the Trusts to be bound by the terms of this Agreement; *provided* that such wholly-owned subsidiary shall be permitted to own such Purchased Securities only so long as such subsidiary shall remain a wholly-owned subsidiary of the Investor and such subsidiary complies with Section 3.6 as if it were the Investor and provides to the Company sufficient evidence that no U.S. income tax withholding is required in connection with payments made to such subsidiary in respect of Purchased Securities; *provided further* that no such Transfer shall relieve the Investor of its obligations under this Agreement.

(2)    Other than Transfers permitted by Section 4.5(b)(1), until the third anniversary of the final purchase of Common Stock pursuant to the Equity Contracts, with respect to Transfers of more than $1 billion in Purchased Securities in the aggregate in any six-month period the Investor (A) acknowledges that it intends to use reasonable efforts to structure such Transfer in a manner reasonably intended to minimize any negative market impact of such Transfers and (B) agrees to (i) give the Company the opportunity to purchase the securities the Investor intends to Transfer at prices prevailing in the market or (ii) give an Affiliate of the Company the right to act as sole bookrunner, placement agent or global coordinator, in effecting all such Transfers provided its proposal with respect to such action is on market terms.

4.6    Legend.  (a) The Investor agrees that all certificates or other instruments representing Securities will bear a legend substantially to the following effect:

"THE SECURITIES REPRESENTED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR SECURITIES LAWS OF ANY STATE AND MAY NOT BE TRANSFERRED, SOLD OR OTHERWISE DISPOSED OF EXCEPT WHILE A REGISTRATION STATEMENT RELATING THERETO IS IN EFFECT

UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER SUCH ACT OR SUCH LAWS. THIS INSTRUMENT IS ISSUED PURSUANT TO AND SUBJECT TO THE RESTRICTIONS ON TRANSFER AND OTHER PROVISIONS OF AN INVESTMENT AGREEMENT, DATED AS OF NOVEMBER 26, 2007, BETWEEN THE ISSUER OF THESE SECURITIES AND THE INVESTOR REFERRED TO THEREIN, A COPY OF WHICH IS ON FILE WITH THE ISSUER. THE SECURITIES REPRESENTED BY THIS INSTRUMENT MAY NOT BE SOLD OR OTHERWISE TRANSFERRED EXCEPT IN COMPLIANCE WITH SAID AGREEMENT. ANY SALE OR OTHER TRANSFER NOT IN COMPLIANCE WITH SAID AGREEMENT WILL BE VOID."

## ARTICLE V

### MISCELLANEOUS

5.1    Survival; Indemnification.

(a)    Survival.  The representations and warranties of the Company contained in this Agreement shall survive the Closing until the date nine months after the Closing Date; *provided, however,* that the representations and warranties made pursuant to Sections 2.2(a)-(c) and (h)-(m) shall survive until the expiration of the applicable statute of limitations. The representations and warranties of the Investor contained in this Agreement shall survive the Closing until the date nine months after the Closing Date; *provided, however,* that the representations and warranties made pursuant to Sections 2.3(a), (b) and (e) shall survive the Closing until the expiration of the applicable statute of limitations. The agreements and covenants contained in this Agreement shall survive the Closing to the extent contemplated by such provisions. Neither the period of survival nor the liability of a party hereto with respect to its representations and warranties shall be reduced by any investigation made at any time by or on behalf of the other party hereto. If written notice of a claim has been given prior to the expiration of the applicable representations and warranties by one party to the other, then the relevant representations and warranties shall survive as to such claim, until such claim has been finally resolved. Notwithstanding Section 5.2, if this Agreement is terminated or abandoned, the provisions of Sections 3.2, 3.3 and 3.6 and Article V shall survive such termination or abandonment.

(b)    Indemnification by the Company.  The Investor and its Affiliates, officers, directors, employees, agents, successors and assigns (each an "*Investor Indemnified Party*") shall be indemnified and held harmless by the Company for and against any and all liabilities, losses, damages, claims, costs and expenses, interest, awards, judgments and penalties (including attorneys' and consultants' fees and expenses) actually suffered or incurred by them (including any action brought or otherwise initiated by any of them) (hereinafter a "*Loss*"), arising out of or resulting from

-24-

the breach or alleged breach of any representation, warranty or covenant of the Company contained in the Transaction Documents.

