# Exhibit C

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
AMERICAN ARBITRATION ASSOCIATION
NEW YORK, NEW YORK

| | |
|---|---|
| ABU DHABI INVESTMENT AUTHORITY, <br><br> Claimant, <br><br> v. <br><br> CITIGROUP INC., <br><br> Respondent. | ICDR Case No. 50 148 T 00650 09 |

## AWARD AND STATEMENT OF REASONS

We, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with the arbitration agreement in Section 5.6 of the Investment Agreement dated November 26, 2007 ("Agreement"), entered into between the Abu Dhabi Investment Authority ("ADIA") and Citigroup ("Citigroup")(collectively, "the Parties"), having been duly sworn, and having duly heard the allegations and proofs of the Parties, do hereby AWARD, as follows:

### I.     Procedural History and Pre-Hearing Dispositive Decisions

**Submission to Arbitration.** The Parties agreed to submit to arbitration "any dispute that arises out of or relates to the Transaction Documents,[i] or the breach thereof." The arbitration was to be "administered by the American Arbitration Association ["AAA"] in accordance with the International Arbitration Rules then in effect." §5.6(A).[ii]

**Statement of Claim and Response.** On December 15, 2009, ADIA submitted a Statement of Claim against Citigroup to the AAA:

> seeking rescission [of] a $7.5 billion investment that ADIA was induced to make in Citi based on fraudulent misrepresentations. ADIA also seeks rescission of its investment based on Citi's willful and material breach of the November 26, 2007 Investment Agreement (the "Investment Agreement") and the implied covenant of good faith and fair dealing. In the alternative, ADIA seeks an award of damages caused by Citi's misconduct in an amount to be determined by the arbitrators.

ADIA asserted the following specific claims:

---

[i]    The Agreement's Recitals, ¶C, defined "Transaction Documents" as the Agreement and the Parties' Rights Agreement, which was defined at §1.2(e)(2) as the Registration Rights Agreement.

[ii]    Unless otherwise indicated, hereinafter a reference to "§" will refer to a Section of the Agreement.

1

(1)     Common-law and securities fraud based on Citi's intentional misrepresentation to ADIA inducing it to enter into the Investment Agreement.

(2)     Negligent Misrepresentation based on Citi's negligent misrepresentations to ADIA that induced it to enter into the Investment Agreement.

(3)     Breach of Fiduciary Duty based on ADIA's special relationship of trust and confidence with Citi and Citi's failure to disclose material information, the omission of which induced ADIA to enter into the Investment Agreement.

(4)     Breach of Contract based on breach of the Investment Agreement, including Sections 2.2(d)(1), 2.2(d)(3), 2.2(n)(2) and 2.2(e), due to inaccuracies in Citi's financial statements and SEC Reports and the existence of a Material Adverse Effect prior to the closing of the Investment Agreement.

(5)     Breach of the Implied Covenant of Good Faith and Fair Dealing based on Citi's consolidation of the SIVs, its issuance of tens of billions of dollars in preferred shares and the conversion of those shares to common stock at a conversion rate that is far preferable to, and dilutive of, ADIA's conversion rate, depriving ADIA of the central purpose of its investment.[iii]

ADIA's claim was assigned for administration to the AAA's International Centre for Dispute Resolution ("ICDR").[iv]

On February 19, 2010, Citigroup submitted its Statement of Defense to the ICDR denying liability for ADIA's claims.

**Constitution of Tribunal.** Pursuant to §5.6(b), a Tribunal consisting of Jonathan B. Marks, Joseph T. McLaughlin, and Roy L. Reardon was selected by the Parties and, by letter from the ICDR, was deemed fully constituted on May 3, 2010.

**Arbitration Scheduling and Procedures.** Arbitration scheduling and procedures were primarily established and incrementally modified by a series of Scheduling and Procedural Orders ("SPOs"), each issued after submissions and other Tribunal interactions with the Parties. These SPOs are incorporated herein by reference:

SPO#1, dated June 28, 2010.
SPO#2, dated December 7, 2010, as modified, December 9, 2010.
SPO#3, dated March 11, 2011.
SPO#4, dated April 10, 2011.
SPO#5, dated April 27, 2011.
SPO#6, dated May 14, 2011.
SPO#7, dated May 25, 2011.
SPO#8, dated September 26, 2011.

---

[iii]     Stmt. of Claim p. 15.

[iv]     The Parties agreed that the applicable Rules were the ICDR's International Arbitration Rules found at *http://www.adr.org/sp.asp?id=33994.*

Numerous other scheduling, procedural and discovery-related submissions by the Parties and responsive Tribunal Orders and guidance are a part of the ICDR record. For example:

- On August 12, 2010, the Tribunal issued an Order resolving a motion to compel discovery brought by ADIA and providing additional guidance concerning the timing and nature of document discovery.
- On November 7, 2010, the Tribunal issued a further Order resolving additional document discovery disputes.
- On November 22, 2010, the Tribunal issued an Order resolving certain disputes relating to expert testimony. Referring to a November 18th letter from ADIA stating that "UAE law could arguably control certain issues relating to ADIA's tort claims," the Tribunal's November 22nd Order directed ADIA to "decide whether it wishes the Tribunal to consider applying law other than New York law to one or more of the Claims set out at page 15 of its Notice and Statement of Claim, and, if it does, so move."

These and other Tribunal Orders and guidance relating to discovery and arbitration procedures are incorporated herein by reference.

**Summary Judgment -- Choice of Law.** On December 1, 2010, ADIA filed a motion asking the Tribunal to "apply the laws of the Emirate of Abu Dhabi and the United Arab Emirates ('UAE'), as applied by Abu Dhabi, to ADIA's fraud and negligent misrepresentation claims (claims 1 and 2 set forth on page 15 of ADIA's Statement of Claim, collectively the 'Tort Claims')." On December 2nd, the Tribunal issued an Order, incorporated herein by reference, deciding to treat ADIA's December 1st motion as "one for summary judgment on the choice of law issues raised therein," and setting a briefing schedule. On December 8th, ADIA submitted a Statement of Undisputed Material Facts in Support of its Motion to Apply Abu Dhabi Law. On December 17th, Citigroup submitted an Opposition to ADIA's Motion to Apply Abu Dhabi Law and Cross-Motion to Apply New York Law to All Claims, as well as a Statement of Undisputed Material Facts. On December 21st, ADIA submitted its Reply in Support of Application of Abu Dhabi Law to Claimant's Tort Claims. On December 23rd, Citigroup submitted a Reply in Support of Cross-Motion to Apply New York Law to All Claims.[v]

On December 24, 2010, the Tribunal issued an Order on Governing Law directing "that New York law will govern its consideration of all of ADIA's claims in this arbitration." On December 31st the Tribunal issued a Statement of Reasons providing a "brief summary of some, but not necessarily all, of the reasons for the Tribunal's Order" of December 24th. Both are incorporated herein by reference.

**Witness Statements and Expert Reports.** On January 5, 2011, the Parties submitted fact witness declarations. On January 21st, the Parties submitted supplemental fact witness declarations. On January 27th, the Parties submitted expert witness reports. On

---

[v]    During December, 2010, the Parties filed a host of other related submissions, all of which are a part of the ICDR record in this matter.

February 20th, the Parties submitted responsive expert reports.

**Summary Judgment – ADIA's Claims.** On February 11, 2011, Citigroup moved for summary judgment on all of ADIA's claims. On February 28th, ADIA opposed Citigroup's motion. On March 4th, Citigroup filed a reply brief.[vi] The Tribunal heard oral argument on March 9th. On March 11th, the Tribunal issued an Order granting Citigroup summary judgment dismissing ADIA's claim that Citigroup breached the covenant of good faith and fair dealing, but denying Citigroup's motion in all other respects. On March 31st, the Tribunal supplemented its Order with a Statement of Reasons, in which it set out some of its reasons for granting Citigroup's motion concerning the covenant of good faith and fair dealing. Both are incorporated herein by reference.

**Other Pre-Hearing Events.** On March 25, 2011, the Parties exchanged witness lists, and on March 31st, revised witness lists. In early April, the Parties asked the Tribunal to resolve a dispute over witnesses. ADIA alleged that Citigroup was demanding unreasonable justification before agreeing to produce witnesses under its current or former control, and Citigroup alleged that ADIA had designated witnesses not previously identified on earlier milestone schedule dates and/or who had not submitted witness statements.

On April 10, the Tribunal issued SPO#4, providing guidance regarding the calling and order of witnesses. In the Order, the Tribunal stated that it was "loath to foreclose a Party" from calling any witness, providing for four phases of the hearing: in Phases I and II, ADIA and Citigroup would, respectively, present their experts and their own witnesses who had produced pre-hearing declarations. In Phases III and IV, each Party would present witnesses who had not produced declarations and who were being called on "'hostile' direct." The Tribunal provided its understanding of the Parties' then-current witness designations in Exhibit A to SPO #4. That Exhibit listed 34 witnesses ADIA intended to call (10 in Phase I and a possible 24 in Phase III) and 25 Citigroup witnesses (14 in Phase II and a possible 11 in Phase IV).

During the remainder of April 2011:

- The Parties submitted pre-hearing briefs.
- The Parties designated certain witnesses as the individuals most knowledgeable on key topics.
- The Parties submitted their initial joint exhibit list.[vii]
- The Parties briefed a motion *in limine* and privilege objection filed by Citigroup dealing with allegedly inadvertently produced documents, which were claimed to be subject to either the bank examination or attorney-client privilege (The Tribunal issued an Order on May 19th dealing with these issues, which is incorporated herein by reference).

---

[vi]    Other summary-judgment-related submissions and interim Tribunal actions are a part of the ICDR record in this matter.

[vii]    Throughout the hearing, the Parties updated the joint exhibit list. The final joint exhibit list is dated May 25, 2011, and contains Exhibits C-01 to C-16, J-0001 to J-5990, and R-01 to R-20.

- The Parties met and conferred, resulting in the removal of some of the witnesses on each Party's list. As of April 19th, ADIA listed 27 fact and expert witnesses (10 in Phase I, including five fact witnesses and five expert witnesses, and a possible 17 in Phase III) and Citigroup listed 15 fact and expert witnesses (13 in Phase II, including eight fact witnesses and five expert witnesses, and a possible two in Phase IV).
- The Tribunal confirmed this witness list and set out further procedural and timing guidance in SPO #5 on April 27th. SPO #5 also provided guidance regarding the testimony and examination of fact and expert witnesses, and further adjustments to the hearing schedule.
- The Parties reached agreement, which they communicated to the Tribunal on April 29th, that with exceptions for Party Representatives, fact witnesses would not attend the hearing except during their own testimony. The Parties also agreed that they would not call Drs. Anthony and Seznec to testify, but instead would rely on their previously submitted expert reports.
- Thus, on the eve of the hearing, ADIA had stated its intention to call a maximum of 26 witnesses (nine in Phase I, including five fact witnesses and four expert witnesses, and a possible 17 in Phase III). Citi had stated its intention to call a maximum of 14 witnesses (12 in Phase II, including eight fact witnesses and four expert witnesses, and a possible two in Phase IV).

The hearing began on May 2, 2011. The Tribunal sat for 16 hearing days over the course of four weeks, with the final hearing day taking place on May 25th. Witness testimony and other on-the-record proceedings consumed just over 88 hours of actual hearing time.[viii] Of this time, ADIA used just over 46 hours, and Citigroup used just under 42 hours.

In the end, ADIA chose to call a total of 15 witnesses. In Phase I, it called nine witnesses. Five of these were fact witnesses ██████ Redaction ██████. The other four were experts (Drs. Jaffe, Dharan, Hamm and Unni). In Phase III, ADIA called six witnesses (Mssrs. Reid, Stuckey, Armstrong, Wentzel, Bischoff, and Pandit).

Citigroup chose to call nine witnesses during its Phase II. Three of these were expert witnesses (Drs. Ferrell, Schipper and Kleidon). The other six (Mssrs. Crittenden, Shohet, Dickson, Verron, Biglari and Klein) were fact witnesses. Citigroup did not call any Phase IV witnesses.

At the end of the hearing on May 25, 2011, both sides indicated that they had no further oral testimony to present, and the Tribunal closed the record. Hearing Transcript ("Tr.") at 5266-68.

The Parties submitted post-hearing opening and reply briefs on June 30 and July 25, 2011. The Tribunal heard closing arguments on August 2nd, then deemed the matter submitted.[ix]

---

viii

    Pursuant to SPO#1, the Tribunal had allocated the Parties up to 140 actual hearing hours over 20 hearing days to present their cases, divided equally.

ix

    Tr. at 5596.

II.    STATEMENT OF REASONS

Appendix A to this Award, which is incorporated herein by reference, is a Statement of Reasons, which sets out some but not all of the reasons why we have reached our Award.

III.    COMMENDATION

Each member of the Tribunal has extensive arbitration experience. Each of us has noted that rarely have we been as fortunate as in this arbitration to participate in a proceeding characterized by such a high quality of lawyering, in written submissions, oral argument and trial conduct, as well as by attorneys who have so effectively combined zealous advocacy on behalf of their respective clients with respect for the process and their opposing counsel.

IV.    AWARD

Section 5.6(c) provides:

Decision. The arbitrators will base their decision on the terms and conditions of the Transaction Documents. Judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof. The arbitrators shall have no authority to award punitive, special or exemplary damages or any other form of non-compensatory damages.

ADIA's Claims. In reaching its decision on ADIA's claims, the Tribunal has conferred multiple times and each member of the Tribunal has considered the entire arbitration record, including:

- The Transaction Documents.
- Applicable New York law.
- The evidence as presented by the Parties, including pre-hearing declarations, expert reports, the hearing testimony of the Parties' percipient witnesses and experts, and submitted exhibits and case law.
- Pre- and post-hearing briefing, as well as earlier briefings, as on the summary judgment motion.

The Tribunal finds that ADIA has met its burden of proof on none of its claims.

**Accordingly, the Tribunal holds for Citigroup on each of ADIA's Claims (1), (2), (3), (4) and (5)[x], and determines that ADIA shall take nothing on any claim.**

Costs. Article 31 of the Rules requires that the Tribunal "fix the costs of the arbitration in its award," and allows the Tribunal to "apportion such costs among the

---

[x]    The Tribunal decided Claim 5 by summary judgment on March 11, 2011.

parties if it determines that such apportionment is reasonable, taking into account the circumstances of the case."

The Tribunal has considered apportionment of costs and determined (1) the administrative fees and expenses of the International Centre for Dispute Resolution ("ICDR") totaling **Redaction** and the compensation and expenses of the Tribunal (including the Secretary) totaling **Redaction** shall be borne as incurred, and (2) each Party will otherwise bear its own costs.

For the purposes of Article 1 of the 1958 Convention on the Recognition and Enforcement of Foreign Arbitral Awards, we hereby certify that this Final Award was made in New York, New York, USA.

So Ordered:

Jonathan B. Marks                    Joseph T. McLaughlin                    Roy L. Reardon

Date: October 14, 2011          Date: October 14, 2011          Date: October 14, 2011

APPENDIX A
STATEMENT OF REASONS

This Statement of Reasons supplements the Tribunal's Award, and sets out some but not all of the reasons why we have reached our Award.

The Tribunal assumes the Parties have familiarity with each side's factual and legal claims.

I.    **Introduction**

From November, 2007, through January, 2008, the time in which critical aspects of this dispute took place, the U.S. economy was rapidly sliding into a credit crisis that later became a worldwide recession. The consequences of that financial instability included significantly declining stock prices, particularly in the banking sector, ultimately leading to a massive injection of capital by the federal government in late 2008 to prevent the potential collapse of the U.S. banking industry.

In the early days of this crisis ███████████████████████████████████████████ ████████████████████████████████████████████████████████████████ █████████████████████ At roughly the same time, Citigroup estimated it was facing Q4 2007 subprime losses of $8-$11 billion and concluded it should raise more capital.

These parallel interests set the stage for negotiations between ADIA and Citigroup, beginning on November 20, 2007, and concluding with an Investment Agreement ("Agreement")[1] [xi] executed on November 26, 2007, and closed on December 3, 2007, whereby ADIA invested $7.5 billion in mandatory, convertible securities and became one of Citigroup's largest shareholders, with approximately 4.9% of Citigroup's outstanding equity.[2]

Although there are many disputes surrounding these topics, it is undisputed that during ADIA's investment-related due diligence:

- Citigroup provided ADIA written information concerning certain Structured Investment Vehicles ("SIVs") that it "advised," and told ADIA that it had no "obligation whatsoever to support, guarantee or provide liquidity to its managed SIVs in the form of obligations to absorb losses, liquidity puts or otherwise" and that it had no "plan to consolidate the assets" of the SIVs or to "provide any liquidity support beyond ... $10 billion ...."[3]
- Having publically disclosed on November 4, 2007, that it estimated that "at the present time, the reduction in revenues attributable to" declines in "the fair value of ... U.S. sub-prime related direct exposures" "range[d] from approximately $8 billion to $11 billion,"[4] Citigroup supplemented those disclosures on November 24th by telling ADIA in writing[5] and pursuant to a Confidentiality Agreement ["Non-Disclosure Agreement" or "NDA"][6] that:

---

[xi]    Citations to the record and other supplemental comments are set out in endnotes.

- o It had a "total markdown estimate of $6.5 billion as of October 31st" on its "ABS CDO Super Senior Exposure."[7]
- o "This estimate of $6.5 billion, together with $2.4 billion markdown on the sub-prime portfolio in warehouses . . . comes to approximately $9 billion in estimated markdown losses as of October 31st. This valuation is within the range of $8-$11 billion that we publicly disclosed as an estimate of the markdown on the super senior securities due to the rating agency actions and market developments in October."[8]
- Citigroup stated that it had no plans to raise more than $12 billion in capital and knew of no facts and circumstances that would cause it to change those plans.[9]

In the weeks after the ADIA investment, the following events took place:

- On December 13, 2007, Citigroup announced that it had "committed to provide a support facility that will resolve uncertainties regarding senior debt repayment facing the Citi-advised Structured Investment Vehicles ('SIVs')" and that as "a result of this commitment, Citi will consolidate the SIVs' assets and liabilities onto its balance sheet under applicable accounting rules."[10]
- Citigroup informed ADIA in early January, 2008, that it was writing off approximately $18 billion on its subprime-related exposure for Q4 2007[11] and publicly reported $18.1 billion in subprime-related exposure in an 8-K filed on January 15, 2008.[12]
- Citigroup also informed ADIA on January 3, 2008, that it intended to raise additional capital,[13] and announced on January 15, 2008, that it had raised $12.5 billion in additional capital.[14] On January 23 and 25, 2008, respectively, Citigroup issued to the public $3.2 billion of convertible preferred and $3.7 billion of straight preferred securities.[15]

Given the close juxtaposition in time between the November, 2007, Citigroup statements to ADIA about SIVs, Q4 subprime write-offs and needed capital, and the December 2007 and January 2008 Citigroup announcements relating to SIVs, Q4 subprime write-offs and Citigroup's raising capital, any objective observer would be given pause to ask:

- How could events possibly have moved so quickly and had such impact as to cause Citigroup to have so significantly changed course about consolidating its SIVs, the Q4 2007 subprime write-offs, and the capital it needed to raise?
- Given how quickly events brought change, did Citigroup have an adequate basis for the statements[16] made to ADIA, such that they were true in material respects at the time they were made, or, to the contrary, is there a basis for believing that Citigroup knowingly, recklessly or negligently made material misstatements?

**Redaction**

ADIA has sought to establish its entitlement to compensation by claiming and seeking to prove Citigroup's fraud, negligent misrepresentation, breach of fiduciary duty, breach of contract, and breach of the implied covenant of good faith and fair dealing.

In our Award, we have described the procedural history of this arbitration and set out our conclusions that ADIA has failed to meet its burden of proof on any of its claims and that ADIA should take nothing in this arbitration.

In this Statement, we offer some reasons for these conclusions.