(c)   Indemnification by Investor. The Company and its Affiliates, officers, directors, employees, agents, successors and assigns (each a *"Company Indemnified Party"*) shall be indemnified and held harmless by the Investor for and against any and all Losses, arising out of or resulting from the breach or alleged breach of any representation, warranty or covenant of the Investor contained in the Transaction Documents.

(d)   Notice of Loss; Third Party Claims.

(1)   A Company Indemnified Party shall give the Investor notice of any matter, and an Investor Indemnified Party shall give the Company notice of any matter that such Company Indemnified Party or Investor Indemnified Party (either, an *"Indemnified Party"*) has determined has given or could give rise to a right of indemnification under this Agreement, as soon as practicable and in no event later than 60 days of such determination, stating the amount of the Loss, if known, and method of computation thereof, and containing a reference to the provisions of this Agreement in respect of which such right of indemnification is claimed or arises. Notwithstanding anything to the contrary, any such notice must be delivered prior to the expiration of the survival period for the relevant representation, warranty or covenant.

(2)   If an Indemnified Party shall receive notice of any action, audit, demand or assessment (each, a *"Third Party Claim"*) against it or which may give rise to a claim for Loss under this Section 5.1, the Indemnified Party shall give the Company or Investor, as the case may be (the "Indemnifying Party") notice of such Third Party Claim as soon as practicable and in no event later than 30 days of the receipt of such notice; *provided, however,* that the failure to provide such notice shall not relieve the Indemnifying Party from any of its obligations under this Section 5.1 except to the extent that the Indemnifying Party is materially prejudiced by such failure and shall not relieve the Indemnifying Party from any other obligation or liability that it may have to any Indemnified Party otherwise than under Section 5.1(b) or 5.1(c), as the case may be. If the Indemnifying Party acknowledges in writing its obligation to indemnify the Indemnified Party hereunder against any Losses that may result from such Third Party Claim, then the Indemnifying Party shall be entitled to assume and control the defense of such Third Party Claim at its expense and through counsel of its choice if it gives notice of its intention to do so to the Indemnified Party within fourteen (14) days of the receipt of notice from the Indemnified Party of such Third Party Claim; *provided, however,* that if there exists or is reasonably likely to exist a conflict of interest that would make it inappropriate in the judgment of the Indemnified Party in its reasonable discretion for the same counsel to represent both the Indemnified Party and the Indemnifying Party, then the Indemnified Party shall be entitled to retain its own counsel, at the expense of the Indemnifying Party. In the event that

NY12532:411584.9

the Indemnifying Party exercises the right to undertake any such defense against any such Third Party Claim as provided above, the Indemnified Party shall cooperate with the Indemnifying Party in such defense and make available to the Indemnifying Party, at the Indemnifying Party's expense, all witnesses, pertinent records, materials and information in the Indemnified Party's possession or under the Indemnified Party's control relating thereto as is reasonably required by the Indemnifying Party. Similarly, in the event the Indemnified Party is, directly or indirectly, conducting the defense against any such Third Party Claim, the Indemnifying Party shall cooperate with the Indemnified Party in such defense and make available to the Indemnified Party, at the Indemnifying Party's expense, all such witnesses, records, materials and information in the Indemnifying Party's possession or under the Indemnifying Party's control relating thereto as is reasonably required by the Indemnified Party. No such Third Party Claim may be settled by the Indemnifying Party without the prior written consent of the Indemnified Party.

5.2    Termination.  This Agreement may be terminated at any time prior to the Closing:

(a)    by either the Investor or the Company if the Closing shall not have occurred by the 60th calendar day following the date of this Agreement; *provided, however,* that the right to terminate this Agreement under this Section 5.2(a) shall not be available to any party whose failure to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur on or prior to such date;

(b)    by either the Investor or the Company in the event that any Governmental Entity shall have issued an order, decree or ruling or taken any other action restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement and such order, decree, ruling or other action shall have become final and nonappealable; or

(c)    by the mutual written consent of the Investor and the Company.

In the event of termination of this Agreement as provided in this Section 5.2, this Agreement shall forthwith become void and there shall be no liability on the part of either party hereto except that nothing herein shall relieve either party from liability for any breach of this Agreement.

5.3    Amendment.  No amendment of any provision of this Agreement will be effective with respect to any party unless made in writing and signed by an officer of a duly authorized representative of such party.