We begin with fraud, then turn to negligent misrepresentation, breach of fiduciary duty, and breach of contract.[18]

## II.  Fraud

### A.  Legal Framework

We have considered the evidence before us, including the Transaction Documents, by applying New York law.[19]

#### 1.  Elements of Fraud

We agree with ADIA that:

To establish fraud, ADIA must demonstrate by clear and convincing evidence the existence of "a representation of material fact, the falsity of the representation, knowledge by the party making the representation that it was false when made, justifiable reliance by the plaintiff and resulting injury." *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 165 (1st Dep't 2003). It is well settled that a "'representation of fact, which is either untrue and known to be untrue or recklessly made'" suffices. *Heaven v. McGowan*, 40 A.D.3d 583, 584 (2d Dep't 2007) (quoting *Jo Ann Homes at Bellmore, Inc. v. Dworetz*, 25 N.Y.2d 112, 119 (1969)) (emphasis added).[20]

#### 2.  Circumstantial Evidence

Since a claimant can only rarely adduce direct evidence of fraud, ADIA may rely on circumstantial evidence to support an inference of fraud, and may establish its case by including proof of circumstances "which, separately considered, may be quite immaterial, but when combined are . . . material. . . ."[21]

#### 3.  Clear and Convincing Evidence

We evaluate each element of ADIA's proof by applying a "clear and convincing" evidence standard.

As stated by Judge Bianco in *Fierro v. Gallucci*, No. 06-CV-5189 (JFB) (WDW), 2010 WL 1223122 at *13 (E.D.N.Y. Mar. 24, 2010):

Under New York law, "[e]ach element of a fraud claim must be proven by clear and convincing evidence." *Nader v. ABC Television, Inc.*, 150 F. App'x 54, 57 (2d Cir.2005)

(citation omitted); *see also Laugh Factory, Inc. v. Basciano*, 608 F.Supp.2d 549, 558 (S.D.N.Y.2009) ("In proving the elements of fraud, the proponent of the claim must put forth clear and convincing evidence, a standard which applies at the summary judgment stage as well as at trial." (citations omitted)). A failure to satisfy any one element defeats a plaintiff's claim of fraud. *See Shea v. Hambros PLC*, 244 A.D.2d 39, 673 N.Y.S.2d 369, 373 (App.Div.1998) ("[I]f sufficient factual allegations of even a single element [of fraudulent inducement] are lacking, then the cause of action must be dismissed.") (granting summary judgment on fraud claims where there was no reasonable reliance).

We are not a jury, and are not bound by New York's Pattern Jury Instructions ("PJI"). However, we find helpful PJI §1:64, which provides the following "General Instruction – Burden of Proof – Clear and Convincing Evidence":

> The burden is on the plaintiff to prove [fraud] by clear and convincing evidence. This means evidence that satisfies you that there is a high degree of probability that there was [fraud]....

> To decide for the plaintiff it is not enough to find that the preponderance of the evidence is in the plaintiff's favor. A party who must prove [its] case by a preponderance of the evidence only need satisfy you that the evidence supporting [its] case more nearly represents what actually happened than the evidence which is opposed to it. But a party who must establish [its] case by clear and convincing evidence must satisfy you that the evidence makes it highly probable that what [it] claims is what actually happened.

> If, upon all the evidence, you are satisfied that there is a high probability that there was [fraud] . . . , you must decide for the plaintiff. If you are not satisfied that there is such a high probability, you must decide for the defendant.

### 4. Nature of Representations

To support a fraud claim, misrepresentations "must have been false when made and must have concerned present facts."[22] Misrepresentations that involve promises,[23] predictions,[24] estimates,[25] expectations,[26] or opinions[27] about future events,[28] conduct,[29] value,[30] or performance[31] ("forward-looking statements") are not actionable in fraud, unless such forward-looking statements misstated facts in existence at the time the representation was made,[32] were made with "an intent not to comply with the promise at the time it was made,"[33] or expressed a subjective state of mind, such as an opinion, that was not actually held at the time the statement was made.[34] Misrepresentations that are "mere puffery"[35] or that are "too vague and generalized"[36] are also not actionable.

### 5. Recklessness

The Parties have offered varying characterizations of the applicable standard for recklessness.

ADIA, for example, notes the following:

"False statements, recklessly made, without knowing whether they are true or false will support a fraud action," *Coolite Corp. v. Am. Cyanamid Co.*, 384 N.Y.S.2d 808, 811 (1st Dep't 1976), (citing 24 N.Y. Jur., Fraud and Deceit § 150); *accord State St. Trust Co. v. Ernst*, 278 N.Y. 104, 112, 120-21 (1938) ("A representation certified as true to the knowledge of the [defendants] when knowledge there is none, a reckless misstatement, or an opinion based on grounds so flimsy as to lead to the conclusion that there was no genuine belief in its truth, are all sufficient upon which to base liability")....[37]

ADIA highlights the standard set out, *inter alia*, in *Burgundy Basin Inn, Ltd. v. Watkins Glen Grand Prix Corp.*, 379 N.Y.S.2d 873 (4th Dept.1976):

"Scienter, a necessary element of fraud, includes not only knowing falsehood but also a reckless indifference to error, a pretense of exact knowledge and the assertion of a false material fact susceptible of accurate knowledge, but stated to be true on the personal knowledge of the representer." *Woo*, 2000 WL 297114, at *6 (quoting *Burgundy Basin Inn, Ltd. v. Watkins Glen Grand Prix Corp.*, 379 N.Y.S.2d 873, 879 (4th Dep't 1976)); *see also Hadcock v. Osmer*, 153 N.Y. 604, 608 (1897) ("Where a party represents a material fact to be true to his personal knowledge, as distinguished from belief or opinion, when he does not know whether it is true or not, and it is actually untrue, he is guilty of falsehood, even if he believes it to be true"); 60A N.Y. JUR. 2D, FRAUD AND DECEIT, § 127 ("In short, it is a fraud to affirm positive knowledge of that which one does not positively know."). The assessment of the court in *Williams* [v. Freeman, 208 N.Y.S. 691, (1st Dep't 1925)] applies directly here:

If they did know and misrepresented, then they are clearly liable for such fraud. <u>If they did not know its condition, then they knew of such lack of knowledge on their own part. Then their statement made as if from personal knowledge is equally fraudulent as though intentionally falsely made.</u> If damage ensues from either of these two situations the person making representations must be held to responsibility.

208 N.Y.S. at 698 (quoting *Churchill v. St. George Dev. Co. of Fla.*, 160 N.Y.S. 357, 361 (4th Dep't 1916)) (emphasis added); *cf. Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1062 (9th Cir. 2000) ("Key corporate officers should not be allowed to make important false financial statements knowingly or recklessly, yet still shield themselves from liability to investors simply by failing to be involved in the preparation of those statements. Otherwise, the securities laws would be significantly weakened, because corporate officers could stay out of the loop ....")[38]

According to Citigroup, "the case that we think most accurately states the New York standard on recklessness"[39] is *DaPuzzo v. Reznick Fedder & Silverman*, 14 A.D.3d 302 (1st Dep't 2005). *DaPuzzo* found that a "complaint adequately alleged facts supporting an inference of fraud based on reckless disregard or blindness to the true nature of the client's financial condition, which tends to demonstrate that defendant's opinion was 'based on grounds so flimsy as to lead to the conclusion that there was no genuine belief in its truth.'" *Id.* at 303 (citation omitted).

Citigroup asks[40] the Tribunal to focus its recklessness inquiry on whether a "defendant flagrantly disregarded whether the representations were true or did not believe in their truth,"[41] and contends that recklessness requires "'nothing less than guilty knowledge or willful ignorance.'"[42]

Citigroup also notes[43] that "[i]n the context of securities fraud, recklessness is conduct that is 'highly unreasonable,' representing 'an extreme departure from the standards of ordinary care,' that 'approximate[s] an actual intent' to defraud." [44]

### 6. Actual Reliance

To establish actual reliance, ADIA must prove that it would not have acted but for the alleged misrepresentations.[45]

### 7. Reasonable Reliance

Given the complexities of New York's law of reasonable reliance, the Parties' differences of view about that law, and the relevance of the Parties' NDA, we defer our discussion of this subject until we have offered our views on the NDA and reached the point of actually considering the Parties' factual contentions with regard to reasonable reliance.

### B.    Contractual Framework

Mindful of the Agreement's mandate that the Tribunal is to base its "decision on the terms and conditions of the Transaction Documents,"[46] we now consider the contractual framework within which the Tribunal is obligated to apply New York law to the evidence.

### 1. Summary

NDA. On November 24, 2007, ADIA and Citigroup signed an NDA.[47] Section 9.1 of that Agreement provided:

> The provision of Information will not constitute an offer capable of acceptance, or a representation which may be relied upon by a Recipient with respect to the accuracy or completeness of any of the Information or with respect to any opinion expressed in any of the Information, and save in the case of fraud or pursuant to any written binding agreement between the parties to this letter, neither we nor you nor any of our respective Associates, directors, officers, employees, agents or Professional Advisers will be liable for any loss or damage suffered in connection with the supply of the Information, including, without limitation, as a result of any Information proving inaccurate or incomplete or any such opinion proving unfounded....[48]

The NDA defined "Information" as "all information relating to the Company . . . which is made available . . . orally or in writing or in any other way or relating to the Project in any way. . . ."[49] and "Project" as "a possible investment . . . by [ADIA] in securities to be issued by Citigroup. . . ."[50]

13

**Transparency Letter.** On November 26, 2007, Sir Winfried Bischoff, Citigroup's Interim CEO, signed a letter ("Transparency Letter") to ADIA "Re: Investment Agreement, dated November 26, 2007,"[51] which stated in its entirety:

> In connection with entry into the above-referenced Investment Agreement, Citigroup Inc. (the "Company") confirms to you that its discussions with you regarding the Company's current plans for financing through sales of Common Stock and securities convertible into Common Stock (the "Current Plans") have been transparent. As of the date of this letter agreement, we have under review, as possible financings of this type, an offering of ETruPS (which are not convertible into Common Stock). The Company is not aware of any facts or circumstances as of the date of this letter that would cause the Company to change its "Current Plans". During the next 120 days, the Company will notify you upon establishing a plan, if any, and reasonably in advance of the execution of any such plan to sell Common Stock or securities convertible into Common Stock in a financing transaction. This letter is provided to you with the understanding that it is Information as defined in and subject to the non-disclosure agreement between the Company and you dated November 24, 2007.

**Agreement.** On November 26, 2007, ADIA and Citigroup signed the Agreement.[52] The Agreement incorporated by reference the NDA, and included, *inter alia*, the following provisions:

| | |
|---|---|
| 1.3 | Interpretation . . . . this Agreement is the product of negotiation between sophisticated parties advised by counsel. . . . |
| 2.1(c) | Each party acknowledges that it is not relying upon any representation or warranty not set forth in this Agreement. Investor acknowledges that it has conducted its own independent review and analysis of the business, assets, condition, operation and prospects of the Company and the subsidiaries. |
| 2.2(d)(1) | Company Financial Statements. The consolidated financial statements of the Company and its consolidated subsidiaries included or incorporated by reference in the SEC Reports, present fairly in all material respects the consolidated financial position of the Company and its consolidated subsidiaries as of the dates indicated therein . . . . |
| 2.2(d)(3) | The Company and its subsidiaries do not have any liabilities or obligations (accrued, absolute, contingent or otherwise) of a nature that would be required to be accrued or reflected in a consolidated balance sheet prepared in accordance with GAAP, whether accrued, absolute, contingent or otherwise other than liabilities or obligations (i) reflected on, reserved against, or disclosed in the notes to, the Company's consolidated balance sheet included in the Company's Quarterly Report on Form 10-Q for the fiscal quarter ended September 30, 2007, (ii) that have been discharged or paid in full prior to the date of this Agreement in the ordinary course of business, or (iii) that would not be reasonably likely to have a Material Adverse Effect. |
| 2.2(e) | No Material Adverse Effect. Since September 30, 2007, no event or circumstance has occurred that, individually or in the aggregate, has had or is reasonably likely to have a Material Adverse Effect. |
| 2.3(c) | Purchase for Investment. . . .The Investor . . . has such knowledge and |

experience in financial and business matters and in investments of this type that it is capable of evaluating the merits and risks of its investment in the Equity Units and of making an informed investment decision, and has conducted a review of the business and affairs of the Company that it considers sufficient and reasonable for purposes of its making this Investment . . . ,

5.11 <u>Entire Agreement. Etc.</u> . . . This Agreement (including the Exhibits and Disclosure Schedules hereto) and the Confidentiality Agreement constitute the entire agreement, and supersede all other prior agreements, understandings, representations and warranties, both written and oral, between the parties, with respect to the subject matter hereof. . . .

## 2. Analysis

We have considered the Agreement, the NDA and the Transparency Letter in the context of the Parties' arguments about the significance of those documents to fraud-related reliance and other issues.

**The NDA.** The legal issues related to whether, as a matter of law, ADIA actually and reasonably relied on Citigroup's alleged misrepresentations were extensively briefed at the summary judgment stage of this arbitration. But neither Party made the arguments they now put front and center with regard to the NDA; they focused neither on the applicability of the NDA's disclaimer of reliance language nor on the "save in the case of fraud" language.[53] In pre-hearing briefing, Citigroup claimed that NDA's disclaimers, read along with those in the Investment Agreement, "are fatal to ADIA's claim of reasonable reliance";[54] ADIA made a brief non-analytical mention of the NDA in its pre-hearing briefing.[55]

We think the NDA is important to our consideration of the Parties' reliance-related disputes, but agree with neither side's views as set out in the post-hearing briefing. The contract interpretation problem presented by the NDA arises from the tension between its disclaimers and its "save in the case of fraud" provision.

Given that the NDA defines Information to cover every due diligence communication from Citigroup, if the NDA were read both to allow ADIA to sue for fraud in the inducement and to foreclose ADIA's reliance on any Information, then any ADIA fraud in the inducement suit would be doomed before it started. In our view, the only reasonable reading of the NDA is one that concludes that the Parties' intent was to allow claims for fraud without a definitive contractual bar on reliance. But that doesn't mean that ADIA is free to bring a fraud claim without demonstrating actual and reasonable reliance. We find that the appropriate interpretation of the NDA's "save in the case of fraud" provision is that ADIA is not foreclosed from bringing its fraud claim, but that its burden of proof includes establishing by clear and convincing evidence each element of common law fraud, including establishing actual reliance and demonstrating that that reliance was reasonable. In that context, while the Agreement and NDA disclaimers can't be dispositive, they are appropriately considered in a reasonable reliance analysis.

**The Transparency Letter.** The Transparency Letter was signed prior to the signing of the Agreement.[56] Mr. Fagen suggested at closing argument that, by contrast to the NDA, the "transparency letter is not part of the contract."[57] He went on to say that "[t]he

investment agreement was entered into after . . . the transparency letter. The investment agreement merges everything and says all prior agreements are out."[58]

Based on the evidence before us, we find that obtaining the Transparency Letter was a precondition of ADIA's willingness to enter into the Agreement. As such, we deem its single representation[59] – Citigroup "is not aware of any facts or circumstances as of the date of this letter that would cause the Company to change its 'Current Plans,'" which we find to mean plans to raise between $10 billion and $12 billion in capital[60] --- to be binding[61] on Citigroup in the same way as are the Agreement's explicit representations and warranties.[62]

We have noted but disagree with ADIA's contention that the Transparency Letter served as a confirmation that "Citi had provided its best current information concerning its subprime losses, the SIVs, and its capital needs."[63] We don't find any ambiguity in the words of the Transparency Letter. We view its actual language as defining both the breadth and limits of Citigroup's representation. In the Transparency Letter, Citigroup represented that it "is not aware of any facts and circumstances as of the date of this letter that would cause the Company to change its 'Current Plans,'" which we have found to mean its plans to raise $10-$12 billion in capital. In seeking to meet its burden to prove that Citigroup was aware of facts and circumstances that "would cause" a change in its capital-raising plans, ADIA was free to point to facts and circumstances relating to subprime losses, the SIVs, needed capital *or anything else.*[64] That said, the Transparency Letter's language can't be interpreted as confirming that "Citi had provided its best current information concerning its subprime losses, the SIVs, and its capital needs." Citigroup's representation did not go so far.

**Other Representations.** ADIA's fraud claim is based on (1) the specific "not aware of any facts and circumstances" representation in the Transparency Letter and (2) a multiplicity of other alleged written and oral representations. ADIA contends it "signed the Investment Agreement" relying "on the Transparency Letter, the Q&A Letter, and the Q&A Call, and other information and representations Citi provided to ADIA."[65] Other than the "not aware of any facts and circumstances" representation in the Transparency Letter, all the other alleged written and oral representations that ADIA relies on in support of its fraud claim are non-contractual, and must be analyzed from that perspective.

C.   What are the Actionable Misrepresentations?

ADIA has not consistently articulated its allegations of fraud with regard to SIVs, subprime write-offs and capital.

ADIA contentions about the core issues have varied between:

- Allegations that Citigroup made misrepresentations that something – SIV consolidation; more than $8-11 billion or $9 billion in 4th Quarter 2007 subprime write-offs; more than $12 billion in additional capital raised – would not happen in the future; and
- Allegations relating to whether Citigroup had during the due diligence period a plan, estimate or intent with regard to these subjects.

In spite of ADIA's lack of consistency in how it frames its statements of the misrepresentations that it wishes us to evaluate, ADIA itself recognizes what, under the applicable law, it can appropriately claim as a fraudulent misrepresentation. Although it

sprinkled even its Post-Hearing Brief with assertions of misrepresentations framed in terms of what would or would not happen in the future, in its Post-Hearing Reply Brief ADIA backed off of any attempt to base its case on such forward-looking representations when it recognized that it could properly rely only on representations that "concern facts in existence at the time the representations were made,"[66] characterizing actionable representations as follows:

- "Citi misrepresented that its 'best estimate,' <u>as of the negotiation period</u>, was that it would post 4Q losses of $8-11 billion."[67]
- "Citi similarly misrepresented to ADIA that it had no plans, <u>as of the negotiation period</u>, to consolidate the SIVs or to raise additional capital."[68]

Many of ADIA's allegations of fraudulent misrepresentation are not actionable under New York law, since they involve representations about future events, conduct, value or performance. We find alleged statements such as the following are not actionable, and do not further evaluate them in our fraud analysis, except in the context of asking whether the statements were subjectively false at the time they were made:[69]

- **SIVs.** Citigroup "would not consolidate the SIVs onto its balance sheet";[70] "Citi would not consolidate the SIVs";[71] Citigroup "would take no action . . . to consolidate its SIVs";[72] "'We have said definitively we will not do anything that would trigger consolidation'";[73] "Citi would not bring the SIVs onto its books."[74]
- **Subprime Losses.** Citigroup's "4Q 2007 losses on its subprime portfolio would be $9 billion";[75] "Citi's subprime losses for 4Q 2007 were $9 billion";[76] Citigroup's "subprime losses were approximately $9 billion";[77] Citigroup's "4Q 2007 subprime losses would be in the range of $8-11 billion";[78] Citigroup's "4Q 2007 losses on its subprime portfolio would be $8-11 billion";[79]
- **Capital.**[80] Citi's "near term future capital needs, including ADIA's investment, would be limited to $12 billion";[81] "Citi was adamant that it . . . would not need to raise more than $12 billion (including ADIA's investment) in additional capital";[82] Citi "would not seek additional capital";[83] Citigroup informed "ADIA that $10-12 billion would satisfy its foreseeable capital needs."[84]

We now turn to what we understand to be ADIA's "core" allegations of misrepresentation in this arbitration:

- Citigroup's estimate[85] of its Q4 subprime losses was $8-11 billion.[86]
- Citigroup had no plan to consolidate the SIVs and did not "have any obligation whatsoever to support, guarantee or provide liquidity to its managed SIVs in the form of obligations to absorb losses, liquidity puts or otherwise." [87]
- Citigroup was "not aware of any facts or circumstances as of [November 26, 2007] that would cause [it] to change its 'Current Plans'" for "financing through sales of Common Stock and securities convertible into Common Stock,"[88] which we have found involved plans for raising $10 to $12 billion in capital.