5.4    Waiver of Conditions.  The conditions to each party's obligation to consummate the Purchase are for the sole benefit of such party and may be waived by such party in whole or in part to the extent permitted by applicable law. No waiver will

-26-

be effective unless it is in a writing signed by a duly authorized officer of the waiving party that makes express reference to the provision or provisions subject to such waiver.

5.5   Counterparts and Facsimile.  For the convenience of the parties hereto, this Agreement may be executed in any number of separate counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts will together constitute the same agreement. Executed signature pages to this Agreement may be delivered by facsimile and such facsimiles will be deemed as sufficient as if actual signature pages had been delivered.

5.6   Dispute Resolution.

(a)   Arbitration.  If the Company and/or the Investor (each, a "*Disputing Party*") cannot resolve any dispute that arises out of or relates to the Transaction Documents, or the breach thereof, within 30 calendar days after written notice of the dispute specifying in reasonable detail the nature of the dispute is first given, such dispute will be decided through arbitration administered by the American Arbitration Association in accordance with its International Arbitration Rules then in effect; *except* that (i) Article 37 of the International Arbitration Rules of the American Arbitration Association will not apply and (ii) a Disputing Party seeking a temporary restraining order, injunction or an order to maintain the status quo or to prevent irreparable harm (such remedies being "*Interim Measures*") shall only seek such remedy through court proceedings in accordance with Section 5.7 and shall not seek such remedy through arbitration as provided under this Section 5.6. The number of arbitrators shall be three, appointed as set forth in Section 5.6(b).  The place of arbitration shall be the Borough of Manhattan, The City of New York.  The language of the arbitration shall be English.

(b)   Appointment of Arbitrators.  Each Disputing Party shall appoint one arbitrator in a time to be set by the American Arbitration Association.  The two arbitrators so appointed shall mutually appoint the third arbitrator (who shall act as the chairman), if possible.  If the two arbitrators have not so appointed the third arbitrator within 30 calendar days of the appointment of the second arbitrator, the American Arbitration Association shall appoint the third arbitrator.

(c)   Decision.  The arbitrators will base their decision on the terms and conditions of the Transaction Documents.  Judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.  The arbitrators shall have no authority to award punitive, special or exemplary damages or any other form of non-compensatory damages.

(d)   Confidentiality.  The parties shall keep any such arbitration confidential and shall not disclose to any person, other than those necessary to the proceedings, the existence of the arbitration, any information, testimony or documents submitted during the arbitration or received from the other party, a witness or the arbitrator(s) in connection with the arbitration, and any award, unless and to the extent

-27-

that disclosure is required by law or is necessary for permitted court proceedings, such as proceedings to recognize or enforce an award.

5.7    Governing Law; Submission to Jurisdiction, Etc.    The Transaction Documents will be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within such State. In the case of any permitted court proceedings, including any request for Interim Measures, each of the parties hereto agrees (i) to submit to the personal jurisdiction of the State or Federal courts in the Borough of Manhattan, The City of New York, (ii) that exclusive jurisdiction and venue shall lie in the State or Federal courts in the State of New York, and (iii) that notice may be served upon such party at the address and in the manner set forth for such party in Section 5.10. The parties may seek to enforce an arbitral award in any court in which jurisdiction may be had.

5.8    Sovereign Waiver.    To the extent permitted by applicable law, if the Investor has or hereafter may acquire any immunity (sovereign or otherwise) from any legal action, suit or proceeding, including arbitration, from jurisdiction of any court or arbitral tribunal, or from set-off or any legal process (whether service or notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) with respect to itself or any of its property, the Investor hereby irrevocably waives and agrees not to plead or claim such immunity in respect of its obligations under the Transaction Documents. The Investor agrees that the waivers set forth above shall have the fullest extent permitted under the Foreign Sovereign Immunities Act of 1976 of the United States of America and are intended to be irrevocable and not subject to withdrawal for purposes of such Act.

5.9    Remedies.    In addition and supplementary to other rights and remedies existing in a party's favor under this Agreement, such party may apply to a court of law or equity of competent jurisdiction for specific performance and/or injunctive or other equitable relief in order to enforce or prevent any breach or violation of any provision of this Agreement. All such rights and remedies shall, to the extent permitted by applicable law, be cumulative and the existence, assertion, pursuit or exercise of any thereof by such party shall not preclude such party from exercising or pursuing any other rights or remedies available to it.