### D.    Were Citigroup's Representations Knowingly or Recklessly False?

We consider here in sequence ADIA's claims relating to subprime losses, the SIVs, and capital. We devote the majority of our attention to the subprime issue, because ADIA

has focused particularly on it and because we believe it is the strongest of ADIA's three claims.

### 1.  Subprime Losses

Citigroup's estimates on November 24th and 25th that its subprime losses for Q4 2007 would be in the range of $8-$11 billion were statements of subjective opinion rather than of fact, since they were based on complicated and uncertain financial models and required multiple judgments and assumptions.[89]

This conclusion is significant to our analysis of whether Citigroup's conveying to ADIA its November estimate of $8-$11 billion in Q4 losses involved a knowing or reckless falsity, since "a material misstatement of opinion is by its nature a false statement, not about the objective world, but about the defendant's own belief. . . . [T]he statement (unlike a statement of fact) cannot be false at all unless the speaker is knowingly misstating his truly held opinion."[90]

So our inquiry needs to be first whether ADIA has proved by clear and convincing evidence that Citigroup did not, when it communicated to ADIA, truly hold its stated opinion about its estimated Q4 subprime losses. If we find that the estimate was actually Citigroup's "truly held opinion" (or, more formally, that ADIA hasn't met its burden of proving the contrary), that will also resolve the *scienter* issue, except as it relates to recklessness.

**Knowing Falsity.** The substantial weight of the evidence before us supports the conclusion that before, during and after the ADIA due diligence period, Citigroup's institutional opinion was that its Q4 2007 subprime losses would, at the end of the year, be within the range of the $8-$11 billion estimate. Thus, ADIA has not proved by clear and convincing evidence that there was a knowing misrepresentation.

We reach this conclusion based primarily on the following:

- The issue is whether Citigroup's stated opinions about subprime losses were subjectively and truly held.
- There is no persuasive evidence before us that Mr. Crittenden, who we find had ultimate management responsibility for determining Citigroup's institutional position on subprime loss (both for formal accounting purposes, such as establishing monthly reserves, and for reporting purposes), or any other senior Citigroup official with responsibility for participating in that formulation, had a contrary belief during the relevant time period.
- We rest this conclusion in substantial part on the consistency of Citigroup's institutional subprime loss opinions from the formulation of the $8-$11 billion estimate in the days leading up to the November 4th announcement, through the setting of the October 31st reserve of about $9 billion on November 14th and Mr. Crittenden's report to the Executive Committee on November 27th,[91] up to the point in early December when the opinion was revisited.
- ADIA has presented no persuasive direct evidence to contradict our conclusion that Citigroup did not lie to ADIA or, for that matter, the public, when it stated its $8-$11 billion subprime loss opinion.
- Nor does the circumstantial evidence that ADIA has pointed to, either before or during November, 2007, viewed both separately and collectively, clearly and

18

convincingly support an inference that the $8-$11 billion subprime estimate at issue was anything other than Citigroup's "truly held opinion." While they are arguably relevant to the issue of recklessness, to which we will turn momentarily, none of the evidentiary points that ADIA has emphasized to seek to bring into question the appropriateness of the $8-$11 billion subprime loss estimate, either separately or collectively, is sufficient to support such an inference.

- Thus, we have also considered the evidentiary bases ADIA has cited for its assertions that:
    o "Citi deliberately chose to delay and minimize its subprime exposure and loss disclosures";[92]
    o Citigroup "blatantly manipulated" ABCP numbers;[93]
    o Citigroup consciously and deliberately failed to disclose the November 14th $13 billion collateral value estimate;[94]
    o Citigroup made deliberate choices, as with regard to HPA and discount rate inputs, designed to produce lower loss estimates from the intrinsic cash flow model.[95]

None of the evidence that we have reviewed, viewed separately and collectively, is, in the context of all relevant evidence, sufficient to support a finding that ADIA has established by clear and convincing evidence that Citigroup deliberately or consciously sought to mislead either ADIA or the public with regard to the underpinnings of its subprime loss estimate.

- We have found relevant the following interchange with Dr. Jaffee, ADIA's valuation expert:

    Q: Dr. Jaffee, you have not seen any documents, reviewed any evidence, seen anything in the record that suggests that Citi did not act in good faith in conducting its valuation efforts in November 2007; is that right?
    A: I guess I'm not – I'm not a lawyer so I don't know what in good faith means, but I think in the common sense I think I would agree. I've not seen any documents that suggest that Citigroup was acting in bad faith.[96]

- Picking up on Judge Lynch's view in *Salomon* that there must be "an identifiable gap between the opinion publically expressed and the opinion truly held,"[97] the evidence before us doesn't come close to opening up such a gap.

**Recklessness.** Given these conclusions, the remaining question is whether ADIA has proved by clear and convincing evidence that Citigroup was reckless in reaching its Q4 2007 subprime loss opinion. In this regard, we have considered whether ADIA has presented persuasive evidence that establishes a high degree of probability[98] that Citigroup's statements of opinion with regard to Q4 2007 subprime losses were based on grounds so flimsy as to lead to the conclusion that Citigroup had no genuine belief as to their truth or reflected willful or blind ignorance.

ADIA's challenge of proving recklessness under a high probability of no genuine belief as to truth standard is made harder by the nature of the "opinion" at issue. Citigroup's subprime estimates were opinions based on efforts to value assets:

- Which had not previously required close valuation analysis (because before "September 2007, the super seniors were considered extremely safe . . . , had not experienced any significant losses," and "were generally carried at par"[99]);
- For which, by and large, there was no public market; and

19

- For which there was no consensus about which financial model or models were best or about how to pick between competing options for inputs into the model or models.

As powerfully evidenced by ADIA's own contemporaneous views,[100] no one believed that the process by which financial institutions came up with estimates for subprime assets was capable of anything remotely approaching precision. These difficulties were compounded by the fact that, as Dr. Ferrell persuasively explained, the markets in Q4 2007 were "highly unpredictable" and characterized by "dramatic" and "unprecedented" events.[101] That these difficulties were real is demonstrated, albeit in hindsight, by the fact that similarly situated firms to Citigroup, including Merrill, Bank of America and Credit Suisse, were in the relevant time period wrong in terms of underestimating what future subprime write-downs would be.[102] In our view, the blunt fact that there could be no "right answer" to how an estimate of subprime losses should be made or whether such an estimate was "correct" makes it all the more difficult to establish a claim Citigroup was reckless in coming to the estimate it did.

In evaluating the recklessness issue, we have focused on Citigroup's actions with regard to the subprime loss issue from the time in late October it first realized that there were sufficient problems with its subprime assets to require a public disclosure to the point in December when it came to the conclusion that it needed to increase its Q4 estimate and reserve. We have come to the following conclusions:

- We find it significant that Citigroup devoted enormous time, effort and resources from July of 2007 onward to dealing with the problem of valuing the super seniors. We find credible Mr. Verron's extensive and detailed testimony about how these efforts began and evolved, including what we find to be appropriate and extensive efforts by Citigroup to evaluate, enhance and, as appropriate, modify the models it was using in order to improve its valuation estimates.[103] These facts are inconsistent with any contention that Citigroup's efforts to determine Q4 2007 estimates for subprime losses evidenced a "disregard or blindness to the true nature of [its] financial condition."[104]
- While ADIA raises questions about how Citigroup reached the subprime loss estimates it conveyed to the public on November 4-5, 2007, and to ADIA on November 24-25, none have justified our concluding that Citigroup was reckless in failing either to modify or supplement its expressed opinions relating to Q4 2007 subprime losses.
- We think Citigroup's take on the evidence relating to the change in ABCP numbers from J-2850 to J-2713/J-2722 is more plausible than ADIA's. While there are arguments that Citigroup was mistaken in deciding to change the discount rate and use the rates it did, the evidence doesn't support a finding of unreasonableness, much less recklessness, particularly because the apparent change from an across-the-board use of 250 basis points to using different spreads for each of the four types of super-senior securities resulted in a higher overall loss estimate.[105]
- Although Citigroup overstates the lack of significance of the November 14th $13 billion collateral value estimate and goes too far in trying to minimize the role of the collateral value model in its estimating process, the evidence relating to this issue, viewed as a whole, does not convince us that it was unreasonable, much less reckless, for Citigroup management to ignore this model output after

November 14th, including in its interactions with ADIA or later reporting to Citigroup's Board.[106]

- Although ADIA raises questions about some decisions Citigroup made about the assumptions it used at various points in its intrinsic cash flow model, we find that the evidence relating to each one of the disputed assumptions and inputs (HPA, discount rate, etc.) establishes, at the very least, that Citigroup's choices were within the wide realm of reasonableness justified by the inherent uncertainty of the valuation effort[107] and thus can't be characterized as "unreasonable"[108] or "imprudent,"[109] much less as reckless.

- Although ADIA made some points in its contentions relating to what those conveying subprime loss information to ADIA during due diligence did to understand and verify the information they were providing, we find that in light of the applicable law, which justifies reliance on information provided by those lower in a corporate hierarchy,[110] ADIA has not come close to demonstrating by clear and convincing evidence that any of those who provided such information were reckless under the standards of, for example, *Williams v. Freeman, supra.*

- ADIA made some points in connection with (1) its allegations that Citigroup could have updated its models between November 14th and November 25th and (2) whether "current" information was provided during that call. But ADIA has not convinced us that Citigroup was reckless either in how it dealt with the on-going issue of valuing subprime losses from November 14th to November 25th or in answering ADIA's questions during the November 25th call.

- On some matters relied on by ADIA, we don't need to reach the question of recklessness, because we reject ADIA's view of what Citigroup represented.

  ○ We find an insufficient evidentiary basis for ADIA's contention that Citigroup "reported the $9 billion figure and the $8-11 billion range as reliable and certain, utterly failing to disclose or even allude to the uncertainty that Citi now trumpets."[111] Even putting aside the detailed qualifications in Citigroup's 10Q,[112] supplemented by Mr. Crittenden's analyst call remarks,[113] we find there is no persuasive evidence that supports that the conclusion any Citigroup participant on the November 25th call represented that the $9 billion figure and the $8-11 billion range were either "reliable" or "certain."

  ○ Nor, putting to the side the forward-looking aspects of these statements, do we find a persuasive evidentiary basis for ADIA's contentions that in the November 21st and November 25th conference calls, Citigroup stated that "the majority of the ABCP exposure, the portion related to earlier-vintage mortgages, was virtually immune from loss," assured ADIA that "its losses on the ABCP would be limited to the 9% of those subprime assets that were related to more recent-vintage mortgages," and "insist[ed] that the loss projection of 8% on the ABCP was wholly related to subprime assets backed by mortgages created in 2006 or later."[114] The substantial weight of the evidence before us demonstrates that Citigroup's statements on these issues were appropriately qualified.[115]

## 2. SIVs

In considering ADIA's claim, we distinguish between its contention that Citigroup fraudulently stated that "it did not have 'any obligation whatsoever' to its SIVs" and its contention that Citigroup fraudulently stated that "it had 'no plan.'"

21

### i. No Obligation

ADIA contends that Citigroup represented that it did not have "any obligation whatsoever" to its SIVs.[116]

The actual language of Citigroup's representation in the Q&A slides and letter was:

Citi does not own any equity positions in the SIVs nor does Citi have any obligation whatsoever to support, guarantee or provide liquidity to any Citi-advised SIVs, whether in the form of obligations to absorb losses, liquidity puts or otherwise.[117]

**Redaction**

**Redaction**

We have reviewed the evidence concerning Citigroup's SIV-related legal obligations We find that Citigroup's Q&A language accurately states its legal obligation.

**Redaction**

Assuming *arguendo* that the statement could be deemed to be ambiguous with regard to the scope of the "obligations" referred to, we have noted that ADIA contends that "Citi understood that, even if it had no legal obligation to the SIVs, Citi still had a 'reputational obligation' to prevent them from going into defeasance."[120] We thus have considered whether the evidence supports the conclusion that Citigroup had a reputational obligation "to support, guarantee or provide liquidity to any Citi-advised SIVs, whether in the form of obligations to absorb losses, liquidity puts or otherwise," and whether any such "obligation" made the Q&A statement false or, even if not false, whether Citigroup had a duty to supplement the statement by making a further disclosure to ADIA that discussed "reputational" considerations.

We have noted that internal Citigroup documents cited by ADIA refer to "reputational obligations,"[121] "moral hazard,"[122] "reputation risk,"[123] and "reputational issues."[124]

Considering all the evidence before us, including documents and testimonial evidence adduced by ADIA, we have concluded that ADIA has not established by clear and convincing evidence that the Q&A statement was false or misleading because incomplete. We also find that there is no persuasive evidence, much less clear and convincing evidence, supporting the proposition that Citigroup made this statement to ADIA knowingly or recklessly intending to mislead ADIA into acting in a way that it might not have had

Citigroup supplemented its statement by expressing its view that the SIVs presented reputational issues, risks and, in some sense, non-legally binding obligations.

### ii. No Plan

**Knowing Falsity.** The evidence before us supports the conclusion that before, during and after the ADIA due diligence period, Citigroup had no plan to consolidate its SIVs. Thus ADIA has not proved by clear and convincing evidence that there was a knowing misrepresentation.

We reach this conclusion based primarily on the following:

- As with the subprime issue, we rest our conclusion in substantial part on the consistency of Citigroup's institutional views on how to handle the SIVs from October, 2007, though the entire month of November, up to the point in December when Citigroup first concluded that it needed to treat the SIVs differently.
- We find that Citigroup had no plan to consolidate its SIVs at any point in November and early December, including during the period when it was negotiating with ADIA and entering into the Investment Agreement.[125]
- We also find that Citigroup believed during the period of September to November that it had in place and was implementing a plan of action that would allow it to avoid consolidating and that it would, if necessary, allow the SIVs to fail.[126]
- We find that Citigroup changed its view after December 5th when faced with a fundamentally different, potentially catastrophic, and unprecedented threat of a withdrawal of liquidity support by SIV investors if Citigroup did not resolve the SIV situation.[127] This was what Mr. Crittenden credibly referred to as a "shock[ing] boycott,"[128] involving the withdrawal of approximately $20 billion in total liquidity support by significant financial institutions that, we agree, would have had "extreme, very severe, almost. . .lethal implications to [Citigroup]."[129]
- In that context, there is no persuasive evidence before us that Mr. Crittenden, whom we find had ultimate management responsibility for determining Citigroup's institutional position on what actions, if any, to take with regard to the SIVs, or any other senior Citigroup official with any role in dealing with the SIVs, believed during the relevant time period that the SIVs had to be consolidated or that Citigroup should or would have to take steps that would result in the consolidation of the SIVs.
- ADIA has presented no persuasive direct evidence to contradict our conclusion that Citigroup did not lie to ADIA when it stated that it had no plan to consolidate the SIVs.
- Nor does the circumstantial evidence that ADIA has pointed to, either before or during November, 2007, viewed both separately and collectively, support the inference that Citigroup actually had a plan to consolidate its SIVs during that time period. While they are arguably relevant to the issue of recklessness, to which we will turn momentarily, none of the evidentiary points that ADIA has emphasized to seek to bring into question Citigroup's contention that it had no SIV consolidation plan, either separately or collectively, are sufficient to support such an inference. In this context, we have considered each of the evidentiary bases that ADIA has cited for its assertions that, for example:

- o "Citi knew" that "the only way to avoid" defeasance "was for Citi to bring [the SIVs] only its balance sheet."[130]
- o Citigroup knew that its SIV asset "fire sale" would be inadequate to "boost their liquidity" and, as a result, the SIVs would need "billions of dollars in financing by 1Q 2008."[131]
- o Citigroup knew that letting the SIVs fail was never an option.[132]
- o By early November, Citigroup "knew that it needed to position itself to consolidate the SIVs by raising capital to address consolidation."[133]
- o "Citi had begun assuming that the SIVs would be consolidated by 1Q 2008."[134]
- o By mid-November "Citi knew the SIVs would be downgraded unless consolidated."[135]

None of the circumstantial evidence that we have reviewed, viewed separately and collectively, is sufficient to support a finding that ADIA has established by clear and convincing evidence that Citigroup deliberately or consciously sought to mislead ADIA with regard to its SIVs.[136]

**Recklessness.** Given these conclusions, the remaining question is whether ADIA has proved by clear and convincing evidence that Citigroup was reckless in failing in November 2007 to have a plan to consolidate its SIVs and/or to take steps in November 2007 that would have led to SIV consolidation. In this regard, we have considered whether ADIA has presented persuasive evidence that establishes a high degree of probability that Citigroup's statements with regard to the SIVs were based on grounds so flimsy as to lead to the conclusion that Citigroup had no genuine belief as to their truth or reflected willful or blind ignorance.

In evaluating the recklessness issue, we have focused on Citigroup's actions with regard to the SIVs from October until December. We have come to the following conclusions:

- Citigroup had a sound basis during September to November of 2007 for believing in the potential efficacy of its efforts to "avoid defeasance by funding the SIVs through capital exchanges, asset sales, third-party facilities and limited direct support that did not require consolidation." The fact that there were uncertainties about how effective this strategy would be does not support the conclusion that Citigroup was reckless in believing it could reduce its SIV risks and avoid consolidation by undertaking the strategy.
- We find that Citigroup's running scenarios during November about possible adverse future events, including possible SIV consolidation, reflected appropriate risk planning, and provides no material support for a conclusion that Citigroup was being reckless in holding to its view that it didn't need to consolidate.
- There is no credible evidentiary basis for ADIA's attempt to suggest that Citigroup's continued adherence to the position that it had no plan to consolidate its SIVs was a pretextual effort to allow it to reduce its SIV exposure prior to implementing a consolidation plan.
- The evidence supports the conclusion that, rather than being reckless, Citigroup was correct in its view that during October and November 2007 it had no consolidation obligation under FIN 46R. Citigroup's expert on this subject, Professor Schipper, one of the drafters of FIN 46R, testified persuasively that Citigroup did not experience reconsideration events in October 2007 when it purchased additional commercial

paper supporting some of the SIVs[137] and correctly concluded that Professor Dharan's testimony regarding a hypothetical SIV-by-SIV analysis in late November was mere speculation.[138]

- While ADIA's evidence concerning the drop in NAV value and Moody's methodology changes supports an inference that Citigroup was being optimistic about the likelihood of avoiding a Moody's downgrade, there is no evidentiary basis for a conclusion that Citigroup's belief that it could deal effectively with the Moody's risk was unreasonable, much less that it was reckless.

- We find persuasive Dr. Schipper's testimony that (1) a Moody's downgrade of the senior debt would not necessarily have required Citigroup to consolidate the SIVs;[139] and that (2) neither new Moody's guidelines nor any resulting downgrades would have constituted reconsideration events under FIN 46R.[140] Indeed, Dr. Dharan conceded these points.[141]

### 3.   Capital

ADIA contends that since Citigroup's "subprime losses and SIV consolidation negatively affected its capital position," its misrepresentations "concerning its impending subprime losses and the likelihood of SIV consolidation were also misrepresentations concerning Citi's capital needs."[142]

ADIA further contends that "[e]ven if Citi's representations with regard to SIV consolidation and subprime losses had been accurate, however, Citi knowingly or recklessly misrepresented its capital position by informing ADIA that $10-12 billion would satisfy its foreseeable capital needs."[143]

We have found that ADIA has not proved by clear and convincing evidence any knowing or reckless Citigroup misrepresentations concerning Q4 2007 subprime losses and SIV consolidation.

Accordingly, our focus is on whether ADIA has proven by clear and convincing evidence that Citigroup made fraudulent capital-related misrepresentations to ADIA, relating particularly to the representation in the Transparency Letter that "[t]he company is not aware of any facts or circumstances as of the date of this letter that would cause the company to change its plans," which we have found to mean plans to raise $10-$12 billion in capital.

**Knowing Falsity.** The substantial weight of the evidence before us supports the conclusions that before, during and after the ADIA due diligence period, (1) Citigroup's Current Plan was to raise $10 to $12 billion of new capital and (2) Citigroup truthfully stated that it was not aware of facts and circumstances sufficient to cause it to change that plan. Thus, ADIA has not proved by clear and convincing evidence that there was a knowing misrepresentation.