5.10    Notices.    Any notice, request, instruction or other document to be given hereunder by any party to the other will be in writing and will be deemed to have been duly given (a) on the date of delivery if delivered personally, or by facsimile, upon confirmation of receipt, (b) on the second business day following the date of dispatch if delivered by a recognized next day courier service, or (c) on the tenth business day following the date of mailing if delivered by registered or certified mail, return receipt requested, postage prepaid. All notices hereunder shall be delivered as set forth below, or pursuant to such other instructions as may be designated in writing by the party to receive such notice.

NY12532:411584.9

(a)    If to the Investor:

                Abu Dhabi Investment Authority
                ADIA Tower
                Corniche Road
                Abu Dhabi
                PO Box 3600
                United Arab Emirates

                Facsimile: +971 2 4151000
                Attn: Executive Director, Emerging Markets
                Department
with a copy to:

                Shearman & Sterling LLP
                599 Lexington Avenue
                New York, New York 10022-6069
                Attention: Robert Evans III
                            Stephen M. Besen

                Facsimile: (212) 848-7179

(b)    If to the Company:

                Citigroup Inc.
                399 Park Avenue
                New York, New York 10043
                Attention: Deputy General Counsel

                Facsimile: (212) 559-7057

with a copy to:

                Sullivan & Cromwell LLP
                125 Broad Street
                New York, New York 10004
                Attention: Mitchell S. Eitel
                            Mark J. Welshimer

                Facsimile: (212) 558-3588

-29-

5.11  Entire Agreement, Etc.  (a)  This Agreement (including the Exhibits and Disclosure Schedules hereto) and the Confidentiality Agreement constitute the entire agreement, and supersede all other prior agreements, understandings, representations and warranties, both written and oral, between the parties, with respect to the subject matter hereof; and (b) this Agreement will not be assignable by operation of law or otherwise (any attempted assignment in contravention hereof being null and void).

5.12  Definitions of "subsidiary" and "Affiliate".  (a) When a reference is made in this Agreement to a subsidiary of a person, the term *"subsidiary"* means those corporations, banks, savings banks, associations and other entities of which such person owns or controls more than 50% of the outstanding equity securities either directly or through an unbroken chain of entities as to each of which more than 50% of the outstanding equity securities is owned directly or indirectly by its parent; *provided, however,* that there shall not be included any such entity to the extent that the equity securities of such entity were acquired in satisfaction of a debt previously contracted in good faith or are owned or controlled in a *bona fide* fiduciary capacity.

(b)  The term *"Affiliate"* means, with respect to any person, any person directly or indirectly controlling, controlled by or under common control with, such other person. For purposes of this definition, "control" when used with respect to any person, means the possession, directly or indirectly, of the power to cause the direction of management and/or policies of such person, whether through the ownership of voting securities by contract or otherwise.

5.13  Captions.  The Article, Section and paragraph captions herein are for convenience of reference only, do not constitute part of this Agreement and will not be deemed to limit or otherwise affect any of the provisions hereof.

5.14  Severability.  If any provision of this Agreement or the application thereof to any person (including the officers and directors of the Investor and the Company) or circumstance is determined by a court of competent jurisdiction to be invalid, void or unenforceable, the remaining provisions hereof, or the application of such provision to persons or circumstances other than those as to which it has been held invalid or unenforceable, will remain in full force and effect and shall in no way be affected, impaired or invalidated thereby, so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination, the parties shall negotiate in good faith in an effort to agree upon a suitable and equitable substitute provision to effect the original intent of the parties.

5.15  No Third Party Beneficiaries.  Nothing contained in this Agreement, expressed or implied, is intended to confer upon any person or entity other than the parties hereto, any benefit right or remedies, except that the Trusts shall be third party beneficiaries of the obligations of the Investor under this Agreement.

\*      \*      \*

-30-

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officers of the parties hereto as of the date first herein above written.

CITIGROUP INC.

By: _____

Name:   Sir Winfried Bischoff
Title:   Interim CEO

ABU DHABI INVESTMENT AUTHORITY

By: _____

Name:  Saeed Al Hajeri
Title:    Executive Director
          Emerging Markets Department

By: _____

Name:  Hamad Al Badi
Title:    Assistant Director
          Emerging Markets Department