We reach this conclusion based primarily on the following:

- The issues are whether Citigroup's stated opinions about the capital it planned to raise were subjectively and truly held and whether Citigroup was aware of any facts and circumstances that "would cause" it to change its plan.

- ADIA has presented no persuasive direct evidence to contradict our conclusion that Citigroup did not lie to ADIA, when it stated its plan to raise $10-$12 billion. Nor does the circumstantial evidence that ADIA has pointed to, viewed both separately and collectively, clearly and convincingly support an inference that the $10-$12 billion capital objective was anything other than Citigroup's truly held opinion. Put another way, there is insufficient persuasive evidence before us to establish that Mr. Crittenden or any other senior Citigroup official had a plan or intent to raise more than $10-12 billion of new capital during the relevant time period or that they were aware of facts or circumstances sufficient to cause them to change those plans.
- We rest these conclusions in substantial part on the consistency of Citigroup's views about how much capital it aimed to raise from the point after it announced the Q4 2007 subprime loss estimate of $8 to $11 billion up to and past the ADIA funding[144] until the time in December when it began to be apparent to Citigroup that it needed to raise capital in addition to that which it had raised from ADIA and through the ETruPS because of increases in estimates of subprime losses and worsening markets.[145]
- In reaching these conclusions, we have also reviewed (1) all the documents and testimony that Citigroup relies on to support its contention that it planned at the end of November to raise only $10-12 billion and (2) all the documents and testimony relied on by ADIA in support of its contentions that Citigroup believed, in November, that raising $10-12 billion was only a "first step" and planned then to raise additional capital. Viewing this evidence as a whole, we find that the substantial weight of the evidence supports Citigroup's position.
- Even though the evidence is not unmixed, substantially more than a preponderance of the evidence supports a finding that during October to December, 2007, Citigroup's target for Tier 1 capital was 7.5%.[146] Citigroup's stating on December 11, 2007, a 2008 objective of improving the Tier 1 ratio to 8.5% doesn't contradict Citigroup's having a "target" of 7.5% during October and November of 2007 or thereafter.
- Neither Citigroup's articulating on November 27th a "broader plan to restore our equity to historical capital" nor Citigroup's considering the ADIA equity raise to be a "part" of that plan provides weighty evidence supporting the conclusion that Citigroup during November or on November 27th had a plan to improve capital levels by raising more equity capital, particularly in light of the broad range of options beyond simply raising equity capital that Citigroup was contemporaneously considering. Mr. Biglari's preparing talking points in January 2008 that address putting "the capital question to rest by building a 'fortress-like' balance sheet" doesn't provide weighty evidence about what Citigroup's capital raising plans were in November 2007, particularly when considered in context with his e-mailed December 12th statement, J-2343, that "there are no current plans" to raise more capital.
- Nor is there any substantial evidence before us of "facts and circumstances" of which ADIA was "aware" that "would cause" Citigroup to change its current plan to raise $10-$12 billion in capital. We note that the "would cause" wording of the Transparency Letter introduces a subjective element into Citigroup's representation. To establish a knowing misrepresentation with regard to the Transparency Letter, ADIA's burden was to present evidence creating a high degree of probability that Citigroup knew of facts and circumstances that, separately or collectively, were sufficient to cause Citigroup to change its plans, but nevertheless did not do so. ADIA's proof in this regard related primarily to what Citigroup

26

allegedly knew about its SIVs and its estimated Q4 subprime losses, which ADIA contended not merely established SIV- and subprime-related misrepresentations, but also necessarily created capital-related misrepresentations. Since ADIA has offered no persuasive evidence concerning non-SIV and non-subprime facts and circumstances of which it contends Citigroup was aware and would have caused Citigroup to change its Current Plans, our earlier findings concerning the SIVs and estimated Q4 subprime losses also put to rest the issue of a knowing violation of the Transparency Letter's representation.

**Recklessness.** The remaining question is whether ADIA has proved by clear and convincing evidence that Citigroup was reckless in reaching its decision to raise $10 to $12 billion in capital or in ignoring facts and circumstances that would have caused it to conclude that it needed to raise more than $10 to $12 billion in capital. In this regard, we have considered whether ADIA has presented persuasive evidence that establishes a high degree of probability that Citigroup's current capital plans were based on grounds so flimsy as to lead to the conclusion that Citigroup had no genuine belief as to their truth or that those plans reflected willful or blind ignorance.

In evaluating the recklessness issue, we have focused on Citigroup's actions with regard to the SIVs from October until December. We have come to the following conclusions:

- The evidentiary analysis we have undertaken in considering whether Citigroup had a plan to raise more than $12 billion at the time it took the ADIA investment and whether it was aware of facts and circumstances that would cause Citigroup to change its capital raising plans is applicable to our recklessness review.
- Viewed as a whole, the evidence establishes that ADIA hasn't come close to establishing a high probability that Citigroup's grounds for deciding it needed to raise $10-$12 billion were flimsy or reflected willful ignorance.
- We have also noted ADIA's suggestion that Mr. Bischoff should be deemed reckless because he signed the transparency letter within 20-30 minutes of learning that ADIA wanted it and testified that he did not do due diligence. We find, however, that no facts have emerged that suggest, taken together, that Citigroup's management, viewed collectively, should have concluded that raising $10-$12 billion was too little given the circumstances that existed at the end of November 2007.[147]

### 4.    Conclusion

ADIA has failed to prove by clear and convincing evidence that Citigroup knowingly or recklessly made false representations to ADIA with regard to the SIVs, Q4 2007 estimated subprime losses and plans for raising capital.[148]

### E.    Reliance

For the sake of completeness, but in less detail than we have devoted to the question of knowing or reckless misrepresentation, we address the other elements of ADIA's fraud claim. We first deal with issues relating to actual reliance, then consider reasonable reliance.

### 1. Actual Reliance

With regard to actual reliance, ADIA's burden was to prove by clear and convincing evidence that it would not have made the investment had it not been for the alleged misrepresentations. Its burden was to show that the alleged misrepresentations were substantial factors in inducing it to invest, not to show that the alleged misrepresentations were the exclusive cause of its making the investment.

We start by dealing with credibility issues, then treat in turn the Transparency Letter representation and the representations relating to the estimated Q4 subprime losses and SIVs.







31



Redaction



33



34



35







38











### III.   Negligent Misrepresentation

ADIA claims that during due diligence Citigroup made negligent misrepresentations. We consider here whether:

- The NDA bars ADIA's negligent misrepresentation claim.
- ADIA and Citigroup had a special relationship that created a Citigroup duty not to make negligent misrepresentations.
- ADIA has proved the other elements of negligent misrepresentation.[226]

### A.   NDA

New York law permits parties to contract away liability.[227]

Section 9.1 of the NDA provides that "save in the case of fraud or pursuant to any written binding agreement between the parties to this letter, neither [ADIA] nor [Citi] . . . will be liable for any loss or damage suffered in connection with the supply of the Information, including, without limitation, as a result of any Information proving inaccurate or incomplete or any such opinion proving unfounded." The NDA defines Information to encompass all due diligence communications, which we find includes the allegedly false representations upon which ADIA seeks to base its negligent misrepresentation claim.

**Contentions.** Citigroup claims that the explicit disclaimer of liability, "save in the case of fraud or pursuant of any written binding [ADIA/Citigroup] agreement," in an NDA drafted and signed by ADIA, bars ADIA's negligent misrepresentation claim.[228]

ADIA seeks to avoid this result, contending:

New York law is clear that a claim for negligent misrepresentation "sounds in fraud" when, as here, it is based on the same facts underlying a fraud claim.[229] Because ADIA's negligent misrepresentation claim sounds in fraud, the NDA's carve-out for fraud preserves ADIA's right to assert the negligent misrepresentation claim."[230]

By contrast to the cases cited by Citigroup in support of its position, the language of the NDA does not explicitly disclaim liability for the "use of 'Information' negligently provided," for "a duty of care," or from "claims arising from the releasee's own negligence."[231] Nevertheless, the NDA's blanket preclusion of liability "in connection with the supply of the Information," "save in the case of fraud or pursuant to any binding written agreement" must be read to preclude liability for negligent misrepresentation, among other causes of action, unless, as ADIA claims, "fraud" can be read to include negligent misrepresentation.

**ADIA's Cases.** We have reviewed the cases cited by ADIA in support of its contention that because ADIA's negligent misrepresentation claim "sounds in fraud," the NDA's "save in the case of fraud" preserves ADIA's right to sue for negligent misrepresentation.

In both *Calcutti* and *Argo*, the issue before the court was whether to apply a six-year statute of limitations to a claim for negligent misrepresentation, rather than a three-year statute. The *Calcutti* court summarized applicable New York law, stating that "a negligent

misrepresentation claim that is based on the same factual situation as a fraud claim is subject to a six-year statute of limitations," and found "Calcutti's negligent misrepresentation claim sounds in fraud since it arises out of the same transaction and occurrence that underlie Calcutti's fraud claim. Accordingly, the appropriate limitation period is six years."[232]

In *Hutton Construction*, the issue before the court was whether fraud had been pled "with the particularity required by Rule 9(b)."[233] The court's sole arguably relevant language (not relevant to its without prejudice decision denying Plaintiff's motion to amend its complaint) was the following:

> Plaintiff's additional claims sound either in fraud or mutual mistake. The fifth claim alleges "negligent misrepresentation," a concept I am not sure I recognize. To the extent plaintiff alleges misrepresentation in contrast to unwitting or negligent failure to disclose, the claim sounds in fraud. Others of plaintiffs' additional claims clearly sound in fraud.[234]

**Conclusion.** ADIA's negligent misrepresentation claim is based on the same transactions and occurrences as its fraud claim, so it appears to us that under New York law it would be deemed to "sound in fraud" for purposes of a statute of limitations analysis. But we find no basis in the *Argo* and *Calcutti* courts' holdings for a finding that as a matter of contract interpretation, a contractual disclaimer's exclusion of fraud should also be read to exclude negligent misrepresentation because for statute of limitations purposes negligent misrepresentation could be found to "sound in fraud" if based on common facts. Nor can we find such a basis in *Hutton Construction*.

Fraud and negligent misrepresentation claims are different in multiple respects. Proof of fraud requires demonstrating a knowing or reckless misrepresentation by clear and convincing evidence; proof of negligent misrepresentation requires proof by a preponderance of the evidence that the misrepresentation was negligent.[235] By contrast to fraud, a defendant can only be held liable for negligent misrepresentation if the defendant had some legal duty to impart accurate information to the plaintiff. A plaintiff proving fraud may also recover punitive damages not available to the negligent misrepresentation plaintiff.

For these obvious reasons, a claim of fraud is not the same as a claim of negligent misrepresentation. Even though it has been useful in the context of statute of limitations analysis for courts to speak of negligent misrepresentation's "sounding in fraud," that doesn't suggest or support the conclusion either that fraud is negligent misrepresentation or that the use of the word, "fraud," in a contract can be read to signify the contracting parties' intent to comprehend both fraud and the similar but very different claim of negligent misrepresentation. Here, ADIA, from whose standard form §9.1 of the NDA was derived, could have, if it had chosen to, proposed that liability would be disclaimed "save in the case of fraud, *negligent misrepresentation*, or pursuant to any written binding agreement between the parties." But it did not, and thus does not have an actionable claim for negligent misrepresentation in this arbitration.[236]

43

### B.     Special Relationship

Under New York law, to prevail on a claim of negligent misrepresentation, a plaintiff must prove that "the defendant had a duty, as a result of special relationship, to give correct information."[237]

**Contentions.** ADIA contends that such a "special relationship" existed. ADIA states that "such a relationship exists where the defendant 'possess[es] unique or specialized expertise' or is 'in a special position of confidence and trust with the injured party such that reliance on the negligent misrepresentation is justified.'"[238] It relies on decisions in *Merrill Lynch Auction Rate, Scognamillo*, and *Capital Bank* that ADIA says "found a special or fiduciary relationship on facts strikingly similar to those alleged here."[239] In support of the proposition that "Citi repeatedly and deliberately fostered a 'partnership'-type relationship,"[240] ADIA points, *inter alia,* to Citigroup Vice Chairman Volk's pronouncement that ADIA enjoyed "all the benefits of a special relationship with [Citi],"[241] contends that "ADIA and Citi shared an extensive relationship for many years before Citi approached ADIA for this transaction,"[242] highlights Citigroup's "'unique and specialized expertise'"[243] with regard to the information it was providing ADIA, and relies on evidence of Citigroup's repetitive use of "partnership" and "trust."

Citigroup contends that no case finds "a special relationship under New York law based on facts and circumstances remotely comparable to those here."[244] It asserts that the ADIA/Citigroup "relationship bears all the hallmarks of an arm's-length relationship . . . between two sophisticated entities," which is "the 'very antithesis of a special relationship.'"[245] According to Citigroup, "ADIA and Citi engaged in extensive negotiations while represented by counsel from two of the world's most prestigious law firms; conducted thorough due diligence; acted solely in their own best interest; and memorialized their rights and obligations in a comprehensive Investment Agreement that contains two separate disclaimers of reliance, ten pages of representations and warranties, acknowledgments of ADIA's independent due diligence and sophistication, a release of liability for non-fraud claims, and a merger clause."[246]

**Analysis.** Based on our review of all the evidence before us, we find that ADIA hasn't proven by a preponderance of the evidence that, as required by *Kimmell*, the "nature and caliber" of the ADIA/Citigroup relationship during the period from November 20, 2007, until the closing of the investment transaction was such as to "give rise to an exceptional duty regarding commercial speech and justifiable reliance on that speech."[247]

*Unique and Specialized Expertise.* We deal first with ADIA's contention that Citigroup's "unique and specialized expertise" supports a finding that a "special relationship" existed. ADIA contends that Citigroup had "special expertise" about "its own finances and business" and that, beyond this, Citigroup had "unique knowledge *vis-à-vis* ADIA regarding, among other things, subprime instruments and valuation, off-balance sheet vehicles, and the complex nature of a large bank's balance sheet in general."[248]

With regard to Citigroup's special expertise about its own finances and business, we agree with Citigroup's contention that "since *Kimmell* New York courts have uniformly held that 'knowledge of the particulars of [a] company's business[,] and of the true situation underlying the misrepresentations pertaining to that business . . . does not constitute the

type of 'specialized knowledge' that is required in order to impose a duty of care in the commercial context.'"[249] With regard to Citigroup's alleged superior knowledge in comparison to ADIA about subprime assets, SIVs and bank balance sheets, we are aware of no case law holding that, in the absence of a professional or advisory relationship, allegedly superior knowledge of such matters can support a finding of a special relationship. ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In addition, ADIA itself had significant internal knowledge of relevant subjects;[251] ADIA affirmed in the Agreement that it had "such knowledge and experience in financial and business matters and in investments of this type that it is capable of evaluating the merits and risks of its investment . . . and of making an informed investment decision";[252] and ADIA could have, had it chosen to, sought and obtained independent professional advice in conducting its due diligence.





*"Special Relationship" Case Law.* We finally note that we have reviewed the extensive "special relationship" case law cited by both sides. We have concluded that Citigroup has much the better of the argument over whether there is case law precedent for a finding under the facts of our case of a "special relationship" sufficient to establish the "duty" element of ADIA's negligent misrepresentation proof. We agree with Citigroup that no New York case "comes even close to finding a special relationship between large,

sophisticated financial actors" such as ADIA and Citigroup, that our facts are materially different than those in *Kimmell*, and that post-*Kimmell* New York courts have resiled from *Kimmell's* emphasis on the defendant's having "unique or special expertise,"[265] at least where the knowledge at issue is of the defendant's own business.[266] The *Merrill Lynch Auction Rate*, *Scognamillo*, and *Capital Bank* cases relied on by ADIA were not decided under New York law and dealt with "fiduciary duty" issues rather than the question of a "special relationship." Even putting those points aside, the decisions in *Merrill Lynch Auction Rate*, *Scognamillo*, and *Capital Bank* are far from sufficient to overcome a plethora of New York cases finding that no special relationship existed in factual circumstances that, while not on all fours with our case, are much closer to our case than the facts of ADIA's three key cases.

The New York Court of Appeals in *Kimmell* began its analysis of "the nature of the duty which may give rise to liability for negligent misrepresentation" by stating that "[i]n the commercial context, a duty to speak with care exists when 'the relationship of the parties, arising out of contract or otherwise, [is] such that in morals and good conscience the one has the right to rely upon the other for information.'"[267] Having considered the record as a whole, we find the evidence before us doesn't come close to meeting this standard.

### C.    Negligence

Given our NDA and special relationship findings, we need not reach the question of whether ADIA was negligent in making its alleged misrepresentations. Based on our analysis of whether ADIA made knowing or reckless misrepresentations, we do note that none of Citigroup's actions and representations with regard to the SIVs, subprime losses or capital raising struck us as sufficiently inappropriate to support the conclusion that a similarly situated and prudent financial institution should reasonably have acted differently.

## IV.   Breach of Fiduciary Duty

For the same reasons that the NDA bars ADIA's negligent misrepresentation claim, it also bars ADIA's breach of fiduciary duty claim.

ADIA has not demonstrated that it and Citigroup have the kind of "special relationship" necessary to support a negligent misrepresentation claim. Because "the standard of a special relationship in the context of a negligent misrepresentation claim is less rigorous" than that necessary to establish a fiduciary duty,[268] we find that the lack of a legally sufficient "special relationship" also bars ADIA's fiduciary duty claim.

ADIA also contends that Citigroup breached its fiduciary duty by refusing to convert ADIA's securities on terms similar to those voluntarily extended to preferred shareholders in January 2009.[270] The evidence before us persuasively establishes that Citigroup based this decision on contractual differences between ADIA's securities and those held by the January 2008 investors.[271]



## V.     Breach of Contract

Contending that "by the execution date of the Investment Agreement (November 26, 2007) and no later than the closing date (December 3, 2007), GAAP required that Citi consolidate the SIVs onto its balance sheet,"[273] ADIA argues that Citigroup breached the following representation in §2.2(d)(3) of the Investment Agreement:

> The Company [i.e., Citigroup] and its subsidiaries do not have any liabilities or obligations ... of a nature that would be required to be accrued or reflected in a consolidated balance sheet prepared in accordance with GAAP ... other than liabilities or obligations (i) reflected on, reserved against, or disclosed in the notes to, the Company's consolidated balance sheet included in the Company's quarterly report on Form 10-Q for the fiscal quarter ended September 30, 2007....

Citigroup defends by contending that ADIA's breach claim is untimely and that, even if timely, there was no breach since it was not required to consolidate the SIVs prior to December 13, 2007, when it actually did.[274]

### A.     Timeliness

The Tribunal finds that ADIA's breach of contract claim is time barred.

§5.1(a) of the Agreement states in relevant part that "[t]he representations and warranties of the Company contained in this Agreement shall survive the Closing until the date nine months after the Closing Date" and "[i]f written notice of a claim has been given prior to the expiration of the applicable representations and warranties by one party to the other, then the relevant representations and warranties shall survive as to such claim, until such claim has been finally resolved."

Under §5.1(a), Citigroup's GAAP-related "representations and warranties" in §2.2(d)(3) survived until nine months after the Closing Date. The Closing Date was December 3, 2007, so the relevant "representations and warranties" survived until September 3, 2008. The only contractually provided exception was when "written notice of a claim" was given, during the nine months, in which case the "relevant representations and warranties [would] survive as to such claim."



**Substantial Compliance.** We next address ADIA's assertions that it substantially complied with the contract notice provisions during the nine months after closing, that Citigroup was aware of its grievances, and that Citigroup did not suffer any prejudice from ADIA's lack of formal compliance. ADIA relies on the *Suarez* and *Schwartz* cases[279] to support its contention that strict compliance with contractual notice provisions is excused under the circumstances ADIA has set out.

However, neither *Suarez* nor *Schwartz* involves a contractual time limitation on contractual representations or requirements for filing suit. *Schwartz* involved requirements for the termination of an independent contractor agreement, and in fact involved a termination that the court found to be consistent with those requirements.[280] The *Suarez* court held that despite a contractual requirement for termination by certified mail, a letter otherwise properly terminating a contract for the sale of real property was not ineffective

because not sent by certified mail where the other party did not contest receipt and did not claim prejudice.[281] Here, by contrast, there was no claim transmitted by a means other than that specified by the contract; as we have found above, there was no claim at all.[282] In the Tribunal's view, there is nothing in *Suarez* or *Schwartz* that dispenses with the notice requirement altogether.





    We find that the above events, taken together, do not establish by a preponderance of the evidence that ADIA gave Citigroup, or that Citigroup received from ADIA, notice of ADIA's intent to file a claim. First, ADIA has not persuaded us that it may circumvent the

50

requirement that it provide Citigroup with "written notice." ADIA has proffered no evidence of written notice. Second, even if we were to find that written notice were not required, we see no ADIA actions that show it communicated to Citigroup, during the spring of 2008, its intent to file a claim. Therefore, we do not find that ADIA gave Citigroup notice of its intent to file a claim prior to September 3, 2008.

**Equitable Estoppel.** Nor do we find that ADIA's delay in giving formal notice is excused under the doctrine of equitable estoppel. To make such a finding, we would first need to find that Citigroup's conduct caused ADIA to delay in filing suit during the course of what ADIA characterizes as settlement discussions, starting in spring 2008 and continuing until October 19, 2009. We have reviewed the totality of the evidence ADIA has presented and find that ADIA has not established by a preponderance of the evidence that Citigroup's conduct caused ADIA to delay filing suit during the relevant time period. Most of the evidence consists of Citigroup-internal emails. They support the finding that Citigroup knew individuals at ADIA were unhappy, but not that Citigroup believed ADIA intended to file suit, much less that Citigroup had received any such indication from ADIA. ADIA has pointed to no other evidence showing or even suggesting that anything about the cited or other Citigroup conduct caused ADIA not to file suit.



Thus, we find that ADIA's breach of contract claim is time barred.

**B.     Merits**

Although we find that ADIA's claim is time-barred, we nonetheless consider its breach claim on the merits.

For ADIA to succeed on the merits of its breach of contract argument, it must establish not only that under GAAP, events had occurred requiring Citigroup to perform an additional FIN 46R analysis between November 1 and December 3, but also that the analysis would have shown that there had been one or more reconsideration events that would have required Citigroup to consolidate the SIVs. ADIA has not met its burden of proving by a preponderance of the evidence that Citigroup should have performed a FIN 46R analysis between November 4 and December 3, or that had it performed one, consolidation would have been required.

During his testimony, Dr. Dharan agreed that the first step in a FIN 46R analysis is to determine whether any reconsideration events have taken place.[287] He described a reconsideration event as "any changes that reallocate the losses between various parties."[288] He also agreed that under FIN 46R, the rule that sets out the steps in a FIN 46R analysis, various occurrences are not reconsideration events.[289] These included a Moody's downgrade, a decline in the NAV of junior notes, a decline in market conditions, and a liquidity crisis for the SIVs.[290]

The only other occurrence ADIA has pointed to in the relevant time frame possibly constituting a reconsideration event is Citigroup's sale of commercial paper back to the SIVs. We find that ADIA has not established that a Citigroup sale of commercial paper back to the SIVs in the context presented here constitutes a reconsideration event. First, Dr. Dharan conceded that FIN 46R does not explicitly require reconsideration upon a sale such as that from Citigroup back to one or more of the SIVs.[291] Our review of all of the relevant testimony as well as the language of FIN 46R leads us to agree with Citigroup that the key issue is not merely whether there was a sale, but rather, whether the seller was the "primary beneficiary," as defined in FIN 46R, at the time of sale.[292]

Here, Citigroup was not the primary beneficiary. Paragraph 15 of FIN 46R provides for a variety of scenarios under which an entity is considered a primary beneficiary. After its October 15 and 16, 2007, purchases of CP, Citigroup reran its models and "reconfirm[ed] the accounting conclusion that Citigroup reached as of September 30, 2007 and reported in the October 18 memorandum, that it was not the primary beneficiary of any of the seven SIVs."[293] The October 18th memorandum reached the conclusion that "Citigroup neither absorbs a majority of expected losses nor receives a majority of expected residual returns of the SIVs. Therefore, Citigroup is not the Primary Beneficiary of the SIVs, and thus is not required to consolidate."[294]

Further, Citigroup assumed, in its view conservatively, in its September 30, 2007, FIN 46R analysis that it owned 100% of the SIVs' senior debt.[295] As of November 2007, it actually held only 12% of that debt.[296] The up to $10 billion in commercial paper Citigroup had arranged to purchase from the SIVs "would be a component of that 100 percent of the senior debt."[297] In addition to the debt assumptions, "8 times the spread volatility was assumed, which is more extreme than the spreads in the current market environment."[298] Based on these assumptions, Citigroup concluded that it would absorb 49% of expected losses.[299] As Dr. Dharan testified, FIN 46R only requires consolidation in this context "if it turns out that the probability of you absorbing losses is more than 50 percent."[300] Although Dr. Dharan offered a view that consolidation during the fall of 2007 was imminent, Citigroup rebutted this assertion through Dr. Schipper, who persuasively testified that "imminent" does not have meaning in the FIN 46R context; "it either meets the condition or it doesn't meet the condition. Being close to the condition doesn't have any meaning for this consolidation analysis."[301]

Finally, we agree with Dr. Schipper that the October-November arrangement to provide up to $10 billion in support to the SIVs occurred contemporaneous with third-party participation, resulting in the "accounting conclusion" that the up to $10 billion purchase of CP from the SIVs "[did] not create an implicit variable interest."[302] Since there was no implicit variable interest, Citigroup was not the primary beneficiary, and consolidation was again not required.[303]

We find that ADIA has not carried its burden of showing Citigroup was required, under GAAP, to consolidate the SIVs onto its balance sheet at any point between November 4th and December 3rd. Hence, Citigroup did not breach §2.2(d)(3) of the Investment Agreement.

## VI.   Damages

Having concluded that Citigroup is not liable to ADIA for fraud, or any other cause of action in the Statement of Claim, it is not necessary to parse the damage theories and expert opinions. We comment only on two critical issues.

ADIA could not – two years after learning the facts relevant to its Claims and after the receipt of billions of dollars in dividends – obtain rescission even assuming Citigroup was liable for fraud.

ADIA's alternate damage theories based on traditional loss causation arguments fail to establish that any "significant declines" in Citigroup's common stock price were attributable to Citigroup's corrections of previous statements about subprime losses, equity issuances or subprime write-downs.

Jonathan B. Marks

Date: October 14, 2011

Joseph T. McLaughlin

Date: October 14, 2011

Roy L. Reardon

Date: October 14, 2011

## ENDNOTES

1

  J-0246.

2

  *E.g.,* **Redaction** (C-05) ¶111; J-0893 at 2; J-0919b at 5.

3

  J-0966 at 9, 36.

4

  J-3733 at 2.

5

  ADIA relies on further oral interactions with Citigroup on November 25th, which we deal with *infra*.

6

  J-2448.

7

  J-0966 at 5,35.

8

  *Id.* at 5-6, 35.

9

  J-0768; J-3053 at 2.

10

  J-1428 at 2.

11

  **Redaction** (C-04) ¶62.

12

  J-3722.

13

  **Redaction** (1) 243:5-21.

14

  J-1530 at 18.

15

  RSOF ¶327 (Undisputed).

"RSOF" refers to ADIA's "Response to Respondent's Statement of Undisputed Facts in Support of Citigroup's Motion for Summary Judgment" of February 28, 2011. The RSOF contains Citigroup's list of allegedly undisputed facts and ADIA's paragraph-by-paragraph response to those allegedly undisputed facts.

16

When we use the words, "statement," "representation," or "misrepresentation" herein, we intend to include, to the extent applicable, omissions.

17

*E.g.,* "The timing and magnitude of this second capital raise renders Citi's insistence a few weeks earlier that it had *no* outstanding or anticipated capital needs hard to believe." ADIA Pre-Hearing Br. at 9.

18

We provided reasons for our granting Citigroup's motion for summary judgment and dismissing ADIA's claim of breach of the covenant of good faith and fair dealing in our March 31, 2011, Statement of Reasons, which is incorporated herein by reference.

19

In an Order of December 24, 2010, we found that "New York will govern [our] consideration of all of ADIA's claims in this arbitration." We issued a Statement of Reasons related to this decision on December 31, 2010. Both are incorporated herein by reference.

20

ADIA Post-Hearing Br. at 32.

Citigroup's view of the applicable standards isn't materially different:

> To establish fraud, ADIA had the burden of showing by clear and convincing evidence that Citi knowingly made a material false representation with the intention of inducing ADIA's reliance on that representation, that ADIA actually and reasonably relied on the representation and that it sustained damages as a result. *Gaidon v. Guardian Life Ins. Co.*, 94 N.Y.2d 3f30, 348-50 (1999); *Daly v. Kochanowicz*, 884 N.Y.S.2d 144, 152 (2d Dep't 2009).

> . . . .

> It is longstanding New York law that a plaintiff asserting a fraud claim must show that the defendant made the statement either knowing that it was untrue or "with reckless disregard of its truth." *Adams v. Berkowitz*, 212 A.D.2d 557, 558-59 (1st Dep't 1995).

Citigroup Post-Hearing Br. at 5; Citigroup Pre-Hearing Br. at 16.
21

*Williams v. Freeman*, 208 N.Y.S. 691, 698 (1st Dep't 1925), quoting *First Nat'l Bank of Amsterdam v. Miller*, 163 N.Y. 164, 167 (3rd Dep't 1900); 10B Fed. Prac. & Proc. Civ. § 2730 (3d ed.).
22

*Pacnet Network Ltd. v. KDDI Corp.*, No. 602182/08, 2009 WL 2999200, at *4 (N.Y. Sup. Ct. Sept. 16, 2009).
23

*Murray v. Xerox Corp.*, 811 F.2d 118, 121 (2d Cir. 1987) (**promise** of promotion: "Murray must demonstrate that **promises** were made to him with a present intent not to perform the **promised** acts. Under New York law, a failure to perform **promises** of future acts is not fraud unless there exists an intent not to comply with the **promise** at the time it is made") (emphasis added); *Hydro Investors, Inc. v Trafalgar Power Inc.*, 227 F.3d 8, 20-21 (2d Cir. 2000) (representations about a hydroelectric plant's **expected** energy output in connection with the negotiation of a contract to develop and construct the plants were non-actionable **promises** about future events).
24

*Pacnet Network Ltd. v. KDDI Corp.*, No. 602182/08, 2009 WL 2999200, at *4 (N.Y. Sup. Ct. Sept. 16, 2009) ("The only misrepresentation that could arguably be considered a present fact is the alleged statement by Dr. Akiba that 'the MCC repeaters did not represent a threat to the System's performance' (Complaint, ¶ 46). However, this is merely an expression of his **opinion** and is, in reality, a **prediction** of something which is hoped or expected to occur in the **future**" (citation omitted) (emphasis added).
25

*Zanani v. Savad*, 217 A.D.2d 696, 697 (N.Y. App. Div. 1st Dep't 1995) (**Estimate** in condominium offering plan concerning annual real estate taxes: "In general, a representation of **opinion** or a **prediction** of something which is hoped or **expected** to occur in the **future** will not sustain an action for fraud. To constitute actionable fraud, the false representation relied upon must relate to a past or existing **fact**, or something equivalent thereto, as distinguished from a mere **estimate** or expression of **opinion**. Thus, a projection of a plaintiff's future real estate tax liability generally is considered to be an **estimate** and can only reasonably be understood as such given the volatility of tax rates and assessments") (citation omitted) (emphasis added).

By contrast, the court found actionable an allegation that the "offering plan contained a false representation by stating that there was no standard approach used by the City of New York to reassess real property after substantial renovations of a building were completed." *Id.*

26

    *Naturopathic Laboratories Int'l, Inc. v. SSL Americas, Inc.,* 18 A.D.3d 404, 404 (N.Y. App. Div. 1st Dep't 2005) (Statements that defendants "would envision funding proposed acquisition with cash on hand and borrowings," "proposals [that] used the word 'intend,'" and a statement that "financing 'would be no problem' for SSL International because of its size, amount to no more than statements **of prediction or expectation,** and as such are not actionable")(citation omitted) (emphasis added).

27

    *Zanani,* 217 A.D.2d at 697; *Pacnet Network,* 2009 WL 2999200 at *4.

28

    *Pacnet Network,* 2009 WL 2999200 at *4 (**future events:** "expected failure rate of the MCC repeaters over time").

29

    *Murray,* 811 F.2d at 121 (citation omitted) (**future conduct:** promises concerning promotions and job transfers).

30

    *Sheth v. New York Life Ins. Co.,* 273 A.D.2d 72, 74 (N.Y. App. Div. 1st Dep't 2000) (rejecting alleged misrepresentations because "they are **conclusory** and/or constitute mere **puffery, opinions** of value or future **expectations**")(citations omitted) (emphasis added).

31

    *Pacnet Network,* 2009 WL 2999200 at *4 ("None of KDDI's alleged misrepresentations are actionable, because they all concern the **future reliability and performance** of the MCC repeaters. . . . The complaint only alleges misrepresentations about the expected failure rate of the MCC repeaters over time") (citation omitted) (emphasis added).

32

    *Pacnet Network,* 2009 WL 2999200 at *4, 6 ("presently existing facts").

33

    *Murray,* 811 F.2d at 121 (citation omitted).

34

    *In re Salomon Analyst Level 3 Litigation,* 350 F. Supp. 2d 477, 489 (S.D.N.Y. 2004) (Section 10(b) claim):

    Courts often review securities fraud and common law claims together and generally view the fraud elements in each as comparable. *Ashland Inc. v. Morgan Stanley & Co.,* 700 F. Supp. 2d 453, 471 (S.D.N.Y. 2010) ("The elements of common law fraud are much the same as the elements of a claim of securities fraud in violation of Section 10(b) of the Securities Exchange Act") (citation omitted); *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC,* 376 F. Supp. 2d 385, 407 (S.D.N.Y. 2005) ("The elements of common law fraud thus are largely the same as those of a Rule 10b-5 claim except that there is no requirement that the fraud be 'in connection with the purchase or sale of securities.' ").

    The Parties in this arbitration have regularly cited both federal securities act and common law cases to support their contentions relating to fraud proof requirements. *E.g.,* ADIA's citation of *Howard v. Everex Sys., Inc.,* 228 F.3d 1057, 1062 (9th Cir. 2000).

35

    *Sheth,* 273 A.D.2d at 74.

36

    *Pacnet Network Ltd. v. KDDI Corp.,* No. 602182/08, 2009 WL 2999200, at *4 (N.Y. Sup. Ct. Sept. 16, 2009) ("Dr. Akiba's alleged misrepresentations that the MCC repeaters 'did not represent a threat to the System's performance' is **too vague and generalized a statement** upon which Pacnet could reasonably claim that it pursued any particular course of conduct in connection with the negotiation of CV 19.")(citation omitted) (emphasis added).

37

    ADIA Post-Hearing Br. at 37.

38

    *Id.* at 38-39.

---

39

    Tr. 5473:4-6.

40

    Citigroup Pre-Hearing Br. at 16-17.

41

    Citing *Musalli Factory for Gold & Jewelry v. JPMorgan Chase Bank, N.A.*, 261 F.R.D. 13, 22 (S.D.N.Y. 2009), *aff'd*, 382 F. App'x 107 (2d Cir. 2010); *DaPuzzo v. Reznick Fedder & Silverman*, 14 A.D.3d 302, 303 (1st Dep't 2005),

42

    Citing *Schwartz v. Newsweek, Inc.*, 653 F. Supp. 384, 390 (S.D.N.Y. 1986) (quoting *Mfrs. & Traders Trust Co. v. Sapovitch*, 296 N.Y. 226, 229 (1947)), *aff'd*, 827 F.2d 879 (2d Cir. 1987).

43

    Citigroup Post-Hearing Reply Br. at 20.

44

    Citing *Decker v. Massey-Ferguson Ltd.*, 681 F.2d 111, 120-21 (2d Cir. 1982) (applying federal securities law).

45

    *Matthews v. Schusheim*, 42 A.D. 2d 217, 221 (2d Dep't 1973), *aff'd*, 35 N.Y.2d 686 (1974)("As is stated in 2 N Y P J I 688: 'Reliance is to fraud what proximate cause is to negligence; that is to say, fraud and injury must bear the relation of cause and effect. It is not necessary that the representation have been the exclusive cause of plaintiff's action or non-action; it is sufficient that but for the representation plaintiff would not have acted or refrained from acting, that is, that the representation was a substantial factor in inducing him to act or refrain from acting.'") (citations omitted).

46

    Agreement §5.6(c). The Agreement's Recitals, ¶C, define "Transaction Documents" as the Agreement and the Parties' Rights Agreement, which is defined at Article I §1.2(e)(ii) as the Registration Rights Agreement.

47

    J-2448.

48

    *Id.* at 4.

49

    *Id.* at 4-5.

50

    *Id.* at 2.

51

    J-0768.

52

    J-0246.

53

    §9.1, J-2448 at 4.

54

    Citigroup Pre-Hearing Br. at 10.

55

    ADIA Pre-Hearing Br. at 12.

56

    **Redaction** (4) 1410:9-24.

57

    Tr. 5505:10-11.

58

    Tr. 5514:20-5515:2.

59

    We say "single representation" even though we recognize that the Transparency Letter also "confirms" that Citigroup's "discussions with you regarding the Company's current plans for

financing through sales of Common Stock and securities convertible into Common Stock (the "Current Plans") have been transparent." We find that this statement is not materially different from and is subsumed by the "not aware of any facts or circumstances" representation.
60

We base this finding, *inter alia*, on the following documents, as well as on the analysis and record citations in fn. 144, *infra*:

- J-3324 at 1 – Dickson to Biglari e-mail, November 8, 2007: "who knows what we are solving for? Tier-1 vs rap vs other? Does all $10bn have to meet all of these or can we solve with $5 bn against one constraint and $5 bn against another?"
- J-3011 at 3 – Project Hercules document, November 12, 2007: "Given the high level of uncertainty about the direction of markets and investor appetite, we believe it would be prudent for Zeus to target raising $10bn in equity capital to provide itself with a sufficient level of capital to capture attractive opportunities that current dislocated market conditions are expected to present."
- J-1614 at 13 – November 15, 2007, Update to the Executive Committee: A slide, "Capital generation options," discusses nine options for generating capital, including asset reduction, divestitures, a dividend cut, and raising capital through "equity/convertible issuance (10 billion 4Q07 – "May be achievable through a private offering"), issue hybrid equity (e-TruPS)/already in current plan (.8 billion 4Q07), and additional e-TruPS (2.6 billion 1Q08).
- J-0999 at 1 – Biglari to Dickson e-mail, November 18, 2007: "I personally would be prepared to raise another $1-2bn over $10bn."
- J-0924 at 1 – Biglari to Dickson e-mail, November 20, 2007: "You need to pull together a list of investors for a $10bn capital-raise for name-by-name discussion with Vikram. . . ."
- J-3053 at 2 – Klein e-mail reporting on guidance he had provided to ADIA "based upon Hamid's 10 to 12B funding statement . . . ."
- J-0922 at 1 – Pandit to Biglari e-mail, November 24, 2007: "Shooting for $11-12bn in total, with $3.5bn coming from E-Trups."
61

We also note Mr. Fagen's suggestion, Tr. 5505:21-25, that the "the guts of that transparency letter is we could [raise] capital, but we'll give you notice." This was consistent with the testimony of Mr. Dickson. Tr. (9) 3507:25-3508:23; R-10 ¶ 13. We agree with ADIA's analysis, Tr. 5390:2-4, 5392:15-5393:2, that the Transparency Letter has "two parts," which are not inconsistent; both the "not aware of any facts or circumstances" provision and the "notice of change of plans" provision are binding commitments of Citigroup.
62

J-0246 at 29-38, Art. II.
63

ADIA Post-Hearing Br. at 7-8.
64

At closing argument, having said there "weren't any things to change current plans," Tr. 5506:10-11, Mr. Fagen said that it was "important to maintain that that letter and the NDA didn't suddenly create a thousand new representations and warranties. That letter is about capital. And many things in Citi's balance sheet, many things in Citi's universe could have dramatically changed what the current plans and capital would have been. Are we now saying that by virtue of the transparency letter and that NDA that virtually everything in Citi's universe of financial issues was suddenly the subject of a representation, when at the same time the contract, which didn't incorporate by reference the transparency letter has limited representations and a merger clause?" Tr. 5506:12-5507:8. In our view, the answer to Mr. Fagen's rhetorical question is "yes," at least to the extent that ADIA could meet its burden of proof that Citigroup was aware of "facts and circumstances" that "would cause" Citigroup to "change its Current Plans."
65

ADIA Post-Hearing Br. at 8.

---

66

      ADIA Post-Hearing Reply Br. at 25-26 n.22.

67

      *Id.* at 25 n.22 (emphasis in original). ADIA explicitly recognized in its Post-Hearing Brief that Citigroup's $8-11 billion November 4th estimate was a "forward-looking . . . statement" (emphasis in original).

68

      *Id.* at 25-26 n. 22 (emphasis in original).

69

      If at the time Citigroup made forward-looking statements such as "Citi would take no action . . . to consolidate the SIVs," Citigroup's "4Q subprime losses on its subprime portfolio would be $8-$11 billion" or Citigroup "would not need to raise more than $12 billion," ADIA could prove by clear and convincing evidence that, for example, Citigroup had already decided to consolidate its SIVs, already concluded that its subprime losses would be materially greater than $11 billion, or already decided to raise more than $12 billion in capital, then the otherwise forward-looking statements would be actionable. We need not deal with these issues separately, since each possibility is analytically subsumed under our consideration of evidence relating to whether Citigroup had no plan to consolidate its SIVs, had an estimate of Q4 2007 subprime losses of $8-11 billion, and was aware of no facts and circumstances that would cause Citigroup to change its plan to raise $10 to $12 billion in capital.

70

      ADIA Stmt. of Claim ¶25.

71

      ADIA Pre-Hearing Br. at 5.

72

      ADIA Post-Hearing Br. at 1.

73

      *Id.* at 9.

74

      ADIA Pre-Hearing Br. at 7.

75

      *Id.* at 1.

76

      *Id.* at 5.

77

      *Id.* This statement and the preceding one are forward-looking statements even though not stated in the conditional because the actual amount of subprime losses could only be determined in the future, after the close of Q4 2007.

78

      ADIA Post-Hearing Br. at 1.

79

      *Id.* at 9. ADIA also relies on alleged misrepresentations by Citigroup about elements comprising Citigroup's $9 billion and $8-$11 billion estimates. Here, too, ADIA sometimes lapses into articulating the alleged misrepresentations as forward-looking statements. Thus, it contended in its Pre-Hearing Brief that with regard to the $9 billion number, Citigroup falsely stated "the extent to which this total loss **would** derive from the various components of Citi's subprime portfolio. Specifically, as to the Super Senior ABS CDO assets ('Super Senior ABS') component, Citi told ADIA that the loss **would** be $6.5 billion. As to the asset-backed commercial paper ('ABCP') component, Citi represented that (a) an 8%, or $1.9 billion, loss was expected; and (b) this loss **would come** entirely out of the 9%, or $2.25 billion, portion of ABCP that derived from newer vintage mortgages vulnerable to the bursting of the housing bubble, as compared to the other ABCP non-subprime and older-vintage mortgage assets that had 'real' built-in home-price appreciation (protecting the lender in the event of default). *See, e.g.,* C-04 <span style="background-color: black; color: white;">Redaction</span> ¶ 39; J-0966 at CITI-A 00001581." ADIA Pre-Hearing Br. at 5 (emphasis added).

---

80

    We put to the side ADIA's allegation in its Statement of Claim that "Citi would need only $5 billion more in near term future capital to shore up its troubled financial position." Stmt. of Claim ¶4. ADIA didn't thereafter emphasize this point, and we find it both forward-looking and too ambiguous to be actionable. We are not sure whether, for example, ADIA intended that it relate to additional capital that Citigroup would seek to raise simultaneously with the potential ADIA investment or whether ADIA aimed by this allegation to try to deal up front with the problem presented to its capital-related misrepresentation claims by the $5 billion reset threshold in the Agreement.

81

    Stmt. of Claim ¶39.

82

    ADIA Pre-Hearing Br. at 9.

83

    ADIA Stmt. of Claim ¶40.

84

    ADIA Post-Hearing Br. at 28.

85

    We use the word, "estimate," rather than ADIA's "best estimate" phrasing set out earlier in text. While Citigroup internally used the phrase, "best estimate," in connection with the Super Senior ABS losses during November (J-2123 at 1; see Biglari Tr. (10) 3833:5, 3943:10-23), as far as we are aware Citigroup never explicitly used the term, "best estimate," in its communications about its potential subprime losses with the public or ADIA.

86

    We include here Citigroup's representations about the $9 billion subprime estimate. E.g., "In the Q&A Letter and Q&A Call, Citi represented to ADIA that its estimated markdown losses were approximately $9 billion, comprised of $6.5 billion in super senior losses and $2.4 billion in warehouse losses, and that '[t]his valuation is within the range of $8-$11B that we publicly disclosed.'" ADIA Post-Hearing Br. at 19-20, citing J-0966 at 5.

87

    Stmt. of Claim ¶29, quoting J-0966 at 9 & 36; ADIA Post-Hearing Br. at p.21.

88

    As noted earlier, the evidence supports the conclusion that by Current Plans, Citigroup meant plans to raise between $10 billion and $12 billion in capital. ADIA's allegations that Citigroup committed fraud by misrepresenting that "Citi's capital needs were limited to $10-$12 billion," ADIA Post-Hearing Br. at 1, and that "Citi's capital needs were at most $12 billion," ADIA Pre-Hearing Br. at p. 5, present substantially the same issues for decision as those involved in deciding the truth or falsity of whether Citigroup was "aware of facts or circumstances that would lead [it] to change its 'Current Plans.'"

89

    See In re Salomon Analyst Level 3 Litig., 373 F. Supp. 2d 248, 251-52 (S.D.N.Y. 2005) ("'Facts' about a company include data like amount of sales in a past quarter or the firm's market capitalization on a given date (closing price of the stock multiplied by number of shares outstanding), or events like an executive's promotion to CEO or the acquisition of a competitor. In contrast to these objective statements, financial valuation models depend so heavily on the discretionary choices of the modeler-including choice of method (E.g., discounted cash flow vs. market-based methods), choice of assumptions (such as the proper discount rate or cost of capital for a particular firm or industry), and choice of 'comparables' that the resulting models and their predictions can only fairly be characterized as subjective opinions. Like other opinions, some valuation models may be more or less reliable than other models, have more or less predictive power, or hew more or less closely to the conventional wisdom on a subject, but they are nonetheless opinions and not objective facts."); see also Demarco v. Lehman Bros., 309 F. Supp.2d 631, 635 (S.D.N.Y. 2004) (In the context of a "fraud on the market" analysis, noting a "qualitative difference between a statement of fact" and "a statement of opinion," since statements of fact, such as that "profits increased 10%," "are relatively,

fixed, certain and uncontradicted," whereas statements of opinion, such as those "emanating from a research analyst," are "far more subjective and far less certain").
90

    *In re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 2d 477, 490 (S.D.N.Y. 2005).
91

    J-5829 – Minutes of November 27th Telephonic Meeting of Citigroup Executive Committee: "Mr. Crittenden presented a financial report to the Board, using a deck that had previously been provided to Board members. He reported on the outlook for fourth quarter of 2007 and fiscal year 2007, noting there was still a range in results due to the uncertainty relating to the expected valuation of the super senior exposures, which the Company believes will reflect a markdown within the $8-$11 billion range previously announced (including the additional write downs on CDO inventory positions), though it presently seemed unlikely the markdown would be below $9 billion."
92

    ADIA Post-Hearing Br. at 9.
93

    Tr. 5302:11-14.
94

    ADIA Post-Hearing Br. at 18.

    We have also considered ADIA's contention that Mr. Biglari ""literally cut and pasted stale data for October 31 into the Q&A Letter, deliberately omitting more recent data in the same document showing $2 billion in additional losses as of November 14 . . . ." ADIA Post-Hearing Br. at 21, citing J-0966 at 6 and J-2722 at 6.
95

    *E.g.*, ADIA Post-Hearing Br. at 11.
96

    Jaffee Tr. (3) 983:18-984:6.
97

    350 F. Supp. at 489.
98

    PJI §1:64.
99

    Verron Stmt. (R-08) ¶¶ 6, 15; Crittenden Tr. 2227:25-2228:11 ("You know, these securities in particular had been, you know marked at par, historically they'd never lose value. These were securities that were safer than General Electric Credit. And so these securities had been marked at par and so we had a rudimentary model that enabled us to do a valuation, but our team focused heavily on ensuring that we had the right modeling capability to estimate what these losses were").
100

    J-0213 at 4-5 (*circa* November 11, 2007, Report on Citigroup): "The value of Citigroup's least transparent assets is likely to be debated. Level III assets are valued using internally generated models as there are no observable market transactions to base the value. In other words, the value of these assets are 'marked to model' rather than 'marked to market' . . . . *No one can reasonably claim what the true value is of Level III assets*, and with its exposure being so large, Citigroup will bear the brunt of such valuation concerns" (emphasis added).



████████████████████████████████████████████

101    Ferrell Tr. (8) 3142:6 - 3143:10.

102    *Id.* 3150:12-18.

103    Verron Stmt. ¶¶12-79. Mr. Verron did testify about internal disagreement among Citigroup's executives over the particular basis for the estimate in the $11 billion upper end of the range of anticipated losses (Verron Tr. (9) 3708:5-3709:4). But internal debate over subjective methodologies for determining estimates does not equal recklessness; if anything, it cuts the other way.

104    *DaPuzzo,* 14 A.D.3d at 303.

105    *E.g.,* Verron Stmt. (R-08) ¶¶36, 39-43.

106    For example:

- We found credible Mr. Verron's testimony and other evidence about the status and problems with the reliability of the collateral value model. *E.g.,* Verron Tr. (9) 3705:16-23; 3706:3-10; 3718:7-3719:21 ("if [super seniors] ever started trading," Citi might "potentially change [its] pricing methodology.").
- While we think a possible inference is that the "Today Nov. 13 → another $2bn of worsening" in Mr. Biglari's notes, J-4869 at 13, refers to an increase in the collateral value estimate in some projection, that isn't the only possible inference, particularly given that the notes indicate that the $2bn leaves the write-downs "still in range," *id.,* which could be in tension with Mr. Biglari's possibly understanding that the $2bn" was additive to the earlier $11 billion collateral value model estimate. We've also taken into account another notation by Mr. Biglari on the same page of his notes: "mkt observables ... are not suff[icient] to use" but "[i]f more Liq[uidity] comes to mkt & ss trade, then observables" might be used.
- We agree with Citigroup that there is a deficiency of evidentiary support for ADIA's contention that Biglari "literally cut and pasted stale data for October 31 into the Q&A Letter," deliberately omitting more recent data in the same document showing $2 billion in additional losses as of November 14." ADIA Post-Hearing Br. at 21. We have no credible evidence linking Mr. Biglari to J-2722, and we find credible Mr. Biglari's testimony about how he drafted the relevant Q&A portions. Biglari Tr. (10) 3832:20-25, 3958:17-23, 3989:18-24, 4019:12-21.

107    Thus, for example, we think the pertinent testimony of Dr. Ferrell (*e.g.,* Tr. (8) 3154:3-3162:14, 3167:3-13, 3171:14-3173:11, 3175:3-23), which, overall, we found persuasive, is sufficient to trump any claim that Citigroup's decisions were outside the realm of reasonableness.

108    *Salomon,* 350 F. Supp. at 492.

109    *Id.*

110    *E.g.,* N.Y.BUS. CORP. LAW §§ 715(h), 717(a) (corporate officer or director may rely in good faith on "information" prepared by "employees" and "counsel" "believe[d] to be reliable" and related to "such person's professional or expert competence"); *Kimmell v. Schaefer,* 89 N.Y.2d 257, 265-66 (1996) (applying statute and concluding reliance unreasonable only where employee was "woefully negligent and abysmally uninformed").

111    ADIA Post-Hearing Br. at 20 (emphasis in original).

112

      J-1798 at 9, 13, 68. The 10Q stated:
- Citigroup's expectation that "market conditions will continue to evolve, and that the fair value of Citi's positions will frequently change."
- The statements were "forward-looking statements" that were "based on management's current expectations and are subject to uncertainty and changes in circumstances."
- "The impact on Citi's financial results for the fourth quarter from changes in the fair value of these exposures will depend on future market developments and could differ materially from the range [of $8–11 billion] above."

113

      J-1572 at 10, 4, 7. In this November 5th analyst call, Mr. Crittenden discussed the $8–$11 billion estimate, stating that "there is no way that . . . anyone can give . . . an assurance about how things are going to move." He also said that "[t]here is still a lot of uncertainty about what is going to happen in the market . . . . [T]his is just our current view of the way things may look during the course of the quarter. It obviously could be higher and lower than that." He added, "We just simply don't know" what the fourth quarter losses will be; "we wanted to give you a sense of what we thought the impact would be during the course of the fourth quarter but it really is very dependent on how the market evolves here now over the next eight weeks or so."

      ADIA reviewed the 10Q. **Redaction** (4) 1751:16–1752:10. There is nothing in the record to establish that ADIA reviewed the November 5th analyst call transcript, but it was in the public record and we find that ADIA is deemed to have had knowledge of it.

114

      ADIA Post-Hearing Br. at 42.

115

      *E.g.,*
- J-0966 at 5 ("Early vintages have preserved their value much better than recent vintages because they incorporate several years of home appreciation before the current housing environment set in. It is because of the weighting towards earlier vintages and the better mix of their underlying collateral that we believe the ABCP (liquidity puts) and High-Grade super senior CDOs are worth more than other types of super senior CDOs (ours and our competitors). A portion of the information in the attached materials was obtained or derived from third party public sources, and we disclaim all responsibility for verifying such information.").
- J-1572 at 12 (Crittenden on November 5th: "I think the general trends that are true for the industry are true for us so that is the more recent vintages are more impacted than those that are older").


Redaction

      ADIA Post-Hearing Br. at 21 (Citing "J-0966 at 9; Tr. (5) 1843:22–1844:14; Tr. (7) 2944:20–23; J-4869 at 27, 30 ($10 billion support 'is our capped liability to SIVs')."

117

      J-0966 at 9, 36.

118

      **Redaction** (5) 1844:3-9.

119

      ADIA also relies on J-4869 and portions of Mr. Shohet's testimony, but neither involve representations by Citigroup to ADIA.

J-4869 at 27, 30 presents Mr. Biglari's notes. He writes, "We have said definitively we will not do anything that would trigger consolidation" and $10 billion support "is our capped liability to SIVs."

Although not in the context of what Citigroup said or wrote to ADIA, Mr. Shohet testified as follows, Shohet Tr. (7) 2944:16-23:

Q:    Did Citi have any legal obligation to provide support to the SIVs?
A:    We did not.
Q:    Did Citigroup have any sort of obligation to support the SIVs.
A:    We did not have any obligation to support the SIVs.

120

ADIA Post-Hearing Br. at 22.

121

J-2496 at 1.

122

J-1165 at 1.

123

J-2502 at 1.

124

J-5834 at 3 (October 15, 2007, Audit and Risk Management Committee Minutes: "Mr. Pandit and Ms. Kim discussed the financing of SIVs, including the nature of CAI's legal obligations with respect to SIVs, its relationship with SIV investors and potential liquidity and reputational issues for the Company.")

125

This finding is supported by a multitude of contemporaneous documents and substantial credible testimony. For example:

- J-1798 at 10 – Citigroup November 5, 2007, 10Q: "Citigroup will not take actions that will require the Company to consolidate the SIVs."
- J-1453 at 1 – Gary Crittenden November 26th e-mail to Michael Klein and others in response to Klein's request, apparently made while Klein was en route to Abu Dhabi, for a "clear response" to "HEARD ON THE STREET" article on SIVs: "We already addressed this exact issue with [ADIA] a number of times. Our exposure is and remains exactly what we disclosed in the 10Q. There has been no reconsideration event in the CDO or SIV portfolio. As we stated in the 10Q we will do nothing to trigger reconsideration which would lead to consolidation."
- J-5829 at 2 – November 27th Minutes of Telephonic Meeting of Citigroup Executive Committee: "In response to questions from Board members about the risk that off-balance sheet items would come back onto the balance sheet, Mr. Crittenden said he considered that very unlikely. In response to further questions concerning the reputational risk of not supporting products associated with the Company, Mr. Crittenden noted that Citi has been successfully working with owners of the lower tranches of some products, who have cooperated once they became convinced we would not simply put the products back on our balance sheet."
- J-2608 – November 28th e-mail from John Gerspach: "[W]e will not take any action to consolidate the SIVs."
- Crittenden Tr. (6) 2547:12-2548:11: The "reduction of the SIV assets in the fall of 2007" "was completely inconsistent" with "an eventual consolidation of the SIVs." "So if we had believed, thought, had a strategy to consolidate the SIVs, then the holders of the senior notes would have had no interest in acquiring assets out the SIVs and the holders of the junior notes would not have engaged in the exchange transfer process. It simply would not have happened. . . . There was no plan . . . . There wasn't a plan out there that said we're just going to hide the ball here and consolidate these things."

64

- Armstrong Tr. (14) 4836:11-16 (Crittenden "was stalwart in his commitment and conviction that these SIVs were not contractually required to come on our balance sheet and that management felt very strongly that they would not come back on our balance sheet").

[126]

We have reviewed each piece of evidence cited by Citigroup in support of these propositions at Citigroup Post-Hearing Br. pp. 10-11, and find them separately and cumulatively credible: J-3169; J-3172; J-1187; J-1187; J-2647; J-1264; J-1798; J-1598; J-2381; J-1154; J-1599; J-2374; J-5834; J-3706; Biglari Tr. (10) 4057:22-4058:12; Crittenden Tr. (6) 2271:7-19-2272:5,2283:24-2285:4; 2277:6-17; Ferrell Tr. (8) 3183:2-5; Pandit Tr. (16) 5095:16-20; Shohet Tr. (7) 2945:5-12; 2948:17-2949:3; Wentzel Tr. (14) 4976:23-4977:7.

[127]

We have reviewed each piece of evidence cited by Citigroup in support of this conclusion at Citigroup Post-Hearing Br. pp. 11-12, and find them separately and cumulatively credible: J-2867; J-1667; J-1782; J-1292; J-1596; J-1644; J-1713; R-7 ¶¶49, 52 (Mr. Shohet); R-2 ¶¶37,39 (Mr. Crittenden); Bischoff Tr. (15) 5018:19-5019:15; Armstrong Tr. (14) 4870:11-4872:8; Biglari Tr. (10) 3851:5-21; Crittenden Tr. (6) 2285:5-2291:5; Wentzel Tr. (14) 4973:10-4974:24.

We have also considered each piece of evidence cited by ADIA in support of its position that "threats from SIV investors had been made before the ADIA investment," ADIA Post-Hearing Br. at 27 (citing J-2644; J-2474; J-1662; Crittenden Tr. (6) 2558:6-2559:14), and its argument that Citigroup "unpersuasively argues that the growing chorus of SIV investors requesting consolidation after November 30 means that investor pressure was not present or at least foreseeable before November 30." ADIA Post-Hearing Reply Br. at 11 (Initial citation omitted; Citing Crittenden Tr. (6) 2558:6-2559:14; Bischoff Tr. (15) 5052:18-5054:9; J-355; J-259; Ferrell Tr. (8) 3257:11-3258:12; J-2647; J-1198; J-2599; J-2618). While some of this evidence does provide counterpoint to Citigroup's evidence, the heavy weight of the cumulative evidence supports our conclusion that there was a sea change in the amount and nature of investor pressure during the period from December 5th to December 12th, as compared to the time before December 5th.

We have also taken note of ADIA's point, made effectively in its briefing and by Mr. Werder at closing argument, Tr. 5349-50, citing J-1202, J-2599 and J-2618, that Citigroup failed in its public filings to mention that it was driven to consolidation by investor threats. While we can speculate as to why Citigroup made this choice, Citigroup's apparent unwillingness to state publically that it felt it was being subjected to boycott and blackmail by other financial institutions and major corporate clients does not vitiate our conclusion that it was these post-December 5th actions that caused Citigroup to shift its views about SIV consolidation.

[128]

R-2 ¶¶ 37, 39 (Crittenden).

[129]

Shohet Tr. (7) 2961:5 – 2962:13.

[130]

ADIA Post-Hearing Br. at 22 (citing, inter alia, J-1165 at 1-2; J-2496 at 1; J-2502 at 1; J-3172 at 7; J-5834 at 3; Wentzel Tr. (14) 4898:14-4899:21, 4931:6-19; Bischoff Tr. (15) 5050:7-5051:18, 5052:18-5053:16, 5054:2-9).

[131]

Id. (citing, inter alia, J-3219 at 4; J-3239 at 3; J-3242 at 5; J-4353 at 20).

[132]

See citations at n.130, supra.

[133]

ADIA Post-Hearing Br. at 23 (citing, inter alia, J-1658; J-2099; J-2504 at 1; J-3198; Dickson Tr. (8) 3374:14-3375:10, 3381:22-3382:4.

[134]

Id. at (citing J-1684 at 1).

---

135

     *Id.* at 24-25 (citing, *inter alia*, J-1187 at 1, 5; J-1391 at 5; J-1555 at 1; J-2102 at 5; J-2131; J-2598 at 1, 2, 4, 8; J-2837; J-3172 at 7-9; J-4802 at 1; Dharan Tr. (3) 1138:7-1139:10; Crittenden Tr. (6) 2564:2-10.

136



138

     Schipper Tr. (9) 3613: 3-10; 3615: 5 – 3616:18.

139

     *Id.* 3670:7-25.

140

     *Id.* 3603:12-20.

141

     *Id.* 3601:15-3603:5.

142

     Dharan Tr. (3) 1230:23-1231:2.

143

     ADIA Post-Hearing Br. at 28.

144

     *Id.*

     In addition to documents cited in fn. 60, *supra*, we base this finding, *inter alia*, on the following:

- J-1257 at 1 – Dickson to Crittenden e-mail, November 27, 2007: "While we have said we are done, [Capital Global Investors] expressed interest in buying more if offered."
- J-2347 at 2 – Bischoff to Nelson e-mail, December 5, 2007, re Oman inquiry: "The best way forward on this is to say that, for the moment at least, we do not intend to issue NEW equity.

If they wanted to buy shares in Citi the public markets are open to them of course. If they need help to access these in size we would be able to help them."

- J-2341 at 1 – Lee to Biglari e-mail, December 6, 2007: "Morse thanked CDB for its interest but suggested at present we have no immediate capital needs."
- J-2343 at 1 – Biglari to Lee e-mail, December 12, 2007, about Lee discussion with "Gov Chen" regarding possible investment: "There is nothing to discuss at this point. As I mentioned to you, there are no current plans."

In partial contrast to the above-noted documents, J-5829 at 2 (Crittenden Briefing of Executive Committee on November 27, 2007 on a range of "possible capital generating actions," including "possible eTrups sale") and J-1908 at 34 (Report to Webster, December 11, 2007 – "Near term capital issues have been mitigated") are not as clear-cut as Citigroup suggests, Post-Hearing Br. at 6, and were, indeed, presented as arguably helpful to ADIA by Mr. Werder at closing argument. Tr. 5375:17-5377:13. We have considered each document carefully and find that they contain nothing allowing a non-speculative inference concerning the existence of an actual November plan to raise further equity beyond that received from ADIA and the ETruPS.

J-5829's "other possible capital generating actions" could, but don't necessarily, include raising further equity capital. As Mr. Werder said, "mitigated" can mean reduced rather than "solved" or "gone away," Tr. 5376:19-25. Even assuming he, rather than Mr. Cohen, is correct about mitigate's meaning (Tr. 5485:20-22, Mr. Cohen: "Mr. Karp's version of Webster's says mitigated means cure, not lessened"), merely because Citigroup management told its Board on December 11, 2007, that "[n]ear term capital issues have been mitigated" and, additionally, listed "[r]aise additional capital" as one way to "[r]educe risk exposure," doesn't provide material support for an inference that there existed a plan on December 11th, much less at the end of November, actually to raise additional capital beyond the ADIA investment and the ETruPS. We note again, in this regard, J-2343, in which Mr. Biglari wrote on December 12th, "there are no current plans."

We also have considered, and found credible, Mr. Bischoff's testimony on this subject. Asked on cross-examination about Mr. Crittenden's reference, as reported in J-5829, to "other possible capital generating actions," Mr. Bischoff said:

> A: I think we looked at a whole range of things, selling assets, stopping the dividend I think, raising preferred securities. We may have been talking about some hybrid transactions, I can't recollect, but I think there was a whole range of alternatives I think that was being – being discussed.
> Q: A whole range of alternatives to raise capital?
> A: Yes. And then I went on to say with the exception of raising equity.
> Q: And when you say with the exception of raising equity, tell me what you specifically remember. Who talked on the topic of that exception?
> A: I didn't think anybody talked about the exception. I think, again, I suspect we probably had a deck on there which – in relation to the meeting which probably laid out a number of alternatives. I can't – I can't – I really can't remember, but equity certainly was not being discussed at that particular time.
> . . . .
> A: It wasn't – it wasn't – to my recollection, it wasn't discussed. A whole range of other alternatives were being discussed. I cannot remember equity being discussed.

Bischoff Tr. (15) 5046:20-5048:19.

We also give significant weight to the testimony of other Citigroup witnesses, who, on this subject, we found credible: Crittenden Tr. (6) 2598:11-20 ("$12 billion was the amount of capital we intended to raise"); Dickson Tr. (8) 336:6-3361:8; Dickson Tr. (9) 3484:2-17 ("[M]y view of foreseeable future was at least 90 days. We thought we were raising enough capital at that time that

we wouldn't have to raise any more capital.... So we didn't have an intention to issue equity after the amount we sold."); Shohet Tr. (7) 2954:14-2955:2; Bischoff Tr. (15) 5047:18-20; Biglari Tr. (10) 3813:4-13 (Asked how the $10 billion number was arrived at, Mr. Biglari stated, "Broadly, we looked at the level of losses of 8 to 11 and we were looking broadly to raise capital to cover that.").

We have also looked carefully at the record relating to ADIA's contention that Mr. Pandit's statement in J-2355 that "more is better" meant that he believed Citigroup should raise more than $12 billion, with a focus on the entire e-mail chain. In context, we find that the only reasonable interpretation of Mr. Pandit's statement is that he meant that $12 billion was better than $10 billion.[145]

While we find the evidence mixed about precisely when in December Citigroup realized it needed to begin work on raising additional capital, we find the substantial weight of the evidence supports the conclusion that it was not until well after the closing of the ADIA transaction on December 3 that anyone at Citigroup began seriously to contemplate raising more than the ADIA money plus the ETruPS. *E.g.*, Crittenden Tr. (6) 2305:22 – 2306:18; Dickson Tr. (8) 3321:13-23; Shohet Tr. 2 (7) 2969:7-24.[146]

*E.g.*:
- J-5798 at 1 – October 23, 2007, E-mail from Bonnie Howard to Michael Armstrong: "I have confirmed that the Citigroup target has been 7.5% for some time. The Audit Committee was briefed on this target in a December 2005 tutorial session").
- J-3222 at 8 – Presentation to Citigroup Board of Directors, October 31, 2007, showing Tier 1 Target at 7.5% for 3Q07 to 2Q08 (J-5694 at 15 – same).
- J-3706 at 9 – 10Q for "quarterly period ended September 30, 2007," dated November 4, 2007: "Citi has provided specific targets for its two primary capital ratios: the Tier 1 capital ratio and the ratio of tangible common equity to risk-weighted managed assets (TCE/RWMA ration). Those targets are 7.5% for Tier 1 and 6.5% for TCE/RWMA."
- J-2099 – November 8, 2007, E-mail from Mr. Shohet to Mr. Crittenden, including Capital Scenarios slide deck, stating:
    - At 3: "The current forecast shows capital ratios recovering to target levels at the end of the second quarter of 2008 under the strict asset limits that have been put in place."
    - At 5: "Scenario 1: Current Forecast" -- "Tier 1 Ratio: "Target >7.5%."
- J-1614 at 8 – November 15, 2007, Update to the Executive Committee: "Tier 1 Ratio: "Target >7.5%."
- J-4980 at 13 -- December 11th 2007, Draft 2007 Plan Board of Directors Review: "Capital Forecast -- "Tier 1 Ratio – Citigroup Internal Target >7.5%."

We further note that we didn't find Dr. Hamm's testimony on this subject particularly persuasive. Although ADIA summarized his opinion by stating that "a bank similarly situated to Citi would seek to increase its capital cushion in a riskier operating environment, or upon realizing that its balance sheet was riskier than previously thought," ADIA Post-Hearing Br. at 28, citing Hamm Tr. (5) 2091:22-2093:9, Dr. Hamm agreed that he couldn't "tell you what Citi's target was, I don't have that kind of information." Hamm Tr. (5) 2103:18-19.

Following the same logic, we find that ADIA has not established that Citigroup knowingly misrepresented that "its target Tier 1 ratio was only 7.5%," ADIA Post-Hearing Br. at 33, and that raising $10-$12 billion in capital "would allow Citi to meet its target capital ratios." ADIA Post-Hearing Br. at 27.[147]

We have also considered the following capital-related allegations:

- ADIA's allegation that Citigroup said that "it did not need to raise any capital from private investors," and that raising $10-$12 billion in capital would "put Citi on its 'front foot'" and "position Citi 'with a balance sheet to lead the industry.'" ADIA's Post-Hearing Br. at 27-28.
- ADIA's allegation that Citigroup "told ADIA that, in fact, it did not need to raise any capital at that time to address its balance sheet needs or to bolster its Tier 1 capital ratio, but was raising it simply as a precaution and a way to position itself ahead of its competitors in the market. *See, e.g.,* C-04⬛Redaction⬛) ¶ 28; C-05⬛Redaction⬛ ¶ 40." ADIA Pre-Hearing Br. at 12.

We find these allegations too vague and conclusory to be actionable; they are also, at least to a degree, inactionable puffery. Apart from that, to get ahead of ourselves, we have concluded that ADIA has not produced clear and convincing evidence that these allegations were relied on, in light, for example, of the following statements about ADIA's view of Citigroup's capital position:

- November 25, 2007 -- J-0604c at 2: "Citigroup has determined its current deficit in capital to be $12 billion, and it is working on raising its capital to cover this deficit. It has offered $5-8 billion to ADIA."
- November 26, 2007 -- J-0919b at 5: "According to the Executive Director of the Emerging Markets Department, City Group [sic] contacted the Authority indicating that it had a decline in capital adequacy that had to be covered by $12 billion, and that it was working on increasing the capital through a private placement of $8 billion."
- November 25, 2007 -- J-0893 at 2, 4: "Citigroup has identified the shortfall in its capital to be in the region of $12 billion. . . . ;" "Citigroup has a risky balance sheet. Citigroup has a relatively weak capital position and needs to increase its equity base and/or reduce assets."

148

We note for completeness that although ADIA's claims of fraud turn in part on allegations of Citigroup's withholding information, *e.g.,* ADIA Post-Hearing Br. at 8, ADIA did not present its omission allegations in the context of an analysis of the differences in its proof obligations.

Where a plaintiff rests its fraud claim on a failure to disclose allegedly material facts, rather than on an affirmative misrepresentation, New York law additionally requires that the defendant had a duty to disclose the alleged omission. As articulated by Judge Nelson in *General Signal Corp. v. MCI*, 66 F. 3d 1500, 1511 (9th Cir. 1995):

> In order to prove fraud under New York law, a party must show (1) a material, false representation; (2) knowledge of falsity; (3) intent to defraud; (4) reliance upon the representation; and (5) damages. *Kregos v. Associated Press*, 3 F.3d 656, 665 (2d Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 1056, 127 L.Ed.2d 376 (1994). As MCI principally relies on the theory that GSX fraudulently concealed the material fact of a sell or shutdown plan, it must also show that there was a duty to disclose, which occurs if (1) the party made a partial or ambiguous statement; (2) the parties stand in a fiduciary or confidential relationship; or (3) one party "possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge." Brass v. American Film Technologies, Inc., 987 F.2d 142, 150 (2d Cir.1993).

*Accord, Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 181 (2d Cir. 2009) ("Where a defendant, as here, seeks to show fraud by omission, it must prove additionally that the plaintiff had a duty to disclose the concealed fact") (citation omitted).

ADIA does argue in other contexts that it had a fiduciary or special relationship with Citigroup (regarding its negligent misrepresentation and breach of fiduciary duty claims) and that Citigroup had exclusive knowledge (claim that it reasonably relied). But these issues aren't necessarily the same as those presented in the duty to disclose area.

We have looked at the case law in this area, and applied the non-disclosure/duty to disclose law as we understand it to ADIA's various allegations of omission. We do not believe that ADIA has presented evidence sufficient to allow it to take advantage of the "fiduciary or confidential obligation" or "'superior knowledge'" triggers of a duty to disclose. We think ADIA has at least a colorable argument that some of its alleged omissions fall under the "partial or ambiguous statement" trigger. We note that the case law we have read isn't helpful factually to ADIA. We have concluded, overall, that ADIA has not demonstrated by clear and convincing evidence that any of these "triggers" were sufficient to create a duty to disclose.

For example, while there are some factual differences, we believe the *General Signal* case, *supra*, speaks to the question of whether Citigroup had an obligation to disclose that it had run SIV consolidation scenarios or the various underlying issues concerning subprime loss estimations in the context of stating, for example, that it had no plan for SIV consolidation or that its Q4 2007 subprime loss estimate was $8-$11 billion. The *General Signal* court holding sets a high standard for requiring disclosure – *e.g.*, finding there was "insufficient evidence" that a "purported plan to 'sell or shutdown'" an entity had actually been "adopted" and that information concerning "consider[ing] strategies" or "list[ing] option" didn't need to be disclosed. *General Signal*, 66 F.3d at 1512.
149

We note, however that we find no basis for agreeing with ADIA's allegation that Citigroup played a "shell game . . . with its witnesses, their recollections and their responsibilities. . . ." ADIA Post-Hearing Br. at 1.
150

We discuss these statements, *infra*.
151

ADIA Post-Hearing Br. at 46, ▮Redaction▮ (1) 251:2-254:6; (2) 683:16-684:7; ▮Redaction▮ (4) 1688:21-1689:12, 1784:18-1786:25.
152

Citigroup Post-Hearing Reply Br. at 28, citing '▮Redaction▮ 1786:2-6, 1790:16-1791:3: 'false'; ▮Redaction▮ 253:7-20, 613:9-11: 'positive spin'; ▮Redaction▮ 1997:9-1999:14: 'inaccurate')."



J-0055 at 5. This is a January 5, 2008 draft of what eventually became J-5825; J-5825 did not contain the quoted language. Although it lessens its weight, we think the omission of the J-0055 language in J-5825 doesn't establish that the quoted language didn't reflect the contemporaneous beliefs of the drafters.
155

J-5825 at 3; J-0844 at 3 ("BXU presented that given that we had anticipated Citigroup's requirement for additional capital, the implications for ADIA are positive.").
156

▮Redaction▮

ADIA Post-Hearing Br. at 43.
158

▮Redaction▮

J-2910.

---

160
    J-0893 at 63.

161
    J-0213 at 4-5; J-0604 at 2; J-0893 at 1.

162
    J-0893 at 6.

163



Citigroup Post-Hearing Br. at 47 (citations omitted).



168

See record citations collected in Citigroup's Post-Hearing Brief at 47-49.

169

**Redaction**

**Redaction**

**Redaction**

170

*E.g.,* J-0213, J-0313 at 1, J-0322 at 2, J-0529 at 1; **Redaction** (C-01) ¶¶ 10-11; **Redaction** (1) 311:17-22, 315:24-316:6, 318:18-322:16; **Redaction** (4) 1495:12-1496:11, 1528:19-1531:23.

171

J-2114 at 1.

172

**Redaction** (1) 344:4-6.

173

**Redaction**

J-0604b at 2.

175

J-0919b at 5-6.

176

*Id.* at 6, 7.

177

Klein Tr. (12) 4444:20-4445:2.

178

**Redaction** (1) 225:22-226:6; *Compare* Klein Witness Stmt. (R-05) ¶46 *with* **Redaction** (C-06) ¶¶5-7.

**Redaction** (C-01) ¶47; **Redaction** (1) 226:7-227:2.

180

**Redaction** (2) 728:15-21.

181

**Redaction**

183    J-0113 at 2.

184    *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 195 (2d Cir. 2003).

185    *Id.* at 195.

186    ADIA Post-Hearing Br. at 47-49.

    3 N.Y.2d 155, 161 (1957) ("[I]f it were otherwise, a defendant would have it in his power to perpetrate a fraud with immunity, depriving the victim of all redress, if he simply has the foresight to include a merger clause in the agreement.")

187    295 F.3d 312, 330 (2d Cir. 2002)

188    The language of §9.1 was originally included in J-1477, ADIA's "generic NDA," and flowed through to J-2448, the signed NDA, via J-0139.

189    ADIA confirmed that it was "advised by counsel" in the negotiation of the Agreement. §1.3. The record is clear that Mr. Copleston was a part of ADIA's due diligence team, and that he was directly involved in the negotiation of economic terms. *E.g.,* [Redaction] (4) 1664:9-1665:2.

190    J-1435 at 1.

191    [Redaction] (C-04) ¶33.

192    [Redaction] (4) 1663:21-1665:2.

193    [Redaction] (C-02) ¶64.

194    [Redaction] (C-05) ¶61.

195    We say a "pink flag" because we think the tensions we have identified are not as blatant as those that have driven court decisions in key cases such as *Ambac Assur. Corp. v. DLJ Mortg. Capital, Inc.*, 2011 WL 1348375, at *11 (N.Y. Sup. Ct. Apr. 7, 2011) ("Ambac was alert to possible problems with [the originator of the loans at issue], which heightened its obligation of diligent inquiry. . . . Having failed to protect itself by available means, Ambac cannot now claim it was fraudulently

induced.") and *Global Mins. & Metals Corp. v. Holme*, 35 A.D.3d 93, 100 (1st Dep't. 2006) ("[W]hen the party to whom a misrepresentation is made has hints of its falsity, a heightened degree of diligence is required of it. It cannot reasonably rely on such representations without making additional inquiry to determine their accuracy. When a party fails to make further inquiry or insert appropriate language in the agreement for its protection, it has willingly assumed the business risk that the facts may not be as represented").
196

President Reagan's "Remarks on Signing the Intermediate-Range Nuclear Forces Treaty," December 8, 1987:

> [The President.] But the importance of this treaty transcends numbers. We have listened to the wisdom in an old Russian maxim. And I'm sure you're familiar with it, Mr. General Secretary, though my pronunciation may give you difficulty. The maxim is: Dovorey no provorey -- trust, but verify.
> The General Secretary. You repeat that at every meeting. [Laughter]
> The President. I like it. [Laughter]

http://www.reagan.utexas.edu/archives/speeches/1987/120887c.htm
197

ADIA Post-Hearing Br. at 49, citing "J-1432; J-1064; J-4792; J-1618; J-4873; J-1486; J-0964; Tr. (8) 2980:14-2981:20, 2992:3-16."
198

ADIA Post-Hearing Reply Br. at 24.
199

*Id.* at 48-49, citing "*Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 229-30 (S.D.N.Y. 2007) (one plaintiff, a sophisticated hotel owner/operator, could not establish reasonable reliance, but other plaintiff, a "somewhat less sophisticated" contractor, could have established such reliance and gone forward with claim if defendant had made same representation to this plaintiff as to first plaintiff), *aff'd* 354 F. App'x 496 (2d Cir. 2009); *Generale Bank v. Choudhury*, 779 F. Supp. 306, 309-10 (S.D.N.Y. 1991)."
200



201

Agreement §1.3.



*Terra Sec. Asa Konkursbo v. Citigroup,*
*Inc.,* 740 F. Supp. 2d 441, 449 (S.D.N.Y. 2010) is on point:

> The Court thus turns to consideration of whether Terra and Banca Carige are sophisticated
> financial entities that, as a matter of law, could not have reasonably relied on the alleged
> misrepresentations. Representations by a plaintiff that it had "knowledge and experience in
> financial and business matters and that it could readily evaluate the risks of the transaction"
> can indicate sophistication for the purposes of this analysis. *Emergent Capital*, 343 F.3d at
> 196.

202

Citigroup Post-Hearing Reply Br. at 23 n.41. We agree with Citigroup that the preponderance
of relevant case law focuses on overall sophistication, not specific knowledge of the subject matter at
issue. Thus, for example, we find persuasive the approach and reasoning of Judge Marrero in *Terra
Sec. Asa Konkursbo v. Citigroup, Inc.,* 740 F. Supp. 2d 441 (S.D.N.Y. 2010), in which he rejected a
contention that the sophistication that a Norwegian securities firm and an Italian bank may have had
didn't apply to the U.S. bond market, since "sophistication in this context is territorially limited and
issue-specific." *Id.* at 451 n.8. According to Judge Marrero, "the duty so circumscribed misstates the
applicable standard. While the sophistication of an investor in a specific financial sector may be
relevant, Plaintiffs point to no authority that would shield a foreign financial firm from the duty to
conduct their own research and analysis of United States-based investments and publicly-available
interest rates. In any event . . . Terra and Banca Carige explicitly represented that they had the
sophistication and know-how to conduct their own independent appraisal of the FLN investments."
*Id.*

203



(1) 280:12-16, (2) 496:4-8; (4) Tr. 1492:8-11.

204

205

206

*E.g., Id.* 391:21-0392:11; 719:15-720:2.

207

208

(C-05) ¶61.

209



213    *E.g., Yurish v. Sportini*, 123 A.D.2d 760, 761-62 (2d Dep't 1986).

214    *E.g., Rodas v. Manitaras*, 552 N.Y.S.2d 618, 619-20 (1st Dep't 1990).

     *E.g., Bibeault v. Advanced Health Corp.*, 2002 WL 24305, at *5 (S.D.N.Y. Jan. 8, 2002) ("If [defendant's] representation … had been essential to [plaintiffs] decision, the parties could have easily included that representation in the [contract]. Their failure to [use] that inexpensive alternative prevents [plaintiff] from claiming the peculiar knowledge exception."); *Permasteelisa, S.p.A. v. Lincolnshire Mgmt., Inc.*, 16 A.D.3d 352, 352 (1st Dep't 2005); *Century Pac., Inc. v. Hilton Hotels Corp.*, 354 F. App'x 496, 499 (2d Cir. 2009); *Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 76 A.D.3d 310, 320 (1st Dep't 2010); *Ambac Assur. Corp. v. DLJ Mortg. Capital, Inc.*, 2011 WL

1348375, at *11 (Sup. Ct. Apr. 7, 2011); *Curran, Cooney, Penney, Inc. v. Young & Koomans, Inc.,* 183 A.D.2d 742, 743 (1st Dep't 1992).

215

   ADIA Stmt. of Claim ¶25.

216

   ADIA Post-Hearing Br. at 1.

217

   *Id.* at 1.

218

   *Id.*

219

   ADIA Pre-Hearing Br. at 9.

220

   ADIA Stmt. of Claim ¶40.

221

**Redaction**

**Redaction**

   *See, e.g., Centro Empresarial Cempresa S.A. v. América Móvil, S.A.B. de C.V.,* 76 A.D.3d 310, 320 (1st Dep't 2010)(citations omitted).

   "[T]he allegations of the complaint make clear that plaintiffs entered into the 2003 transaction well aware that defendants had not given them access to the internal financial records of Conecel. If plaintiffs did not intend to release claims of fraud concerning the value of Conecel that they might discover in the future, they should have insisted on access to Conecel's internal books and records instead of relying on public filings and the limited documentation and oral representations defendants provided. If defendants would not provide access to the internal books and records voluntarily, plaintiffs could have sued for such access under the terms of their existing agreements with defendants.

   More fundamentally, if plaintiffs did not wish to forgo suing on a fraud claim they might discover in the future, these sophisticated and well-counseled entities should have insisted that the release be conditioned on the truth of the financial information provided by defendants (whether directly or through public filings) on which plaintiffs were relying. In

essence, by entering into the 2003 sale of their interests in reliance on defendants' unverified representations concerning Conecel's financial condition, without inserting into the agreement "a prophylactic provision . . . to ensure against the possibility of misrepresentation" plaintiffs "may truly be said to have willingly assumed the business risk that the facts may not be as represented."

[225]

*E.g., Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 228-30 (S.D.N.Y. 2007), *aff'd*, 354 F. App'x 496 (2d Cir. 2009) (citations omitted; emphasis added):

> Century's representatives explicitly negotiated with Hilton regarding its right to sell Red Lion. They testified to their awareness of the risks created by Hilton's right to sell and to their attempt to eliminate such rights from the contract. Century was partially successful, negotiating the Three-Year Window provision allowing it to terminate the franchise agreement if Hilton sold the Red Lion chain during a specified period. Taken as a whole, the transaction was of substantial magnitude for Century but, although fairly called a complex transaction, there is no evidence this franchise agreement was especially complex in the context of the type of business transactions with which Century was familiar
>
> Applying the *Lazard Freres* factors: (1) this was precisely the type of transaction within Century's expertise and experience and was of a magnitude to focus Century's corporate attention; (2) Century was a sophisticated party, represented by counsel, that understood the nuances of the franchise agreement and the issues at stake; and (3) the content of the Agreement and the negotiation history expressly reflect Century's awareness of the issue of which it now complains, that is, Hilton's right to sell the Red Lion brand. Weighing these factors, the Court finds, based on the undisputed facts, that Century could not reasonably have relied on the alleged material false representations. *Century understood the risk of a Red Lion sale, it bargained for certain protections against them, and it reached its own decision to bet that Hilton's interests in the future of the Red Lion brand would be beneficial to it.*

*See Superior Tech. Res., Inc. v. Lawson Software, Inc.*, 2007 WL 4291575, at *5, *10-11 (N.Y. Sup. Ct. December 7, 2007) ("[W]here the specific alleged misrepresentations are contradicted by or expressly negated by the contract, such extrinsic evidence is inadmissible to establish fraud in the inducement and, in addition, the plaintiff cannot establish reasonable reliance"); *Bango v. Naughton* 184 A.D.2d 961, 963 (3d Dep't 1992) ("[T]he rationale underlying the decisions of the Court of Appeals in *Danann Realty Corp. v Harris* (*supra*) and *Citibank v Plapinger* (66 N.Y.2d 90, 95-96) applies in any case where, as here, an express provision in the written contract contradicts the claimed oral representations in a meaningful fashion").

[226]

Citigroup also argues that ADIA's negligent misrepresentation claim is barred by New York's Martin Act, contending that the Act preempts private common-law claims in transactions involving the sale of securities that could also be the subject of a state enforcement action. Citigroup Post-Hearing Br. at 27, n.43. This issue is now *sub judice* in the New York Court of Appeals. ADIA Post-Hearing Reply Br. at 22, n.17. In light of our other negligent-misrepresentation-related decisions, we do not address this issue, although we note our agreement with ADIA that the better-reasoned precedents support no preemption. We also note the anti-preemption views expressed by the New York Attorney General in the *amicus* brief cited by ADIA.

[227]

*See, e.g., Joao v. Cenuco, Inc.*, 376 F. Supp. 2d 380, 382 (S.D.N.Y. 2005).

[228]

Citigroup Post-Hearing Reply Br. at 21.

[229]

Citing, "*E.g., Calcutti v. SBU, Inc.*, 224 F. Supp. 2d 691, 701-02 (S.D.N.Y. 2002); *Hutton Constr. Co., Inc. v. Rockland County Sewer Dist. No. 1*, 1990 WL 64661, at *1 (S.D.N.Y. May 4, 1990) ("To the

extent plaintiff alleges misrepresentation in contrast to unwitting or negligent failure to disclose, the claim sounds in fraud"); *In re Argo Comm'cs Corp.*, 134 B.R. 776, 795 (Bankr. S.D.N.Y. 1991) (similar)."
230

ADIA Post-Hearing Reply Br. at 22.
231

*Terra Firma Investment (GP) 2 Ltd. v. Citigroup, Inc.*, 2010 WL 4455833, at *2,*5 (S.D.N.Y. Nov. 4, 2010) (U.K. law); *Schwartz v. Martin*, 919 N.Y.S.2d 217, 219 (2d Dep't 2011).
232

*Calcutti*, 224 F. Supp. at 701.

The *Argo* court, which provided a more extensive analysis of the issue, stated that its plaintiff "alleges both fraudulent and negligent misrepresentation. Both claims are based on facts that, read in a light most favorable to the plaintiff, allege fraudulent conduct." It noted the *Ambassador* court's holding that a fraud's six-year statute also applied to negligent misrepresentation claims, citing its reasoning that "because such a claim 'depends on the act of misrepresentation, be it negligent or intentional, the action essentially sounds in fraud." The court then found that under *Ambassador* and other applicable authorities, "in situations where negligent misrepresentation is alleged according to facts that also state a cause of action for fraud," a six-year statute would apply, and stated that its "holding" was "limited" to such "situations." By contrast, the court stated that if "the charge of negligent misrepresentation" were "viewed strictly in negligence, the claim would be time-barred by [a] three-year limitations period." *Argo*, 134 B.R. at 795-96 (citations omitted).
233

*Hutton Construction, supra*, at *1.
234

*Id.*
235

In contending that "Citi at least engaged in negligent misrepresentation," ADIA made the appropriate point that the elements of proof for negligent misrepresentation are less stringent than those for fraud: "Even if this Tribunal were to find that the evidence . . . does not demonstrate knowledge or reckless on Citi's part sufficient to find Citi liable for fraud, there can be no question that Citi negligently misrepresented facts to ADIA. . . ." ADIA Post-Hearing Br. at 50.
236

In support of its contention that "The NDA Preserves ADIA's Negligent Misrepresentation Claim," ADIA also argues that it "has demonstrated that the boilerplate disclaimers in the Investment Agreement are not enforceable and do not preclude ADIA's reasonable reliance on Citi's false information and misrepresentations. The same arguments apply to the NDA." ADIA Post-Hearing Reply Br. at 22-23 (citation omitted). If the NDA's "save in the case of fraud" language could have been interpreted to save negligent misrepresentation claims as well, then we would have needed to decide whether ADIA had proved the elements of negligent misrepresentation, including reasonable reliance, and would have analyzed the issue in much the same way we have in considering whether ADIA proved reasonable reliance in its fraud case, albeit under a preponderance of the evidence standard. Since the Parties agreed contractually to bar negligent misrepresentation claims, we need not reach this question.
237

*Hydro Investors, Inc. v. Trafalgar Power, Inc*, 227 F.3d 8, 20 (2d Cir. 2000).
238

*Kimmell v. Schaefer*, 89 N.Y.2d 257, 263-64 (1996)
239

ADIA Post-Hearing Reply Br. at 23, citing *In re Merrill Lynch Auction Rate Sec. Litig.*, 758 F. Supp. 2d 264, 281 (S.D.N.Y. 2010); *Scognamillo v. Credit Suisse First Boston LLC*, 2005 WL 645446, at *3 (N.D. Cal. Mar. 21, 2005); *Capital Bank v. MVB, Inc.*, 644 So.2d 515, 519-20 (Fla. App. 3d Dist. 1994).
240

*Id.*

---

241

J-1432.

242

ADIA Post-Hearing Reply Br. at 24.

243

Quoting *Kimmell*, 89 N.Y.2d at 263.

244

Citigroup Post-Hearing Br. at 3.

245

Citigroup Post-Hearing Reply Br. at 21-22, citing *Brady v. Lynes*, No. 05-CV-6590, 2008 WL 2276518, at *7 (S.D.N.Y. June 2, 2008).

246

*Id.* at 22.

247

*Kimmell*, 89 N.Y.2d at 264.

248

ADIA Post-Hearing Reply Br. at 25 n. 21.

249

Citigroup Post-Hearing Reply Br. at 25 (quoting *Gusmao v. GMT Grp., Inc.*, 2008 WL 2980039, at *15 (S.D.N.Y. Aug. 1, 2008)). *See* cases collected *Id.* at 25-26 n 45.

250

<span style="background:black;color:white">Redaction</span> (2) 422:8-12.

251

*See* record citations collected in Citigroup Post-Hearing Br. at 40-41.

252

J-0246 §2(c)(4).

253

The elements of the arms-length relationship between ADIA and Citigroup are persuasively set out in Citigroup's Post-Hearing Brief at 32-34.

254

*Murphy* v. *Kuhn*, 90 N.Y.2d 266, 269 (1997) (no "special relationship" despite "long, continuing course of business between plaintiffs and defendant"); *Royal Bank of Can.*, 2010 WL 3294302, at *34 ("The fact that [the parties] had prior dealings does not elevate this arms-length transaction into a relationship of trust and confidence.").

255

There is no contradictory evidence from ADIA on this point.

256

Klein Tr. (12) 4469:24-4470:16, 4604:2-12; *see also* 4604:20-4605:5, 4606:5-14.

257

J-0604b at 2.



J-0604c at 2.



261    (2) 422:2-423:5.

262    J-0893 at 6.

263    *Id.* at 7.



265    ADIA Post-Hearing Br. at 52.

266    *Kimmell*, 89 N.Y.2d at 264.

      *E.g., Gusmao v. GMT Grp., Inc.,* 2008 WL 2980039, at *15 (S.D.N.Y. Aug. 1, 2008) ("knowledge of the particulars of [a] company's business[,] and of the true situation underlying the misrepresentations pertaining to that business . . . does not constitute the type of 'specialized knowledge' that is required in order to impose a duty of care in the commercial context."); *MBIA Ins. Co. v. Residential Funding Co., LLC,* 2009 WL 5178337, at *5 (Sup. Ct. Dec. 22, 2009) ("[A] company's knowledge of the particulars of its own business is not the type of unique or specialized knowledge that the Court of Appeals was talking about in *Kimmell*.").

267    *Kimmell*, 89 N.Y.2d at 263, quoting *International Products Co. v. Erie R.R. Co.* 244 N.Y. 331, 338 (1927).

268    *Musalli Factory for Gold & Jewellry v. JP Morgan Chase Bank, N.A.,* 261 F.R.D. 13, 28 (S.D. N.Y. 2009).

269    *De Kwiatkowski v. Bear Stearns & Co.,* 306 F. 3d 1293, 1308 (2d Cir. 2002).

270    ADIA Post-Hearing Br. at 54.

271    Crittenden Witness Stmt. (R-9) ¶ 23; Dickson Witness Stmt. (R-10) ¶¶ 23-36; Kelly Witness Stmt. (R-11) ¶¶ 12-18.

272    Tribunal's March 31, 2011, Statement of Reasons at 4.

273    ADIA Post-Hearing Br. at 55.

274    Citigroup Post-Hearing Reply Br. at 33-35.

275    J-1024 at 2.

276    J-2910.

277    A "claim" is defined as: (1) a demand for something due or believed to be due; (2) a right to something, specifically: a title to a debt, privilege, or other thing in the possession of another; (3)

something that is claimed, especially: a tract of land staked out. Merriam-Webster online dictionary, http://www.merriam-webster.com/dictionary/claim?show=1&t=1316390106.

278

Nor is the Citigroup-internal email, J-2910, evidence of an ADIA "written notice of a claim."

279

*Suarez v. Ingalls*, 723 N.Y.S.2d 380 (2d Dep't 2001); Schwartz v. Fortune Magazine, 89 F. Supp. 2d 429 (S.D.N.Y. 1999).

280

*Schwartz*, 89 F. Supp. 2d at 433 ("¶ 32 of the contract only requires that plaintiff be given written pretermination notice; it is silent about what the written notice should say. Given ¶32's ambiguity, the court concludes that Boatwright's February 12, 1998, letter, when coupled with the phone conversations he had with plaintiff that day, were sufficient to inform plaintiff that the contract was coming to an end and that the pre-termination notice period had begun.")

281

282   *Suarez*, 282 A.D.2d at 600.

**Redaction**

[black redaction boxes]

**Redaction** (C-02) ¶¶133-34.

285

286   *Id.*

*Cf. Roni LLC v. Arfa*, 903 N.Y.S. 2d 352, 355 (1st Dep't 2010)

287

Dharan Tr. (3) 1183-84.

288

*Id.* at 1184.

289

*Id.* at 1230-31.

290

*Id.*

291

*Id.* at 1241-42.

292

J-3884 at 15-16 (¶15), Schipper Tr. (9) at 3608.

The relevant text of FIN 46R, ¶15, is:

The enterprise that consolidates a variable interest entity is called the primary beneficiary of that entity. An enterprise shall determine whether it is the primary beneficiary of a variable

interest entity at the time the enterprise becomes involved with the entity. An enterprise with an interest in a variable interest entity shall reconsider whether it is the primary beneficiary of the entity if the entity's governing documents or contractual arrangements are changed in a manner that reallocates between the existing primary beneficiary and other unrelated parties (a) the obligation to absorb the expected losses of the variable interest entity or (b) the right to receive the expected residual returns of the variable interest entity. The primary beneficiary also shall reconsider its initial decision to consolidate a variable interest entity if the primary beneficiary sells or otherwise disposes of all or part of its variable interests to unrelated parties or if the variable interest entity issues new variable interests to parties other than the primary beneficiary or the primary beneficiary's related parties. A holder of a variable interest that is not the primary beneficiary also shall reconsider whether it is the primary beneficiary of a variable interest entity if that enterprise acquires additional variable interests in the variable interest entity. A troubled debt restructuring, as defined in paragraph 2 of Statement 15, as amended, shall be accounted for in accordance with that Statement and is not an event that requires the reconsideration of whether an enterprise is the primary beneficiary of the variable interest entity.

293     Schipper Tr. (9) 3606; J-3345.

294     J-3169 at 6.

295     Id. at 5.

296     Schipper Tr. (9) 3620.

297     Id. 3615.

298     J-3169 at 5.

299     Id.

300     Dharan Tr. (3) 1185.

301     Id. 3619.

302     Id. 3658.

303     In his testimony, Dr. Dharan criticized Citigroup's absence of quantitative analysis leading up to its December 13th decision to consolidate the SIVs. This troubled him because he could not determine why Citigroup consolidated at that point and not (say) prior to December 3rd. But Dr. Schipper credibly testified that under FSP FIN 46R-5, Citigroup's December 13th commitment to create a new support facility for the SIVs potentially resulted in the creation of a new Citigroup variable interest in the SIVs. Under Citigroup's analysis, this new interest did result in Citigroup becoming the primary beneficiary of the SIVs. Schipper Tr. (9) 3620-24; J-5395; J-3885.

Dr. Schipper also persuasively testified that a quantitative analysis was not possible as of December 3rd because certain terms of the new support facility, as well as the precise actions Citigroup intended to take to resolve SIV senior debt issues, were still unspecified. Schipper Tr. (9) at 3625-26. Citigroup instead performed a qualitative analysis, which was reasonable under FIN 46R. Id. The new support facility and other actions involved a change in contractual arrangements as well as the possibility that the size of the variable interest created by the commitment would be large enough "to give Citigroup a majority of the variability of each SIV." Schipper Tr. (9) 3627, 3656-57. ADIA did not rebut this testimony.

-------

The Tribunal has also taken into account Citigroup's proffered evidence regarding noteholder pressure, leading to the Citigroup decision to create the support facility.

[304] Kleidon Tr. (10) 4121:7-23.

[305] *Id.* 4102:4-22.

[306] *Id.* 4109:20, 4111:5, 4119:8-16.